**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**AT SEATTLE**

| | |
|---|---|
| DOTCOM LLC,<br><br>Petitioner,<br><br>v.<br><br>AMAZON.COM SERVICES LLC, a Delaware limited liability company; and AMAZON.COM, INC., a Delaware corporation,<br><br>Respondents. | Case No. 2:25-cv-943<br><br>**VERIFIED PETITION TO VACATE ARBITRATION AWARD** |


AMZ SELLERS ATTORNEY
9350 Wilshire Blvd #203, Beverly Hills CA 90212
Tel: (310) 867-6072

Petitioner, DOTCOM LLC ("Petitioner"), herewith submits the following Petition to Vacate the Arbitration Award in this matter, and states as follows:

## I. PRELIMINARY STATEMENT

1. Petitioner seeks an Order from this Court pursuant to the Federal Arbitration Act ("FAA") §12 to vacate the Award of the AAA Arbitrator Jennifer Lupo, issued and signed on April 7, 2025, in AAA Case No. 01-24-0003-2039 (the "Award") a true copy of which is attached hereto and incorporated by reference herein as Exhibit 1.

## II. THE PARTIES

2. Petitioner, DOTCOM LLC, is a single member limited liability company, organized under the laws of the state of Pennsylvania, whose member, EBRU GURLER, is a resident of the state of Pennsylvania.

3. Respondent AMAZON.COM, INC. is a Delaware corporation with its principal place of business in Seattle, Washington. Respondent AMAZON.COM SERVICES, LLC is a limited liability company organized under the laws of the state of Rhode Island with its principal place of business in Seattle, Washington. Both Respondents are collectively referred to herein as "Amazon."

## III. JURISDICTION AND VENUE

4. The Court has subject matter jurisdiction over this petition under 28 USC §1331, in that the underlying arbitration award was made pursuant to the New York Convention on the Recognition and Enforcement of Foreign Arbitral Awards and the FAA, and 9 USC §203, in that the arbitration award is not entirely between citizens of the United States. The Court also has diversity jurisdiction under 28 USC §1331, in that Petitioner and Respondents are citizens of different states.

5. Venue is proper in this judicial district, pursuant to 29 USC §1391, as Respondents have sufficient minimum contacts with this judicial district, as:

a. Respondents' headquarters are in Seattle, Washington;

b. Respondents, from their headquarters in Seattle, Washington, operate the world's largest online retail platform which provides goods and services to millions of residents of this judicial district;

c. The goods which were sold and which are the subject of the funds sought by Petitioner were sourced from retail sources in this judicial district;

d. Those goods were warehoused by the Petitioner's third-party warehouse provider in this judicial district; and

e. Said goods were distributed to Amazon's fulfillment center warehouses in this judicial district, where they were subsequently sent to customers.

## IV. FACTS

6. Petitioner, DOTCOM LLC, filed a demand for arbitration ("Demand") on March 19, 2024, with the American Arbitration Association ("AAA"), Case No. 01-24-0003-2039, a true copy of which is attached hereto and incorporated by reference herein as Exhibit 2.

7. The Demand asserted claims for damages for breach of contract, conversion, and attorney's fees and costs: 1) Alleging that Respondents breached their contract (the "Business Solutions Agreement" or "BSA", a true copy of which is attached hereto and incorporated by reference herein as Exhibit 3) with Petitioner by failing to disburse net proceeds of sales for goods entrusted to Amazon by Petitioner which were sold on Petitioner's behalf, and for which Amazon was obligated to disburse to Petitioner pursuant to Section S-5 of the BSA; 2) Converting said proceeds to Respondents' own use; and 3) For damages, treble damages, and attorney's fees and costs pursuant to the BSA and under Washington's Consumer Protection Act ("CPA") RCW 19.86.010, et seq.

8. Section 18 of the BSA provides, among other things, for all disputes between the parties to be resolved by binding arbitration.

9. Section 8 of the BSA provides, in pertinent part, as follows: "WE WILL NOT BE LIABLE (WHETHER IN CONTRACT, WARRANTY, TORT (INCLUDING NEGLIGENCE, PRODUCT LIABILITY, OR OTHER THEORY), OR OTHERWISE) TO YOU OR ANY OTHER PERSON FOR

COST OF COVER, RECOVERY, OR RECOUPMENT OF ANY INVESTMENT MADE BY YOU OR YOUR AFFILIATES IN CONNECTION WITH THIS AGREEMENT, OR FOR ANY LOSS OF PROFIT, REVENUE, BUSINESS, OR DATA OR PUNITIVE OR CONSEQUENTIAL DAMAGES ARISING OUT OF OR RELATING TO THIS AGREEMENT, EVEN IF AMAZON HAS BEEN ADVISED OF THE POSSIBILITY OF THOSE COSTS OR DAMAGES. FURTHER, OUR AGGREGATE LIABILITY ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED WILL NOT EXCEED AT ANY TIME THE TOTAL AMOUNTS DURING THE PRIOR SIX MONTH PERIOD PAID BY YOU TO AMAZON IN CONNECTION WITH THE PARTICULAR SERVICE GIVING RISE TO THE CLAIM." This clause is invalid pursuant to public policy. *See Shaffer v. Amazon Services, LLC*, 2:11-bk-28944-DPC Adversary No. 2:13-ap-00799 (2021).

10. Section 2 of the BSA provides in pertinent part: "*If we **determine** that your account—or any other account you have operated—has been used to engage in deceptive, fraudulent, or illegal activity (including the sale of counterfeit goods), or to repeatedly violate our Program Policies, then we may in our sole discretion permanently withhold any payments to you.*"

11. On May 13, 2024, AAA appointed Jennifer Lupo as arbitrator (the "Arbitrator" or "Arbitrator Lupo") to preside over the arbitration.

12. Pursuant to Section 18 of the BSA, the Petitioner elected to conduct the arbitration by written submissions and the parties simultaneously submitted opening briefs, declarations and exhibits on September 27, 2024 and responsive briefs on October 11, 2024. Petitioner's briefs requested the Arbitrator to declare unenforceable Section 2 of the BSA as procedurally and substantively unconscionable and to declare Section 2 of the BSA a penalty clause, not enforceable under Washington law as a liquidated damages clause. They further requested the Arbitrator to rule as against public policy Section 8 of the BSA and to award damages to Petitioner for loss of profits.

13. On June 22, 2024, Arbitrator Lupo issued a Scheduling Order, recognizing the parties' request for a reasoned award pursuant to AAA Commercial Rule 48-b. A true copy of said Order is attached hereto and incorporated by reference herein as Exhibit 4.


AMZ SELLERS ATTORNEY
9350 Wilshire Blvd #203, Beverly Hills CA 90212
Tel: (310) 867-6072

14. On April 7, 2025, Arbitrator Lupo issued the Award, a true copy of which is attached hereto as Exhibit 1, ruling, in manifest disregard of the law, the following:

a. Without making the analysis required by law to determine unconscionability, nor the analysis to determine whether Section 2 of the BSA is a liquidated damages clause or is unenforceable, which were fully briefed on both sides, the Arbitrator ruled, in her reasoned award, "While Amazon suspended Claimant's account alleging it was a de facto alter ego of MIB SHOP, the arbitrator searched the record and is not convinced sufficient evidence has been presented to substantiate and suspension and withholding of the Claimant's seller account for these reasons. However, Claimant has not submitted sufficient evidence to meet the burden of proof that it did not violate Respondent's intellectual property and anti counterfeit policies. Respondents may retain the monies within the Claimant's seller account pursuant to the *Amazon Funds Withholding Policy Amazon Funds Withholding Policy* (sic) due to Claimant's (i) misrepresentation of its affiliation with MIB SHOP's ownership and (ii) violation of Amazon's intellectual property and anticounterfeit policies. For the foregoing reasons, Claimant's first claim in the demand is denied and dismissed with prejudice."

b. The arbitrator irrationally failed to determine whether Section 2 contained a liquidated damages clause and failed to apply the two-part test of enforceability of liquidated damages clauses mandated by the Washington State Supreme Court in *Watson v. Ingram*, 124 Wn.2d 845, 881 P.2d 247 (Wash. 1994).

c. In complete disregard of the Washington Consumer Protection Act, Arbitrator Lupo irrationally ruled, "The BSA (Exhibit 1 annexed to the Statement of Claim) is an agreement each party agrees controls the dispute. The Claimant and the Respondent are commercial entities. Claimant's fourth claim in the demand is dismissed with prejudice."

15. Pursuant to 9 USC §12, Petitioner has brought this action within three months after the Award was finally delivered on April 7, 2025.

16. The Award should be vacated under 9 USC §10 because:

a. There was evident partiality in the Arbitrator;

b. The Arbitrator irrationally manifestly disregarded the law of substantive unconscionability and liquidated damages;

c. The Arbitrator irrationally ruled the Washington Consumer Protection Act was not applicable to the case.

**COUNT ONE: VACATUR OF ARBITRATION AWARD UNDER FAA**

17. Petitioner hereby repeats and realleges each and every allegation of paragraphs 1 through 16, as though set forth herein.

18. By reason of the foregoing, the Court should issue an order vacating the Arbitration Award annexed hereto as Exhibit 1 issued by the American Arbitration Association ("AAA") on April 7, 2025, and remand the matter to the AAA for the appointment of a new arbitrator and disposition.

WHEREFORE, Petitioner respectfully requests this Court to:

1. Issue an Order pursuant to 9 USC §10 vacating the Arbitration Award annexed hereto as Exhibit 1 issued by the American Arbitration Association ("AAA") on April 7, 2025;
2. Remand the matter to the AAA for the appointment of a new arbitrator and disposition; and
3. For such other and further relief as the Court may deem just and proper.

///

///

///

DATED: May 2, 2025

Respectfully submitted,

AMZ SELLERS ATTORNEY
*Attorneys for Petitioner*

By: *s/ Michael S. Brandt*

Michael S. Brandt, WSBA #29200
9350 Wilshire Blvd, Suite 203
Beverly Hills, CA 90212
Telephone: (310) 867-6072
Email: michael@amazonsellers.attorney
brandtmichaelsteven@gmail.com

**VERIFICATION**

I, EBRU GURLER, hereby declare as follows:

I am the sole member of DOTCOM LLC, the Petitioner in this matter. I have read the forgoing petition and know the contents thereof.

The matters stated in it are true of my own knowledge except as to those matters which are stated on information and belief, and as to those matters I believe them to be true.

I declare under penalty of perjury under the laws of the State of Washington that the foregoing is true and correct.

Executed this 5 day of May 2025, at 9:30am.

[signature]

EBRU GURLER


AMZ SELLERS ATTORNEY
9350 Wilshire Blvd #203, Beverly Hills CA 90212
Tel: (310) 867-6072

# EXHIBIT 1

**AMERICAN ARBITRATION ASSOCIATION**
Commercial Arbitration Tribunal

In the Matter of the Arbitration between

Case Number: 01-24-0003-2039

DOTCOM LLC,
(the "Claimant"),
-vs-

Amazon.com Services, LLC and Amazon.com, Inc.,

(the "Respondents").

## FINAL AWARD OF ARBITRATOR

I, Jennifer Lupo, THE UNDERSIGNED ARBITRATOR, having been designated in accordance with the arbitration agreement entered into by the above-named parties, having been duly sworn, and oral hearings having been waived in accordance with the Rules, and having fully reviewed and considered the written documents submitted to me by the parties, each represented by counsel, do hereby issue this FINAL AWARD as follows:

## I. BACKGROUND

### A. THE PARTIES, THEIR REPRESENTATIVES, AND THE ARBITRATOR

Claimant: DOTCOM LLC by Amazon Sellers Attorney, Ltd., Kenneth G. Eade, Esq., and Michael Brandt, Esq.

Respondents: Amazon.com Services, LLC and Amazon.com, Inc., by Davis, Wright Tremaine, LLP., John Goldmark, Esq. and Ian Harris, Esq.

Each a "Party" and collectively, the "Parties".

Arbitrator: Jennifer Lupo, Esq.

### B. THE RELEVANT CONTRACT, DISPUTE RESOLUTION CLAUSE, AND APPLICABLE LAW

- The agreement to arbitrate and choice of law are found at Section 18, Miscellaneous, of the Amazon Services Business Solutions Agreement and ancillary policies (collectively the "BSA").

- Governing Laws means the applicable of one of the following:

  a. the laws of the State of Washington, United States together with the Federal Arbitration Act and other applicable federal law (if the Elected Country is Canada, Mexico, or the United States).

The elected country of this Arbitration is the United States of America.

## II. PROCEDURAL HISTORY

- The Demand for Arbitration together with ancillary documents (the "Demand") was filed March 20, 2024.
- Respondents Answer (the "Answer") is dated April 12, 2024.
- The Arbitrator was duly appointed on May 18, 2024 in accordance with the arbitration agreement and the Commercial Rules of the American Arbitration Association ("Rules") effective September 1, 2022, as amended.
- A Preliminary Hearing was held on June 17, 2024. The Parties appeared by counsel. The Parties elected a Desk Only Arbitration and Reasoned Award.
- A Preliminary Hearing Order was effective June 22, 2024.
- Claimant sought an enlargement of time to complete its deposition which was granted allowing the deposition to be completed by November 4, 2024
- On October 23, 2024, Order 2 was entered enlarging the time for the Parties hearing submissions and responses.
- The Parties submitted: moving briefs, responsive briefs, an amended responsive brief and a variety of exhibits and cases for consideration by the arbitrator.
- The hearing was closed on January 20, 2025, reopened February 13, 2025, and re-closed March 13, 2025.

## III. DISCUSION

### A. FACTUAL ALLEGATIONS.

Claimant was an Amazon.com seller before its account was suspended and seller account funds withheld for violation of one or more BSA or ancillary agreement(s) terms. The corporate Claimant is a single member LLC whose principal is Ebru Gurler. Claimant alleges that "Amazon deactivated the Claimant's seller account on April 28, 2022, stating that Claimant had another seller account, MIB SHOP, which was enforced for violating Amazon's policies." See Demand for Arbitration (Demand). While denying ownership of MIB SHOP, Claimant's principal, Ms. Gurler, admitted to having been employed by MIB SHOP. Both MIB SHOP and DOTCOM LLC are located at the same address and Ms. Gurler's credit card backed each seller's Amazon seller account.

The process to reactivate the Claimant's account was set out in the deactivation notice Indeed, Respondents specified how to dispute being identified as the owner of MIB SHOP as follows:

> *If you believe you do not own the other account, please follow the below steps:*
>
> *1. If you once owned the account/were a rights owner but no longer own it/no longer have account rights, please submit an appeal following this https://sellercentral.amazon.ca/performance/notifications and provide supporting documentation to show that you no longer own it/no longer have any relationship to this account. Supporting documentation may include sales deed, purchase agreement, or business transfer agreement, contract termination, etc.*

> *2. If you do not recognize the above account and believe this de-activation was in error, please submit an appeal following this link: https://sellercentral.amazon.ca/performance/notifications and confirm that this account does not belong to you.* ***If we cannot substantiate the claim, your account will not be reinstated, and this account will not be allowed to do business on Amazon in the future.*** (emphasis added).

If the notice information was insufficient, the seller central web pages on the amazon.com website also have information regarding the issue. The BSA makes clear that sellers must provide accurate identity information to Amazon and update it as needed. At section 1 it reads:

> [a]s part of the application, you must provide us with your (or your business') legal name, address, phone number and e-mail address. We may at any time cease providing any or all of the Services at our sole discretion and without notice. Given the importance of verifying the identity of sellers with whom Amazon does business; *Amazon has implemented sophisticated systems to identify and remove sellers who attempt to evade identity-related policies, including those who attempt to create accounts using false or purchased identities.* (Emphasis Added).

Amazon Funds Withholding Policy states:

> If we find that you have engaged in *deceptive*, fraudulent, or *illegal activity*, have abused our systems, or *repeatedly violated our policies that protect our customers* and sellers, we may withhold some or all funds in your account. Examples of deceptive, fraudulent, or illegal activities include, but are not limited to: falsifying or *misrepresenting your identity*, *violating Amazon's anticounterfeit policy,* or submitting forged documents to Amazon. (Emphasis Added).

## B. STANDARD OF REVIEW

R 32(a) requires that "[t]he claimant must present evidence to support its claim. Claimant bears the burden of presenting evidence to support every element of each claim it has alleged against Respondents and demonstrating that it is entitled to judgment on one or more of these claims."

## C. CLAIMS

Claimant pleads the following claims against each Respondents:

- **i.** Breach of Contract
- **ii.** Conversion
- **iii.** Unjust Enrichment
- **iv.** Unfair Trade Practices Under Washington Consumer Protection Act

## D. DISCUSSION OF CLAIMS AND LAW

### i. Breach of Contract

The burden of proof lies with Claimant, and it must be met for each of the elements of each claim to prevail.
The elements for a breach of contract claim are that: (i) the contract, (ii) Claimant's performance or excuse for nonperformance, (iii) Respondents' breach, and (iv) the resulting damages to Claimant. The Parties do not dispute that the BSA is a valid and binding contract governing this dispute. The standard burden of proof for contract under Washington law is preponderance of the evidence. The burden of proof lies with Claimant and it must be met for

each of the elements of each claim to prevail. To open a seller account, Claimant completed the online seller account application, accepted the terms and conditions of the BSA (a condition of opening and operating the account), and provided her bank account and credit card information for payments to, and disbursements from, Respondents. See Harris Decl. ¶ 9, Ex. R8.

By agreement, Ebru Gurler, Claimant's corporate representative, was deposed. See Harris Decl. ¶ 10, Exs. R9, R10, R11. She has also submitted a sworn declaration in support of Claimant's claims. At paragraph 1, she states that she is the sole member of the corporate Claimant and that she has been actively managing her business since inception. At her deposition, she testified:

> Counsel for Amazon: "What day did you register the DOTCOM LLC seller account?"
>
> Claimant: "You're asking about the registration date. I don't have my notes with me. In fact, I don't have anything on my mind. Perhaps it was in 2020. I'd have to review my notes." R-8 at 36:17-20.

Claimant created and registered the DOTCOM seller account on December 13, 2017. *See* Ex. R8.

…

Claimant admits Ebru Gurler, was an employee of MIB Shop though she was unable to recall when or for how long she was employed by the MIB SHOP seller account, testifying she started working for him "roughly around 2017." See Ex. R12 43:13-14. Ms. Gurler testified further:

> Counsel for Amazon: "When did your employment with Mr. Erciyas end?"
>
> Claimant: "I don't recall."
>
> Counsel for Amazon: "You don't recall when your employment with Mr. Erciyas ended; is that correct?"
>
> Claimant: "Correct."
>
> Counsel for Amazon: "Do you recall if it was before or after 2021?"
>
> Claimant: "I honestly don't recall. Most likely it was prior to 2021 because in 2022, we moved to Orlando and at that time, he didn't need any assistance. He didn't need an employee."
>
> Counsel for Amazon: "So are you saying that you worked for him until you moved to Orlando in 2022?"
>
> Claimant: "No. It was until the account getting shut down. And for three months, I stopped working for him because he wasn't able to pay my salary."

Id. at 45:4-18.

Ms. Gurler was unable to identify simple information regarding her employment history with MIB Shop; when her own business was formed and commenced operation on Amazon, information that one who is the sole operator of a business typically knows.

Claimant deems the intellectual property violations a red herring. See Claimant's response to arbitrator February 28, 2025. Respondents submit two affidavits of Mike Coyle, who serves as Risk Manager II at Amazon together with data from its internal database(s) which tracked Claimant's seller account. Mr. Coyle states "…Between May 7, 2020, and May 1, 2022, Amazon issued numerous notices of intellectual property violations to Claimant, including warnings for counterfeit product listings and trademark, copyright, and patent infringements." See also, Harris Decl. at ¶¶ 5, 6 which reads "[b]etween March 1, 2022 and May 1, 2022, Claimant received notice of and admitted to at least 563 violations of Amazon's intellectual property and anticounterfeit policies". Claimant submits no evidence

to refute Respondents' defense to its claims that Claimant listed items which violate the BSA. A. While Amazon suspended Claimant's account alleging it was a de facto alter ego of MIB Shop, the arbitrator searched the record and is not convinced sufficient evidence has been presented to substantiate suspension and withholding of the Claimant's sellers account for these reasons. However, Claimant has not submitted evidence to meet the burden of proof that it did not violate Respondents' intellectual property and anticounterfeit policies. Respondents may retain the monies within the Claimant's seller account pursuant to the *Amazon Funds Withholding Policy Amazon Funds Withholding Policy* due to Claimant's (i) misrepresentation of its affiliation with MIB Shop's ownership; and (ii) violation of Amazon's intellectual property and anticounterfeit policies. For the foregoing reasons, Claimant's first claim in the Demand is denied and dismissed with prejudice.

**ii. Conversion**

Claimant pleads the tort of conversion, the elements for which are: (i) ownership or right to possess or control of the property, (ii) intentional interference with the claimant's right to control the property, and (iii) the interference must be serious enough to warrant the Respondents liability for the full value of the property. The independent tort doctrine generally prohibits tort claims (like conversion) when they are based on the same facts as a breach of contract claim, limiting liability to what was bargained for in the contract. Claimant has neither plead nor proven any independent facts that give rise to the right of recovery in tort separate and apart from its breach of contract claim under the BSA. At Paragraphs 31-35 of the Demand for Arbitration, Claimant states:

> 31. Claimant repeats and incorporates by reference all preceding paragraphs as though set forth in full herein.
>
> 32. At all times herein mentioned, the Claimant was and still is entitled to the possession of the following personal property, namely: Amazon Seller Account Balance in the sum of $321,722.60.
>
> 33. On or about November 2022, in Seattle, Washington, the above-mentioned property had a value of $321,722.60.
>
> 34. On or about November 2022, Claimant demanded the immediate return of the abovementioned property, but Respondents failed and refused, and continues to fail and refuse, to return the property to Claimant, thus converting the property to its own use.
>
> 35. As a proximate result of Respondents' conversion, Claimant suffered the following damages which are the natural, reasonable, and proximate results of the conversion: $321,722.60, all to Claimant's damage in the sum of $321,722.60.

Claimant has neither plead nor proven any independent facts from those predicated on breach of contract in the aforestated claim. Claimant cannot circumvent the contractual obligations to sue in contract by bringing a tort action for the same issues utilizing the same facts as those which predicate the breach of contract claim. Claimant's second claim in the Demand is dismissed with prejudice.

**iii. Unjust Enrichment**

Claimant pleads the equitable doctrine of unjust enrichment which has three elements: (i) the Respondents received a benefit, (ii) the received benefit is at the Claimant's expense, and (iii) the circumstances make it unjust for the Respondents to retain the benefit without payment. The doctrine of unjust enrichment or quasi contract is an equitable solution when there is no express agreement between the parties. It is well settled that a party to a valid express contract may not bring an action on a quasi (implied in law) contract related to the same subject matter. At paragraph 36 of the Demand for Arbitration, Claimant states "The within proceeding is predicated upon the execution of the BSA which the Claimant admits controls the subject matter of this dispute." See Demand for Arbitration at para. 8. Claimant's third claim in the Demand is dismissed with prejudice.

**iv. Unfair or Deceptive Trade Practices pursuant to Washington Consumer Protection Act RCW 61.24.140, et. seq.**

To sustain a claim for unfair or deceptive trade practices under Washington law, a Claimant must allege that the: (i) businesses conduct was consumer-oriented; (ii) act or practice was deceptive in a material way; and (iii) Claimant suffered injury as a result. See 61.24.140, et. seq. Claimant, DOTCOM LLC, is a limited liability company Respondents Amazon.com, INC., is a Delaware corporation and Respondents Amazon.Com Services, LLC is a limited liability company organized under the laws of the state of Washington. The BSA (Exhibit 1 annexed to the Statement of Claim) is an agreement each Party admits controls the subject of this dispute. The Claimant and Respondents are commercial entities. Claimant's fourth claim in the Demand is dismissed with prejudice.

Each party is to bear its own: attorney's fees, costs, and disbursements. The administrative fees of the American Arbitration Association totaling $4,400.00 shall be borne as incurred; the compensation of the arbitrator totaling $19,459.84 shall be borne as incurred.

This Final Award is in adjudication of all claims submitted in this Arbitration. All claims not expressly granted herein are hereby denied.

April 7, 2025

Jennifer Lupo
Jennifer Lupo, Arbitrator

I, Jennifer Lupo, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument which is my Final Award.

April 7, 2025

Jennifer Lupo
Jennifer Lupo, Arbitrator

# EXHIBIT 2

KENNETH G. EADE
info@amazonsellers.attorney
LAW OFFICE OF KENNETH G. EADE
9350 Wilshire Blvd., Suite 203
Beverly Hills, CA 90212
Telephone: (310) 889-0772

*Attorney for Claimant,*
DOTCOM LLC

**AMERICAN ARBITRATION ASSOCIATION**

| | |
|---|---|
| DOTCOM LLC,<br><br>Claimant,<br><br>v.<br><br>AMAZON.COM, INC., a Delaware corporation, and AMAZON.COM SERVICES, LLC,<br><br>Respondent. | No.<br><br>**DEMAND FOR ARBITRATION** |

Claimant, DOTCOM LLC, hereby alleges as follows:

1. Claimant, DOTCOM LLC, is a limited liability company, owned by sole member, EBRU GURLER, with an address of 274 East Center Street, Wind Gap, PA 18091.

2. Respondent AMAZON.COM, INC. is a Delaware corporation. Respondent AMAZON.COM SERVICES, LLC is a limited liability company organized under the laws of the state of Washington. Both Respondents are collectively referred to herein as "Amazon" and have a principal place of business in Seattle, Washington. Amazon owns and operates the Amazon.com website, and equivalent international websites.

3. Amazon operates the world's largest online retail platform. Each day, millions of consumers use the Amazon Platform to search for and purchase products. Indeed, it is where most people begin their online product searches.[1] There is no other comparable platform for sellers to choose.

4. By way of background, sales on Amazon fall into one of two categories: (i) first-party sales, which refer to sales of Amazon's own private-label products or wholesale products sourced by Amazon, and (ii) third-party sales, which refer to sales by independent merchants who sell their own products through the Amazon Platform ("third-party sellers"). Competition is present between the first-party sales (Amazon's direct sales) and third-party sales since both compete to gain more customers and sales on the same platform. Lawmakers have investigated on Amazon's private-label practices and its collection of third-party seller data.

5. In addition to providing online retail platform service and referring customers to the third-party sellers, Amazon also provides the sellers with Fulfillment by Amazon ("FBA") program service[2] . Third-party sellers who use FBA services keep their product inventory in Amazon's warehouses or "fulfillment centers." After a customer places an order online, Amazon fulfills the order by picking, packing and shipping those products.[3] The majority of third-party sellers not only use, but rely on, FBA services,[4] despite the high fees associated with its use, to maintain a favorable search position afforded them by Amazon's algorithm.[5]

6. The four primary Amazon third-party seller fees are sale-related fees, seller account fees, shipping costs and Amazon FBA fees. Sale-related fees range from 6% to 45% of each product's selling

---

[1] *See* "Investigation of Competition in Digital Markets," *Majority Staff Report and Recommendations, House Subcommittee on Antitrust, Commercial and Administrative Law of the Committee on the Judiciary*, at 256 n. 1570 (Oct. 6, 2020) [hereinafter the "House Report"], available at https://judiciary.house.gov/uploadedfiles/competition_in_digital_markets.pdf?utm_campaign=4493-519 (last accessed March 17, 2022). An excerpt from the House Report is attached as Exhibit 7.

[2] *See* "Fulfillment by Amazon," *Amazon* [hereinafter "FBA Introduction"], available at https://sell.amazon.com/fulfillment-by-amazon (last accessed Feb. 14, 2022).

[3] *Id.*

[4] House Report at 288, n.1780-81 ("More than 73% of all … sellers worldwide reportedly rely on FBA services").

[5] *Id.* at n.1781 (explaining that seller success on Amazon is tied to its use of FBA services because Amazon's algorithm favors FBA sellers).

price, with the average seller paying about 15%. Account fees range from $0 to $39.99 per month. Generally, sellers also pay Amazon FBA fees to store inventory and fulfill and ship orders. The four primary Amazon third-party seller fees may account for 30% of sellers' sales proceeds.

7. Considering Amazon is the world's largest online retail platform and there is no other comparable platform to choose from, to gain access to millions of consumers, the Claimant had to sign up as a third-party seller to join the Amazon Platform**.** However, before an independent merchant can open a seller account ("Account") on the Amazon Platform, the seller must fully accept the terms and conditions set forth in the Amazon Services Business Solutions Agreement (the "BSA," which includes provisions regarding FBA services), having not any negotiation power regarding the fairness and enforceability of the contract terms. This makes the BSA an adhesion contract since it is not subject to negotiation, and third-party sellers are left with Hobson's choice of "take it or leave it". The BSA gives Amazon discretionary authority to interpret or apply a contract term and that power to determine the operation of those terms is limited by the duty of good faith and fair dealing.

8. A copy of the BSA is attached as Exhibit 1. Additionally, the BSA incorporates by reference Amazon's "Program Policies" (Exhibit 2), which if violated can, among other things, result in account suspension, deactivation, termination and the indefinite or permanent withholding of a third-party seller's sales proceeds pursuant to Sections 2 and 3 of the BSA.

9. Section 2 of the BSA provides in pertinent part that "[i]f we determine that your actions … may result in violations of our … policies …, then we may in our sole discretion withhold any payments to you for as long as we determine … If we determine that your account – or any other account you have operated – has been used to engage in deceptive, fraudulent, or illegal activity … then we may in our sole discretion permanently withhold any payments to you." Section 3 provides in pertinent part that "[w]e may suspend or terminate your account or this Agreement immediately if we determine that … (b) your account has been … used for deceptive or fraudulent, or illegal activity; or (c) your use of the Services has harmed … other sellers, customers, or Amazon's legitimate interests."

10. Section 2 of the BSA is procedurally and substantively unconscionable and unenforceable as an unenforceable penalty and confiscation clause, rather than a proper liquidated damages clause.

11. Claimant became a third-party seller on Amazon.com by adhering to the BSA in opening a seller account ("seller account") on Amazon's Seller Central Internet platform ("Seller Central"). Claimant operated an Amazon store under his own personal name, Merchant ID A2WV18ZT6PPYTD.

12. Amazon deactivated the Claimant's seller account on April 28, 2022, stating that Claimant had another seller account, MIB SHOP, which was enforced for violating Amazon's policies. Claimant has only one Amazon seller account and never had any interest whatsoever in any others, including but not limited to MIB SHOP. A true copy of the notice is attached hereto and incorporated by reference herein as Exhibit 3.

13. Amazon has an internal appeals process which allows a seller to appeal the deactivation of its seller accounts. Claimant appealed the deactivation of its account on May 3, 2022, a true copy of which is attached hereto and incorporated by reference herein as Exhibit 4.

14. Amazon denied Claimant's appeal, refusing to reinstate Claimant's account, and Claimant filed a funds appeal to release its net sales proceeds. A true copy of said appeal is attached hereto and incorporated by reference herein as Exhibit 5, which was denied by Amazon.

15. Upon deactivation, Amazon withheld all sales proceeds from the Claimant's account.

16. Upon deactivation of the Claimant's Seller Account, Amazon simultaneously froze Claimant's sales proceeds in the amount of $321,722.60 as of November 2022. A true copy of a printout from Amazon showing the amount withheld is attached hereto and incorporated herein as Exhibit 6.

17. As between Amazon and the Claimant, the Claimant is the "seller" of the goods, and Amazon is an Interactive Computer Service Provider that facilitates sales through its e-commerce website.

18. Since the "seller" in this case is the Claimant, the proceeds of sales made in the seller account belong to the Claimant, and Amazon is holding the proceeds of sales that it has collected on sales made by the Claimant and facilitated by Amazon under the BSA for the benefit of the Claimant and has a duty to release them.

19. Under the BSA, Amazon has already collected and deducted from these proceeds all costs and commissions it is entitled to, and the remainders of the proceeds belong to the Claimant, not Amazon.

20. However, Respondent Amazon still currently holds approximately $321,722.60 in funds from sales Claimant has made from products it has sold through Amazon.com, which Respondent refuses to release to Claimant.

21. Section 18 of the BSA provides for attorney's fees and costs to the prevailing party. By reason of the enforcement of the BSA by this arbitration proceeding, the Claimant is entitled to recover his reasonable attorney's fees and costs of this arbitration.

**FIRST CLAIM FOR RELIEF:**

**BREACH OF CONTRACT**

22. Claimant repeats and incorporates by reference all preceding paragraphs.

23. Washington law recognizes an implied covenant of good faith and fair dealing in every contract.

24. Claimant has performed all terms, conditions, covenants, and promises required of Claimant and has performed its obligations under the BSA.

25. Pursuant to the BSA, Amazon owed a duty to release the sales proceeds in Claimant's seller account at the time its account was blocked. Amazon also owed a duty under Section 3 of the BSA to give the Claimant 30 days prior notice of termination.

26. Respondent breached the Agreement in April 2022, by failing to release Claimant's sales proceeds pursuant to Section S-5 of the BSA. It further breached the Agreement by terminating the Agreement without any notice.

27. Amazon further breached the BSA by failing to exercise its discretion under the BSA in good faith, in compliance with the implied covenant of good faith and fair dealing, by blocking Claimant's account without advance notice; and by exercising its discretion under Section 2 of the BSA to withhold Claimant's funds without sufficient evidence of Claimant's use of the seller account to commit fraud or illegal activity.

28. For all the foregoing reasons, Amazon has breached the BSA, and Claimant has suffered damages from both having its seller account terminated without notice in breach of Section 3 and having all its sales proceeds permanently withheld by Amazon.

29. As a proximate result of Defendant's breaches of the BSA, Claimant has been damaged in the amount which will be proven during this proceeding, representing the loss of business and profits Claimant would have made from sales of its inventory on Amazon had the agreement not been improperly terminated.

30. As a further proximate result of Respondent's breach of said Agreement, Claimant has suffered damages representing the loss of Claimant's sales proceeds in the amount of $321,722.60, which represents customers' payments for the merchandise sold by Claimant after the deduction of all refunds, returns, and Amazon's commissions and charges.

**SECOND CLAIM FOR RELIEF:**

**CONVERSION**

31. Claimant repeats and incorporates by reference all preceding paragraphs as though set forth in full herein.

32. At all times herein mentioned, the Claimant was and still is entitled to the possession of the following personal property, namely: Amazon Seller Account Balance in the sum of $321,722.60.

33. On or about November 2022, in Seattle, Washington, the above-mentioned property had a value of $321,722.60.

34. On or about November 2022, Claimant demanded the immediate return of the above-mentioned property, but Respondent failed and refused, and continues to fail and refuse, to return the property to Claimant, thus converting the property to its own use.

35. As a proximate result of Respondent's conversion, Claimant suffered the following damages which are the natural, reasonable, and proximate results of the conversion: $321,722.60, all to Claimant's damage in the sum of $321,722.60.

**THIRD CLAIM FOR RELIEF:**

**UNJUST ENRICHMENT**

36. Claimant repeats and incorporates by reference all preceding paragraphs.

37. The Claimant benefited Amazon by entering into the BSA, sharing his profits, and paying the various charges, including FBA charges, imposed by Amazon.

38. Amazon knew of these benefits and profited from Claimant's business activity and sales.

39. Amazon has been unjustly enriched by confiscating the entire sales proceeds in the seller account upon its termination of the BSA. The Claimant has refunded all customer refund requests from its sales proceeds. Moreover, Amazon did not incur any actual damages; however, it confiscated the Claimant's entire sales proceeds upon termination of the BSA after Amazon had already deducted its sales commissions and other fees from these sales proceeds.

40. Amazon owes a duty to immediately release the confiscated sales proceeds to Claimant.

**FOURTH CLAIM FOR RELIEF:**

**UNFAIR TRADE PRACTICES UNDER WASHINGTON CONSUMER PROTECTION ACT**

41. Claimant repeats and incorporates by reference all preceding paragraphs.

42. Amazon is a business with its headquarters in the state of Washington, and it engaged in unfair and deceptive business practices in its contracting and dealings with Amazon sellers located in the state of Washington and elsewhere.

43. The terms of the BSA and the manner in which Amazon administers the BSA, and its business relationship with Amazon sellers, impact both the individual Amazon sellers and the public interest. By arbitrarily and improperly deactivating third-party sellers' accounts and removing their selling privileges, Amazon reduced the competition between the third-party seller and its own private label sales, reducing all the customers' access to more sellers, more products, and lower prices resulting from competition.

44. Amazon's conduct as herein described constitutes unfair practices and a violation of Washington's Consumer Protection Act (CPA) under RCW 19.86.093 by terminating the BSA without

notice and confiscating Claimant's net sales proceeds, which negatively affected the public interest because millions of third-party sellers and eventually all the customers are harmed by reduced competition between Amazon's own private sales and those of third-party sellers.

45. The CPA entitles any person who has been injured in their business or property pursuant to a violation of the CPA to bring an action for damages together with the costs of suit and a reasonable attorney fee.

46. Claimant has been damaged by Amazon's violation of the CPA in an amount to be proven, by reason of Amazon's confiscation of Claimant's sales proceeds and termination of the BSA without notice.

47. Claimant has incurred costs of pursuing these damages as well as reasonable attorney's fees.

## REQUESTED HEARING LOCATION

48. Pursuant to Paragraph 18 of the Agreement, Claimant hereby has elected an arbitration by written submissions, per the option given Claimant by Section 18 of the BSA, a reasoned award, and the locale of arbitration is the state of Pennsylvania, the place where Amazon contracted with the Claimant and the Claimant engaged in business with Amazon.

49. The Party or Parties on whom the demand is made are hereby notified those copies of our arbitration agreement and this demand are being filed with the American Arbitration Association, with a request that it commence administration of the arbitration. Under the rules, you may file an answering statement within ten days after notice from the administrator.

## PRAYER FOR RELIEF

WHEREFORE, Claimant respectfully requests as follows:

1. That the Arbitrator issue relief against Amazon for:

i. The release and remittance of Claimant's sales proceeds from its Accounts in the amount of $321,722.60; and

ii. That the Arbitrator, at the conclusion of the arbitration, issue a Final Award against Amazon for damages in an amount subject to proof, plus any applicable interest, attorney fees and costs, arbitration, and arbitrator fees; and

2. That the Arbitrator grant Claimant such additional and further relief as is just and proper.

Dated: March 19, 2024

*/s/ Kenneth G. Eade*
KENNETH G. EADE
*Attorney for Claimant*

# EXHIBIT 1

amazon seller central English Sign in Sell on Amazon

This article applies to selling in: **United States**

Help / Policies, agreements, and guidelines / **Amazon Services Business Solutions Agreement**

# Amazon Services Business Solutions Agreement

The version of this Agreement in English is the definitive legal version. A translation into Chinese is available for your ease of reference.

**General Terms**

Welcome to **Amazon Services Business Solutions**, a suite of optional services for sellers including: Selling on Amazon, Fulfillment by Amazon, Amazon Advertising, Transaction Processing Services, and the Selling Partner API.

THIS AMAZON SERVICES BUSINESS SOLUTIONS AGREEMENT (THE **"AGREEMENT"**) CONTAINS THE TERMS AND CONDITIONS THAT GOVERN YOUR ACCESS TO AND USE OF THE SERVICES AND IS AN AGREEMENT BETWEEN YOU OR THE BUSINESS YOU REPRESENT AND AMAZON. BY REGISTERING FOR OR USING THE SERVICES, YOU (ON BEHALF OF YOURSELF OR THE BUSINESS YOU REPRESENT) AGREE TO BE BOUND BY THE TERMS OF THIS AGREEMENT, INCLUDING THE SERVICE TERMS AND PROGRAM POLICIES THAT APPLY FOR EACH COUNTRY FOR WHICH YOU REGISTER OR ELECT TO USE A SERVICE (IN EACH CASE, THE **"ELECTED COUNTRY"**).

As used in this Agreement, **"we," "us,"** and **"Amazon"** means the applicable Amazon Contracting Party and any of its applicable Affiliates, and **"you"** means the applicant (if registering for or using a Service as an individual), or the business employing the applicant (if registering for or using a Service as a business) and any of its Affiliates. Capitalized terms have the meanings given to them in this Agreement. If there is any conflict between these General Terms and the applicable Service Terms and Program Policies, the

General Terms will govern and the applicable Service Terms will prevail over the Program Policies.

1. **Enrollment.**

To begin the enrollment process, you must complete the registration process for one or more of the Services. Use of the Services is limited to parties that can lawfully enter into and form contracts under applicable Law (for example, the Elected Country may not allow minors to use the Services). As part of the application, you must provide us with your (or your business') legal name, address, phone number and e-mail address, as well as any other information we may request. Any personal data you provide to us will be handled in accordance with Amazon's Privacy Notice.

2. **Service Fee Payments; Receipt of Sales Proceeds.**

Fee details are described in the applicable Service Terms and Program Policies. You are responsible for all of your expenses in connection with this Agreement. To use a Service, you must provide us with valid credit card information from a credit card or credit cards acceptable by Amazon (**"Your Credit Card"**) as well as valid bank account information for a bank account or bank accounts acceptable by Amazon (conditions for acceptance may be modified or discontinued by us at any time without notice) (**"Your Bank Account"**). You will use only a name you are authorized to use in connection with a Service and will update all of the information you provide to us in connection with the Services as necessary to ensure that it at all times remains accurate, complete, and valid. You authorize us (and will provide us documentation evidencing your authorization upon our request) to verify your information (including any updated information), to obtain credit reports about you from time to time, to obtain credit authorizations from the issuer of Your Credit Card, and to charge Your Credit Card or debit Your Bank Account for any sums payable by you to us (in reimbursement or otherwise). All payments to you will be remitted to Your Bank Account through a banking network or by other means specified by us.

**If we determine that your actions or performance may result in returns, chargebacks, claims, disputes, violations of our terms or policies, or other risks to Amazon or third parties, then we may in our sole discretion withhold any payments to you for as long as we determine any related risks to Amazon or third parties persist. For any amounts that we determine you owe us, we may (a) charge Your Credit Card or any other payment instrument you provide to us; (b) offset any amounts that are payable by you to us (in reimbursement or otherwise) against any payments we may make to you or amounts we may owe you; (c) invoice you for amounts due to us, in which case you will pay the invoiced**

**amounts upon receipt; (d) reverse any credits to Your Bank Account; or (e) collect payment or reimbursement from you by any other lawful means. If we determine that your account—or any other account you have operated—has been used to engage in deceptive, fraudulent, or illegal activity (including the sale of counterfeit goods), or to repeatedly violate our Program Policies, then we may in our sole discretion permanently withhold any payments to you.** Except as provided otherwise, all amounts contemplated in this Agreement will be expressed and displayed in the Local Currency, and all payments contemplated by this Agreement will be made in the Local Currency.

In addition, we may require that you pay other amounts to secure the performance of your obligations under this Agreement or to mitigate the risk of returns, chargebacks, claims, disputes, violations of our terms or policies, or other risks to Amazon or third parties. These amounts may be refundable or nonrefundable in the manner we determine, and failure to comply with terms of this Agreement, including any applicable Program Policies, may result in their forfeiture.

As a security measure, we may, but are not required to, impose transaction limits on some or all customers and sellers relating to the value of any transaction or disbursement, the cumulative value of all transactions or disbursements during a period of time, or the number of transactions per day or other period of time. We will not be liable to you: (i) if we do not proceed with a transaction or disbursement that would exceed any limit established by us for a security reason, or (ii) if we permit a customer to withdraw from a transaction because an Amazon Site or Service is unavailable following the commencement of a transaction.

3. **Term and Termination.**

The term of this Agreement will start on the date of your completed registration for use of a Service and continue until terminated by us or you as provided below. You may at any time terminate your account or this Agreement immediately on notice to us via Seller Central, email, the Contact Us form, or similar means. We may terminate your account or this Agreement for convenience with 30 days' advance notice. We may suspend or terminate your account or this Agreement immediately if we determine that (a) you have materially breached the Agreement and failed to cure within 7 days of a cure notice unless your breach exposes us to liability toward a third party, in which case we are entitled to reduce, or waive, the aforementioned cure period at our reasonable discretion; (b) your account has been, or our controls identify that it may be used for deceptive or fraudulent, or illegal activity; or (c) your use of the Services has harmed, or our controls identify that it might harm, other sellers, customers, or

Amazon's legitimate interests. We will promptly notify you of any such termination or suspension via email or similar means including Seller Central, indicating the reason and any options to appeal, except where we have reason to believe that providing this information will hinder the investigation or prevention of deceptive, fraudulent, or illegal activity, or will enable you to circumvent our safeguards. On termination of this Agreement, all related rights and obligations under this Agreement immediately terminate, except that (d) you will remain responsible for performing all of your obligations in connection with transactions entered into before termination and for any liabilities that accrued before or as a result of termination, and (e) Sections 2, 3, 4, 5, 6, 7, 8, 9, 11, 14, 15, and 18 of these General Terms survive.

4. **License.**

You grant us a royalty-free, non-exclusive, worldwide right and license for the duration of your original and derivative intellectual property rights to use any and all of Your Materials for the Services or other Amazon product or service, and to sublicense the foregoing rights to our Affiliates and operators of Amazon Associated Properties; provided, however, that we will not alter any of Your Trademarks from the form provided by you (except to re-size trademarks to the extent necessary for presentation, so long as the relative proportions of such trademarks remain the same) and will comply with your removal requests as to specific uses of Your Materials (provided you are unable to do so using standard functionality made available to you via the applicable Amazon Site or Service); provided further, however, that nothing in this Agreement will prevent or impair our right to use Your Materials without your consent to the extent that such use is allowable without a license from you or your Affiliates under applicable Law (e.g., fair use under United States copyright law, referential use under trademark law, or valid license from a third party).

5. **Representations.**

Each party represents and warrants that: (a) if it is a business, it is duly organized, validly existing and in good standing under the Laws of the country in which the business is registered and that you are registering for the Service(s) within such country; (b) it has all requisite right, power, and authority to enter into this Agreement, perform its obligations, and grant the rights, licenses, and authorizations in this Agreement; (c) any information provided or made available by one party to the other party or its Affiliates is at all times accurate and complete; (d) it is not subject to sanctions or otherwise designated on any list of prohibited or restricted parties or owned or controlled by such a party, including but not limited to the lists maintained by the United Nations Security Council, the US Government (e.g., the US Department of Treasury's Specially Designated Nationals list and

Foreign Sanctions Evaders list and the US Department of Commerce's Entity List), the European Union or its member states, or other applicable government authority; and (e) it will comply with all applicable Laws in performance of its obligations and exercise of its rights under this Agreement.

6. **Indemnification.**

**6.1 Your indemnification obligations**. You will defend, indemnify, and hold harmless Amazon, and our officers, directors, employees, and agents, against any third-party claim, loss, damage, settlement, cost, expense, or other liability (including, without limitation, attorneys' fees) (each, a "Claim") arising from or related to (a) your non-compliance with applicable Laws; (b) Your Products, including the offer, sale, fulfillment (except to the extent attributable to the FBA service), refund, cancellation, return, or adjustments thereof, Your Materials, any actual or alleged infringement of any Intellectual Property Rights by any of the foregoing, and any personal injury, death (to the extent the injury or death is not caused by Amazon), or property damage related thereto; (c) Your Taxes and duties or the collection, payment, or failure to collect or pay Your Taxes or duties, or the failure to meet tax registration obligations or duties; or (d) actual or alleged breach of any representations you have made.

**6.2 Amazon's indemnification obligations**. Amazon will defend, indemnify, and hold harmless you and your officers, directors, employees, and agents against any third-party Claim arising from or related to: (a) Amazon's non-compliance with applicable Laws; or (b) allegations that the operation of an Amazon Site infringes or misappropriates that third party's intellectual property rights.

**6.3 Process**. If any indemnified Claim might adversely affect us, we may, to the extent permitted by applicable Law, voluntarily intervene in the proceedings at our expense. No party may consent to the entry of any judgment or enter into any settlement of an indemnified Claim without the prior written consent of the other party, which may not be unreasonably withheld; except that a party may settle any claim that is exclusively directed at and exclusively affects that party.

7. **Disclaimer & General Release.**

**a.** THE AMAZON SITES AND THE SERVICES, INCLUDING ALL CONTENT, SOFTWARE, FUNCTIONS, MATERIALS, AND INFORMATION MADE AVAILABLE ON OR PROVIDED IN CONNECTION WITH THE SERVICES, ARE PROVIDED "AS-IS." AS A USER OF THE SERVICES, YOU USE THE AMAZON SITES, THE SERVICES, AND SELLER CENTRAL AT YOUR OWN RISK. EXCEPT THOSE SET

FORTH IN SECTION 5 ABOVE, TO THE FULLEST EXTENT PERMISSIBLE BY LAW, WE AND OUR AFFILIATES DISCLAIM: (i) ANY REPRESENTATIONS OR WARRANTIES REGARDING THIS AGREEMENT, THE SERVICES OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT, INCLUDING ANY IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, OR NON-INFRINGEMENT; (ii) IMPLIED WARRANTIES ARISING OUT OF COURSE OF DEALING, COURSE OF PERFORMANCE, OR USAGE OF TRADE; AND (iii) ANY OBLIGATION, LIABILITY, RIGHT, CLAIM, OR REMEDY IN TORT, WHETHER OR NOT ARISING FROM OUR NEGLIGENCE. WE DO NOT WARRANT THAT THE FUNCTIONS CONTAINED IN THE AMAZON SITES AND THE SERVICES WILL MEET YOUR REQUIREMENTS OR BE AVAILABLE, TIMELY, SECURE, UNINTERRUPTED, OR ERROR FREE, AND WE WILL NOT BE LIABLE FOR ANY SERVICE INTERRUPTIONS, INCLUDING BUT NOT LIMITED TO SYSTEM FAILURES OR OTHER INTERRUPTIONS THAT MAY AFFECT THE RECEIPT, PROCESSING, ACCEPTANCE, COMPLETION, OR SETTLEMENT OF ANY TRANSACTIONS.

**b.** BECAUSE AMAZON IS NOT INVOLVED IN TRANSACTIONS BETWEEN CUSTOMERS AND SELLERS OR OTHER PARTICIPANT DEALINGS, IF A DISPUTE ARISES BETWEEN ONE OR MORE PARTICIPANTS, EACH PARTICIPANT RELEASES AMAZON (AND ITS AGENTS AND EMPLOYEES) FROM CLAIMS, DEMANDS, AND DAMAGES (ACTUAL AND CONSEQUENTIAL) OF EVERY KIND AND NATURE, KNOWN AND UNKNOWN, SUSPECTED AND UNSUSPECTED, DISCLOSED AND UNDISCLOSED, ARISING OUT OF OR IN ANY WAY CONNECTED WITH SUCH DISPUTES.

8. **Limitation of Liability.**

WE WILL NOT BE LIABLE (WHETHER IN CONTRACT, WARRANTY, TORT (INCLUDING NEGLIGENCE, PRODUCT LIABILITY, OR OTHER THEORY), OR OTHERWISE) TO YOU OR ANY OTHER PERSON FOR COST OF COVER, RECOVERY, OR RECOUPMENT OF ANY INVESTMENT MADE BY YOU OR YOUR AFFILIATES IN CONNECTION WITH THIS AGREEMENT, OR FOR ANY LOSS OF PROFIT, REVENUE, BUSINESS, OR DATA OR PUNITIVE OR CONSEQUENTIAL DAMAGES ARISING OUT OF OR RELATING TO THIS AGREEMENT, EVEN IF AMAZON HAS BEEN ADVISED OF THE POSSIBILITY OF THOSE COSTS OR DAMAGES. FURTHER, OUR AGGREGATE LIABILITY ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED WILL NOT EXCEED AT ANY TIME THE TOTAL AMOUNTS DURING THE PRIOR SIX MONTH PERIOD PAID BY YOU TO AMAZON IN CONNECTION WITH THE PARTICULAR SERVICE GIVING RISE TO THE CLAIM.

9. **Insurance.**

If the gross proceeds from Your Transactions exceed the applicable Insurance Threshold during any month if the Elected Country is the United States, or each month over any period of three (3) consecutive months if the Elected Country is Canada or Mexico, or otherwise if requested by us, then within thirty (30) days thereafter, you will maintain at your expense throughout the remainder of the Term for each applicable Elected Country commercial general, umbrella or excess liability insurance with the Insurance Limits per occurrence and in aggregate covering liabilities caused by or occurring in conjunction with the operation of your business, including products, products/completed operations and bodily injury, with policy(ies) naming Amazon and its assignees as additional insureds. At our request, you will provide to us certificates of insurance, the full insurance policy, or other documents we may request for the coverage to the following address: c/o Amazon, P.O. Box 81226, Seattle, WA 98108-1226, Attention: Risk Management.

10. **Tax Matters.**

As between the parties, you will be responsible for the collection, reporting, and payment of any and all of Your Taxes, except to the extent that (i) Amazon automatically calculates, collects, or remits taxes on your behalf according to applicable law; or (ii) Amazon expressly agrees to receive taxes or other transaction-based charges on your behalf in connection with tax calculation services made available by Amazon and used by you. You agree to and will comply with the Tax Policies. All fees and payments payable by you to Amazon under this Agreement or the applicable Service Terms are exclusive of any applicable taxes, deductions or withholding (including but not limited to cross-border withholding taxes), and you will be responsible for paying Amazon any of Your Taxes imposed on such fees and any deduction or withholding required on any payment.

11. **Confidentiality and Personal Data.**

During the course of your use of the Services, you may receive Confidential Information. You agree that for the term of the Agreement and 5 years after termination: (a) all Confidential Information will remain Amazon's exclusive property; (b) you will use Confidential Information only as is reasonably necessary for your participation in the Services; (c) you will not otherwise disclose Confidential Information to any other Person except as required to comply with the Law; (d) you will take all reasonable measures to protect the Confidential Information against any use or disclosure that is not expressly permitted in this Agreement; and (e) you will retain Confidential Information only for so long as its use is necessary for participation in the Services or to fulfill your statutory obligations (e.g. tax) and in all cases will delete such information upon termination or as soon as no longer required for the fulfillment of statutory obligations. The foregoing sentence does not restrict

your right to share Confidential Information with a governmental entity that has jurisdiction over you, provided that you limit the disclosure to the minimum necessary and explicitly indicate the confidential nature of the shared information to the governmental entity. You may not issue any press release or make any public statement related to the Services, or use our name, trademarks, or logo, in any way (including in promotional material) without our advance written permission, or misrepresent or embellish the relationship between us in any way. You may only use the "Available at Amazon" badge as defined in and according to the Trademark Usage Guidelines available in Seller Central; you may not use our name, trademarks, or logos in any way (including in promotional material) not covered by the Trademark Usage Guidelines without our advance written permission.

Generally, you may not use customer personal data in any way inconsistent with applicable Law. You must keep customer personal data confidential at all times (the above 5 years' term limit does not apply to customer personal data).

12. **Force Majeure.**

We will not be liable for any delay or failure to perform any of our obligations under this Agreement by reasons, events or other matters beyond our reasonable control.

13. **Relationship of Parties.**

Subject to the Transaction Processing Service Terms (if the Elected Country for a Service is the United States), you and we are independent contractors, and nothing in this Agreement will create any partnership, joint venture, agency, franchise, sales representative, or employment relationship between us. You will have no authority to make or accept any offers or representations on our behalf. This Agreement will not create an exclusive relationship between you and us. Nothing expressed or mentioned in or implied from this Agreement is intended or will be construed to give to any person other than the parties to this Agreement any legal or equitable right, remedy, or claim under or in respect to this Agreement. This Agreement and all of the representations, warranties, covenants, conditions, and provisions in this Agreement are intended to be and are for the sole and exclusive benefit of Amazon, you, and customers. As between you and us, you will be solely responsible for all obligations associated with the use of any third party service or feature that you permit us to use on your behalf, including compliance with any applicable terms of use. You will not make any statement, whether on your site or otherwise, that would contradict anything in this section.

14. **Suggestions and Other Information.**

If you or any of your Affiliates elect to provide or make available suggestions, comments, ideas, improvements, or other feedback or materials to us in connection with or related to any Amazon Site or Service (including any related Technology), we will be free to use, disclose, reproduce, modify, license, transfer and otherwise distribute, and exploit any of the foregoing information or materials in any manner. In order to cooperate with governmental requests, to protect our systems and customers, or to ensure the integrity and operation of our business and systems, we may access and disclose any information we consider necessary or appropriate, including but not limited to user contact details, IP addresses and traffic information, usage history, and posted content. If we make suggestions on using the Services, you are responsible for any actions you take based on our suggestions.

15. **Modification.**

15.1. We will provide at least 15 days' advance notice in accordance with Section 18 for changes to the Agreement.

15.2 However, we may change or modify the Agreement at any time with immediate effect (a) for legal, regulatory, fraud and abuse prevention, or security reasons; (b) to change existing features or add additional features to the Services (where this does not materially adversely affect your use of the Services); or (c) to restrict products or activities that we deem unsafe, inappropriate, or offensive. We will notify you about any change or modification in accordance with Section 18.

15.3 Your continued use of the Services after the effective date of any change to this Agreement in accordance with this Section 15 will constitute your acceptance of that change. If any change is unacceptable to you, you agree not to use the Services and to end the Agreement as described in Section 3.

16. **Password Security.**

Any password we provide to you may be used only during the Term to access Seller Central (or other tools we provide, as applicable) to use the Services, electronically accept Your Transactions, and review your completed transactions. You are solely responsible for maintaining the security of your password. You may not disclose your password to any third party (other than third parties authorized by you to use your account in accordance with this Agreement) and are solely responsible for any use of or action taken under your password. If your password is compromised, you must immediately change your password.

17. **Export.**

You will not directly or indirectly export, re-export, transmit, or cause to be exported, re-exported or transmitted, any commodities, software or technology to any country, individual, corporation, organization, or entity to which such export, re-export, or transmission is restricted or prohibited, including any country, individual, corporation, organization, or entity under sanctions or embargoes administered by the United Nations, US Departments of State, Treasury or Commerce, the European Union, or any other applicable government authority.

18. **Miscellaneous.**

The Governing Laws will govern this Agreement, without reference to rules governing choice of laws or the Convention on Contracts for the International Sale of Goods. If the Elected Country is the United States, Canada, or Mexico, **Amazon and you both consent that any dispute with Amazon or its Affiliates or claim relating in any way to this Agreement or your use of the Services will be resolved by binding arbitration as described in this paragraph, rather than in court**, except that (i) you may assert claims in a small claims court that is a Governing Court if your claims qualify; (ii) you or we may bring suit in the Governing Courts, submitting to the jurisdiction of the Governing Courts and waiving our respective rights to any other jurisdiction, to enjoin infringement or other misuse of intellectual property rights; and (iii) we may bring any claims related to your sale of counterfeit products on the Amazon Site in the Governing Courts and seek any remedy available under law related to those claims. **There is no judge or jury in arbitration, and court review of an arbitration award is limited. However, an arbitrator can award on an individual basis the same damages and relief as a court (including injunctive and declaratory relief or statutory damages), and must follow the terms of this Agreement as a court would.** Before you may begin an arbitration proceeding, you must send a letter requesting arbitration and describing your claim to our registered agent, CSC 300 Deschutes Way SW, Suite 208 MC-CSC1, Tumwater, WA 98501. The arbitration will be conducted by the American Arbitration Association (AAA) under its commercial rules. Payment of all filing, administration and arbitrator fees will be governed by the AAA's rules. We will reimburse those fees for claims totaling less than $10,000 unless the arbitrator determines the claims are frivolous. The expedited procedures of the AAA's rules will apply only in cases seeking exclusively monetary relief under $50,000, and in such cases the hearing will be scheduled to take place within 90 days of the arbitrator's appointment. Likewise, Amazon will not seek attorneys' fees and costs from you in arbitration unless the arbitrator determines the claims are frivolous. You may choose to have the arbitration conducted by telephone, based on written submissions, or in person at a mutually agreed location. **Amazon and you each agree that any dispute**

**resolution proceedings will be conducted only on an individual basis and not in a class, consolidated or representative action.** If for any reason a claim proceeds in court rather than in arbitration **Amazon and you each waive any right to a jury trial**.

You may not assign this Agreement, by operation of law or otherwise, without our prior written consent. Any attempt to assign or otherwise transfer in violation of this section is void; provided, however, that upon notice to Amazon, you may assign or transfer this Agreement, in whole or in part, to any of your Affiliates as long as you remain liable for your obligations that arose prior to the effective date of the assignment or transfer under this Agreement. You agree that we may assign or transfer our rights and obligations under this Agreement: (a) in connection with a merger, consolidation, acquisition or sale of all or substantially all of our assets or similar transaction; or (b) to any Affiliate or as part of a corporate reorganization; and effective upon such assignment, the assignee is deemed substituted for Amazon as the party to this Agreement. Subject to that restriction, this Agreement will be binding on, inure to, and be enforceable against the parties and their respective successors and assigns. We may perform any of our obligations or exercise any of our rights under this Agreement through one or more of our Affiliates. Amazon retains the right to immediately halt any of Your Transactions, prevent or restrict access to the Services or take any other action to restrict access to or availability of any inaccurate listing, any inappropriately categorized items, any unlawful items, or any items otherwise prohibited by applicable Program Policies. Because Amazon is not your agent (except for the limited purpose set out in the Transaction Processing Service Terms (if the Elected Country for a Service is the United States)), or the customer's agent for any purpose, Amazon will not act as either party's agent in connection with resolving any disputes between participants related to or arising out of any transaction.

Amazon will provide notice to you under this Agreement by posting changes to Seller Central or to the applicable Amazon Services site to which the changes relate (such as the Developer Site accessible through your account), by sending you an email notification, or by similar means. You must send all notices and other communications relating to Amazon to our Selling Partner Support team via Seller Central, email, the Contact Us form, or similar means. We may also communicate with you electronically and in other media, and you consent to such communications. You may change your e-mail addresses and certain other information in Seller Central, as applicable. You will ensure that all of your information is up to date and accurate at all times.

If any provision of this Agreement is deemed unlawful, void, or for any reason unenforceable, then that provision will be deemed severable from these terms and conditions and will not affect the validity and enforceability of any remaining provisions. If the Elected Country is Canada, then it is the express wish of the parties that this Agreement and the applicable Service Terms and Program Policies have been drafted in English. (The following is a French translation of the preceding sentence: Si le pays de service est le Canada, les parties conviennent que la présente autorisation et tous les termes et conditions applicables s'y rattachant soient rédigés en anglais.) We may make available translations to this Agreement and the applicable Service Terms and Program Policies, but the English version will control. This Agreement represents the entire agreement between the parties with respect to the Services and related subject matter and supersedes any previous or contemporaneous oral or written agreements and understandings.

## Definitions

As used in this Agreement, the following terms have the following meanings:

**"Affiliate"** means, with respect to any entity, any other entity that directly or indirectly controls, is controlled by, or is under common control with that entity.

**"Amazon Associated Properties"** means any website or other online point of presence, mobile application, service or feature, other than an Amazon Site, through which any Amazon Site, or products or services available on any of them, are syndicated, offered, merchandised, advertised, or described.

**"Amazon Contracting Party"** means the party outlined below.

- If the Elected Country is Canada:

| Service | Amazon Contracting Party |
|---|---|
| Selling on Amazon | Amazon.com.ca, Inc. |
| Selling on Amazon (if your account is enabled to list Optional Coverage Plans) | Amazon.com.ca, Inc. |
| Fulfillment by Amazon | Amazon.com.ca, Inc. |
| Amazon Advertising | Amazon Advertising Canada, Inc. |

- If the Elected Country is Mexico:

| Service | Amazon Contracting Party |
|---|---|
| Selling on Amazon | Servicios Comerciales Amazon México S. de R.L. de C.V. |
| Fulfillment by Amazon | Servicios Comerciales Amazon México S. de R.L. de C.V. |
| Amazon Advertising | Servicios Comerciales Amazon México S. de R.L. de C.V. |

- If the Elected Country is the United States:

| Service | Amazon Contracting Party |
|---|---|
| Selling on Amazon | Amazon.com Services LLC |
| Selling on Amazon (if your account is enabled to list Optional Coverage Plans) | Amazon.com Services LLC |
| Fulfillment by Amazon | Amazon.com Services LLC |
| Amazon Advertising | Amazon.com Services LLC |
| Transaction Processing Services | Amazon Payments, Inc., Amazon Capital Services, Inc., or Amazon.com Services LLC, according to the Transaction Processing Services Terms |

If you register for or use the Selling Partner API, the Amazon Contracting Party is the Contracting Party that provides the applicable Service you use in connection with the Selling Partner API.

**"Amazon Site"** means, as applicable, the CA Amazon Site, the MX Amazon Site, or the US Amazon Site.

**"CA Amazon Site"** means the website, the primary home page of which is identified by the url www.amazon.ca, and any successor or replacement of such website.

**"Confidential Information"** means information relating to us, to the Services, or Amazon customers that is not known to the general public

including, but not limited to, any information identifying or unique to specific customers; reports, insights, and other information about the Services; data derived from the Services except for data (other than customer personal data) arising from the sale of your products comprising of products sold, prices, sales, volumes and time of the transaction; and technical or operational specifications relating to the Services. For the purposes of this Agreement, customer personal data constitutes Confidential Information at all times.

**"Content"** means copyrightable works under applicable Law and content protected by database rights under applicable Law.

**"Excluded Products"** means the items described on the applicable Restricted Products pages in Seller Central, any other applicable Program Policy, or any other information made available to you by Amazon.

**"Governing Courts"** means the applicable one of the following:

- the state or Federal court in King County, Washington (if the Elected Country is Canada, Mexico, or the United States),

**"Governing Laws"** means the applicable one of the following:

- the laws of the State of Washington, United States together with the Federal Arbitration Act and other applicable federal law (if the Elected Country is Canada, Mexico, or the United States),

**"Insurance Limits"** means the applicable one of the following:

- One Million Canadian Dollars ($1,000,000) (if the Elected Country is Canada),
- Ten Million Mexican Pesos ($10,000,000) (if the Elected Country is Mexico),
- One Million U.S. Dollars ($1,000,000) (if the Elected Country is the United States).

**"Insurance Threshold"** means the applicable one of the following:

- Ten Thousand Canadian Dollars ($10,000) (if the Elected Country is Canada),
- One Hundred Thousand Mexican Pesos ($100,000) (if the Elected Country is Mexico),
- Ten Thousand U.S. Dollars ($10,000) (if the Elected Country is the United States).

**"Intellectual Property Right"** means any patent, copyright, Trademark, domain name, moral right, trade secret right, or any other intellectual property right arising under any Laws and all ancillary and related rights, including all rights of registration and renewal and causes of action for violation, misappropriation or infringement of any of the foregoing.

**"Law"** means any law, ordinance, rule, regulation, order, license, permit, judgment, decision, or other requirement, now or in the future in effect, of any governmental authority (e.g., on a federal, state, or provincial level, as applicable) of competent jurisdiction.

**"Local Currency"** means the applicable one of the following:

- U.S. Dollars (if the Elected Country is the United States),
- Canadian Dollars (if the Elected Country is Canada),
- Mexican Pesos (if the Elected Country is Mexico),

**"MX Amazon Site"** means the website, the primary home page of which is identified by the url www.amazon.com.mx, and any successor or replacement of such website.

**"Optional Coverage Plans"** means warranties, extended service plans and related offerings, in each case as determined by us, that you offer.

**"Order Information"** means, with respect to any of Your Products ordered through an Amazon Site, the order information and shipping information that we provide or make available to you.

**"Person"** means any individual, corporation, partnership, limited liability company, governmental authority, association, joint venture, division, or other cognizable entity, whether or not having distinct legal existence.

**"Program Policies"** means all policies and program terms provided on the Program Policies page.

**"Sales Proceeds"** means the gross proceeds from any of Your Transactions, including (a) all shipping and handling, gift wrap and other charges; (b) taxes and customs duties to the extent specified in the applicable Tax Policies; and (c) in the case of invoiced orders, any amounts that customers fail to pay to us or our Affiliates on or before the applicable invoice due date.

**"Seller Central"** means the online portal and tools made available by Amazon to you, for your use in managing your orders, inventory, and presence on a particular Amazon Site or any other online point of presence.

**"Service"** means each of the following services: Selling on Amazon, Fulfillment by Amazon, Amazon Advertising (including Amazon Sponsored Products), the Selling Partner APIs, and, if the Elected Country for a Service is the United States, the Transaction Processing Services, together in each case with any related services and materials we make available.

**"Service Terms"** means the service terms applicable to each Service, which are made part of this Agreement upon the date you elect to register for or use the applicable Service, and any subsequent modifications we make to those terms.

**"Technology"** means any: (a) ideas, procedures, processes, systems, methods of operation, concepts, principles, and discoveries protected or protectable under the Laws of any jurisdiction; (b) interfaces, protocols, glossaries, libraries, structured XML formats, specifications, grammars, data formats, or other similar materials; and (c) software, hardware, code, technology, or other functional item.

**"Trademark"** means any trademark, service mark, trade dress (including any proprietary "look and feel"), trade name, other proprietary logo or insignia, or any other source or business identifier, protected or protectable under any Laws.

**"US Amazon Site"** means that website, the primary home page of which is identified by the URL www.amazon.com, and any successor or replacement of such website.

**"Your Materials"** means all Technology, Your Trademarks, Content, Your Product information, data, materials, and other items or information provided or made available by you or your Affiliates to Amazon or its Affiliates.

**"Your Personnel"** means any third party warranting, administering or otherwise involved in the offer, sale, performance, or fulfillment of Your Products, including any of your employees, representatives, agents, contractors, or subcontractors.

**"Your Product"** means any product or service (including Optional Coverage Plans) that you: (a) have offered through the Selling on Amazon Service; (b) have made available for advertising through the Amazon Advertising Service; or (c) have fulfilled or otherwise processed through the Fulfillment by Amazon Service.

**"Your Sales Channels"** means all sales channels and other means through which you or any of your Affiliates offers products or services, other than physical stores.

**"Your Taxes"** means any and all sales, goods and services, use, excise, premium, import, export, value added, consumption, and other taxes, regulatory fees, levies (specifically including environmental levies), or charges and duties assessed, incurred, or required to be collected or paid for any reason (a) in connection with any advertisement, offer or sale of products or services by you on or through or in connection with the Services; (b) in connection with any products or services provided for which Your Products are, directly or indirectly, involved as a form of payment or exchange; or (c) otherwise in connection with any action, inaction, or omission of you or your Affiliates, or any Persons providing products or services, or your or their respective employees, agents, contractors, or representatives, for which Your Products are, directly or indirectly, involved as a form of payment or exchange. Also, if the Elected Country is the United States, Mexico, or Canada as it is used in the Fulfillment by Amazon Service Terms, this defined term also means any of the types of taxes, duties, levies, or fees mentioned above that are imposed on or collectible by Amazon or any of its Affiliates in connection with or as a result of fulfillment services including the storage of inventory or packaging of Your Products and other materials owned by you and stored by Amazon, shipping, gift wrapping, or other actions by Amazon in relation to Your Products pursuant to the Fulfillment by Amazon Service Terms.

**"Your Trademarks"** means Trademarks of yours that you provide to us: (a) in non-text form for branding purposes; and (b) separate from (and not embedded or otherwise incorporated in) any product specific information or materials.

**"Your Transaction"** means any sale of Your Product(s) through an Amazon Site.

## Selling on Amazon Service Terms

The Selling on Amazon Service (**"Selling on Amazon"**) is a Service that allows you to offer certain products and services directly on the Amazon Sites.

These Selling on Amazon Service Terms are part of the Agreement, but, unless specifically provided otherwise, concern and apply only to your participation in Selling on Amazon. BY REGISTERING FOR OR USING THE SELLING ON AMAZON SERVICE, YOU (ON BEHALF OF YOURSELF OR THE

BUSINESS YOU REPRESENT) AGREE TO BE BOUND BY THE AGREEMENT, INCLUDING THESE SELLING ON AMAZON SERVICE TERMS. **NOTWITHSTANDING THE PREVIOUS SENTENCE, IF YOU HAVE ENTERED INTO A SEPARATE AGREEMENT THAT PERMITS YOU TO OFFER YOUR PRODUCTS THROUGH A PARTICULAR AMAZON SITE (E.G., A MERCHANTS@ AMAZON.COM PROGRAM AGREEMENT, MERCHANTS @AMAZON.CO.JP PROGRAM AGREEMENT OR ANY PREDECESSOR OF THOSE AGREEMENTS), THEN TO THE EXTENT THAT YOU CONTINUE TO LIST AND SELL YOUR PRODUCTS ON THAT AMAZON SITE PURSUANT TO SUCH SEPARATE AGREEMENT, TRANSACTIONS OF YOUR PRODUCTS ON THAT AMAZON SITE AND ANY TAX SERVICES WE MAKE AVAILABLE UNDER THAT AGREEMENT ARE GOVERNED BY THE TERMS OF THAT AGREEMENT AND NOT BY THESE SELLING ON AMAZON SERVICE TERMS.**

**S-1 Your Product Listings and Orders.**

**S-1.1 Products and Product Information.** You will provide accurate and complete Required Product Information for each product or service that you offer through any Amazon Site and promptly update that information as necessary to ensure it at all times remains accurate and complete. You will also ensure that Your Materials, Your Products (including packaging) and your offer and subsequent sale of any of the same on any Amazon Site comply with all applicable Laws (including all minimum age, marking and labeling requirements) and do not contain any sexually explicit (except to the extent expressly permitted under our applicable Program Policies), defamatory or obscene materials. You may not provide any information for, or otherwise seek to offer any Excluded Products on any Amazon Sites; or provide any URL Marks for use, or request that any URL Marks be used, on any Amazon Site. If you offer a product for sale on an Amazon Site that requires a warning under California Health & Safety Code Section 25249.6 (a “Proposition 65 Warning”) you (a) will provide us with such warning in the manner specified in our Program Policies, (b) agree that our display of a Proposition 65 Warning on a product detail page is confirmation of our receipt of that warning, and (c) will only revise or remove a Proposition 65 Warning for a product when the prior warning is no longer legally required.

**S-1.2 Product Listing; Merchandising; Order Processing.** We will enable you to list Your Products on a particular Amazon Site, and conduct merchandising and promote Your Products in accordance with the Agreement (including via the Amazon Associated Properties or any other functions, features, advertising, or programs on or in connection with the applicable Amazon Site). We may use mechanisms that rate, or allow shoppers to rate, Your Products and your performance as a seller and Amazon may make these ratings and feedback publicly available. We will

provide Order Information to you for each order of Your Products through the applicable Amazon Site. We will also receive all Sales Proceeds on your behalf for each of these transactions and will have exclusive rights to do so, and will remit them to you in accordance with these Selling on Amazon Service Terms. We may permit certain customers to place invoiced orders for Your Products, in which case remittance of Sales Proceeds may be delayed according to each customer's invoicing terms. You will accept and fulfill invoiced orders in the same manner as you accept and fulfill non-invoiced orders, except as otherwise provided in this Agreement.

**S-1.3 Shipping and Handling Charges.** For Your Products ordered by customers on or through an Amazon Site that are not fulfilled using Fulfillment by Amazon, you will determine the shipping and handling charges subject to our Program Policies and standard functionality (including any category-based shipping and handling charges we determine, such as for products offered by sellers on the Individual selling plan and BMVD Products generally). When we determine the shipping and handling charges, you will accept them as payment in full for your shipping and handling. Please refer to the Fulfillment by Amazon Service Terms for Your Products that are fulfilled using Fulfillment by Amazon.

**S-1.4 Credit Card Fraud and Unpaid Invoices.** We will bear the risk of (a) credit card fraud (i.e., a fraudulent purchase arising from the theft and unauthorized use of a third party's credit card information) occurring in connection with Your Transactions, and (b) late payments or defaults by customers in connection with invoiced orders for Your Products, except, in each case, in connection with Seller-Fulfilled Products that are not fulfilled strictly in accordance with the Order Information and Shipment Information. You will bear all other risk of fraud or loss.

**S-2 Sale and Fulfillment; Refunds and Returns.**

**S-2.1 Sale and Fulfillment.** Other than as described in the Fulfillment by Amazon Service Terms for each Amazon Site for which you decide to register or use the Selling on Amazon Service, you will: (a) source, offer, sell, and fulfill your Seller-Fulfilled Products, and source, offer, and sell your Amazon-Fulfilled Products, in each case in accordance with the terms of the applicable Order Information, this Agreement, and all terms provided by you or us and displayed on the applicable Amazon Site at the time of the order and be solely responsible for and bear all risk for those activities; (b) package each of Your Products in a commercially reasonable manner complying with all applicable packaging and labeling requirements, including any warnings or instructions necessary to safely use Your Products, and ship each of Your Products on or before its Expected Ship Date; (c) retrieve Order Information

at least once each business day; (d) only cancel Your Transactions as permitted pursuant to your terms and conditions appearing on the applicable Amazon Site at the time of the applicable order or as may be required under this Agreement; (e) fulfill Your Products throughout the Elected Country (except to the extent prohibited by Law or this Agreement); (f) provide to Amazon information regarding fulfillment and order status and tracking (to the extent available), in each case as requested by us using the processes designated by us, and we may make any of this information publicly available; (g) comply with all Street Date instructions; (h) ensure that you are the seller of each of Your Products; (i) include an order-specific packing slip, and, if applicable, any tax invoices, within each shipment of Your Products; (j) identify yourself as the seller of each of Your Products on all packing slips or other information included or provided in connection with Your Products and as the Person to which a customer may return the applicable product; and (k) not send customers emails confirming orders or fulfillment of Your Products. If any of Your Products are fulfilled using Fulfillment by Amazon, the Fulfillment by Amazon Service Terms for the applicable Amazon Site will apply to the storage, fulfillment, and delivery of such Amazon-Fulfilled Products.

**S-2.2 Cancellations, Returns, and Refunds.** The Amazon Refund Policies for the applicable Amazon Site will apply to Your Products. Subject to Section F-6, for any of Your Products fulfilled using Fulfillment by Amazon, you will promptly accept, calculate, and process cancellations, returns, refunds, and adjustments in accordance with this Agreement and the Amazon Refund Policies for the applicable Amazon Site, using functionality we enable for your account. Without limiting your obligations, we may in our sole discretion accept, calculate, and process cancellations, returns, refunds, and adjustments for the benefit of customers. You will route any payments to customers in connection with Your Transactions through Amazon. We will make any payments to customers in the manner we determine, and you will reimburse us for all amounts we pay.

**S-3 Problems with Your Products.**

**S-3.1 Delivery Errors and Nonconformities; Recalls.** You are responsible for any non-performance, non-delivery, misdelivery, theft, or other mistake or act in connection with the fulfillment of Your Products, except to the extent caused by: (a) credit card fraud for which we are responsible under Section S-1.4; or (b) our failure to make available to you Order Information as it was received by us or resulting from address verification. Notwithstanding the previous sentence, for those of Your Products that are fulfilled using Fulfillment by Amazon, if any, the Fulfillment by Amazon Service Terms for the applicable Amazon Site will apply to non-delivery, misdelivery, theft, or

other mistake or act in connection with the fulfillment of those of Your Products. You are also responsible for any non-conformity or defect in, any public or private recall of, or safety alert of any of Your Products or other products provided in connection with Your Products. You will notify us promptly as soon as you have knowledge of any public or private recalls, or safety alerts of Your Products or other products provided in connection with Your Products.

**S-3.2 A-to-z Guarantee and Chargebacks if the Elected Country is Canada or Mexico.** If we inform you that we have received or initiated a claim under the "A-to-z Guarantee" offered on a particular Amazon Site or other dispute relating to the offer, sale or fulfillment of Your Products (other than a chargeback), concerning one of Your Transactions, you will have 30 days to appeal our decision of the claim. If we find that a claim, chargeback, or dispute is your responsibility, you (a) will not take recourse against the customer, and (b) are responsible for reimbursing us in accordance with the Service Fee Payments section of this Agreement for the amount paid by the customer (including taxes and shipping and handling charges, but excluding any Referral Fees that we retained as defined in Section S-4), and all other fees and expenses associated with the original transaction (such as credit card, bank, payment processing, re-presentment, or penalty fees) and any related chargebacks or refunds, to the extent payable by us.

**S-3.3 A-to-z Guarantee, A-to-z Claims Process, and Chargebacks if the Elected Country is the United States.** Claims that we receive or initiate under the "A-to-z Guarantee" or the “A-to-z Claims Process for Property Damage and Personal Injury” will be governed by the Program Policy for such claims.

If we find that any claim, chargeback, or dispute is your responsibility, (i) you will not take recourse against the customer, and (ii) if Amazon resolves the claim directly with the customer and does not waive its right of indemnification, you will reimburse us in accordance with Section 2 of this Agreement to the extent of your responsibility (not to exceed the amount paid by Amazon to resolve the claim), including taxes and shipping and handling charges (but excluding any Referral Fees that we retained as defined in Section S-4), and all other fees and expenses associated with the original transaction (such as credit card, bank, payment processing, re-presentment, or penalty fees) and any related chargebacks or refunds.

**S-4 Compensation.**

You will pay us: (a) the applicable Referral Fees; (b) any applicable Variable Closing Fee; (c) the non-refundable Selling on Amazon Subscription Fee in

advance each month; and (d) any other applicable fees described in this Agreement (including any applicable Program Policies). **"Selling on Amazon Subscription Fee"** means the fee specified as such on the Selling on Amazon Fee Schedule for the applicable Amazon Site at the time such fee is payable. With respect to each of Your Transactions: (i) **"Sales Proceeds"** has the meaning set out in this Agreement; (ii) **"Variable Closing Fee"** means the applicable fee, if any, as specified on the Variable Closing Fee Schedule for the applicable Amazon Site; and (iii) **"Referral Fee"** means the applicable fee based on the Sales Proceeds from Your Transaction through the applicable Amazon Site specified on the Selling on Amazon Fee Schedule for that Amazon Site at the time of Your Transaction, based on the categorization by Amazon of the type of product that is the subject of Your Transaction; provided, however, that Sales Proceeds will not include any shipping charges set by us in the case of Your Transactions that consist solely of products fulfilled using Fulfillment by Amazon.

**S-5 Remittance of Sales Proceeds & Refunds.**

Except as otherwise stated in this Agreement, we will remit to you your available balance on a bi-weekly (14 day) (or at our option, more frequent) basis, which may vary for each Elected Country. For each remittance, your available balance is equal to any Sales Proceeds not previously remitted to you as of the applicable Remittance Calculation Date (which you will accept as payment in full for Your Transactions), less: (a) the Referral Fees; (b) the applicable Variable Closing Fee; (c) any Selling on Amazon Subscription Fees; (d) any other applicable fees described in this Agreement (including any applicable Program Policies); (e) any amounts we require you to maintain in your account balance pursuant to this Agreement (including payments withheld pursuant to Section 2 of the General Terms, Section S-1.4, Section S-3.2, Section S-3.3, and applicable Program Policies); and (f) any taxes that Amazon automatically calculates, collects and remits to a tax authority according to applicable law, as specified in the Tax Policies.

We may establish a reserve on your account based on our assessment of risks to Amazon or third parties posed by your actions or performance, and we may modify the amount of the reserve from time to time at our sole discretion.

When you either initially provide or later change Your Bank Account information, the Remittance Calculation Date may be deferred by up to 14 days. For sellers that registered after October 30, 2011 and are on the Individual selling plan, the remittance amount will not include Sales Proceeds from the 14-day period before the date of remittance. If you refund money to a customer in connection with one of Your Transactions,

and the refund is routed through us (or our Affiliate), on the next available Remittance Calculation Date we will refund to you the amount of the Referral Fee paid by you to us attributable to the amount of the customer refund (including refunded taxes and customs duties only to the extent specified in the applicable Tax Policies), less the Refund Administration Fee for each of Your Products refunded that is not a BMVD Product, which amount we may retain as an administrative fee; provided, however, that in the case of a complete refund of Sales Proceeds for a Media Product, we will refund to you the full amount of any Variable Closing Fee paid by you to us (and in the case of a partial refund of Sales Proceeds for a Media Product, we will not refund to you any portion of any Variable Closing Fee paid by you to us). We will remit any amounts to be refunded by us pursuant to this subsection from time to time together with the next remittance to be made by us to you. **"Refund Administration Fee"** means the applicable fee described on the Refund Administration Fee Schedule for the applicable Amazon Site.

Net Sales Proceeds from non-invoiced orders will be credited to your available balance when they are received by us or our Affiliates. Sales Proceeds from invoiced orders will be credited to your available balance: (a) if you have elected in advance to pay a fee to accelerate remittance of Sales Proceeds from invoiced orders, on the day all of Your Products included in an invoiced orders are shipped; or (b) otherwise, no later than the seventh day following the date that an invoiced order becomes due.

### S-6 Amazon's Websites and Services.

Amazon has the right to determine, the design, content, functionality, availability and appropriateness of its websites, selection, and any product or listing in the Amazon Stores, and all aspects of each Service, including your use of the same. Amazon may assign any of these rights or delegate any of its responsibilities.

### S-7 Continuing Guarantees

Guarantees. We require the following continuing guarantees from you.

S-7.1 Pesticides. If any of Your Products is a "pesticide" being offered or sold in the United States or other product regulated under the US Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA") or its implementing regulations, then you provide to us the following continuing guaranty that: (a) you are a resident of the United States; and (b) with respect to each such product, the pesticides and other FIFRA regulated products comprising each sale, shipment, or other delivery made previously or hereafter are: (i)

lawfully registered with the US Environmental Protection Agency at the time of sale, shipment, or delivery, or fully qualified for a specific exemption from the FIFRA registration requirements at the time of sale, shipment, or delivery, (ii) compliant with all requirements of FIFRA and its implementing regulations at the time of sale, shipment, or delivery, and (iii) provided by you in the original, unbroken packaging.

S-7.2 Foods, Drugs, Medical Devices, and Cosmetics. If any of Your Products is a “food”, “drug”, “medical device”, or “cosmetic” being offered or sold in the United States or other product regulated under the U.S. Federal Food, Drug, and Cosmetic Act (“FFDCA”) or its implementing regulations, then you provide us with the following continuing guaranty that with respect to all such products comprising each sale, shipment, or other delivery made previously or hereafter are: (i) not adulterated or misbranded within the meaning of the FFDCA, (ii) compliant with all requirements of FFDCA and its implementing regulations at the time of sale, shipment, or delivery, and (iii) provided by you in the original, unbroken packaging.

**Selling on Amazon Definitions**

**"Amazon-Fulfilled Products"** means any of Your Products that are fulfilled using the Fulfillment by Amazon Service.

**"Amazon Refund Policies"** means the return and refund policies published on the applicable Amazon Site and applicable to products and services offered via that Amazon Site.

**"BMVD Product"** means any book, magazine or other publication, sound recording, video recording, and/or other media product in any format, including any subscription, in each case excluding any software product, computer game, and/or video game.

**"Excluded Offer"** means any discount, rebate, promotional offer, or other term of offer and/or sale that you: (a) have attempted to make available through a particular Amazon Site but that we do not honor or support (but only until such time as we honor or support the same on such Amazon Site); or (b) make available solely to third parties that either (i) purchase products solely for resale and who are not end users of such products (i.e., wholesale purchasers), or (ii) if the Elected Country is Canada, Mexico, or the United States, have affirmatively elected and opted-in to participate in your or one of your Affiliates' membership-based customer loyalty or customer incentive programs.

**"Expected Ship Date"** means, with respect to any of Your Products, either: (a) the end of the shipping availability period (which begins as of the date on which the relevant order is placed by the customer), or the shipping availability date, as applicable, specified by you in the relevant inventory/product data feed for Your Product; or (b) if you do not specify shipping availability information in such inventory/product data feed or that Your Product is in a product category that Amazon designates as requiring shipment within two (2) business days, two (2) business days after the date on which the relevant order is placed by the customer.

**"Media Product"** means any book, magazine or other publication, sound recording, video recording, software product, computer game, videogame, or other media product in any format, including any related subscription, offered through an Amazon Site.

**"Purchase Price"** means the total amount payable or paid for Your Product (including taxes and shipping and handling charges only to the extent specified in the applicable Tax Policies).

**"Remittance Calculation Date"** is the date that is two (2) business days prior to the date of remittance (the **"Remittance Calculation Date"**).

**"Required Product Information"** means, with respect to each of Your Products in connection with a particular Amazon Site, the following (except to the extent expressly not required under the applicable Program Policies): (a) description, including as applicable, location-specific availability and options, scheduling guidelines and service cancellation policies; (b) SKU and UPC/EAN/JAN numbers, and other identifying information as Amazon may reasonably request; (c) information regarding in-stock status and availability, shipping limitations or requirements, and Shipment Information (in each case, in accordance with any categorizations prescribed by Amazon from time to time); (d) categorization within each Amazon product category and browse structure as prescribed by Amazon from time to time; (e) digitized image that accurately depicts only Your Product, complies with all Amazon image guidelines, and does not include any additional logos, text or other markings; (f) Purchase Price; (g) shipping and handling charge (in accordance with our standard functionality); (h) any text, disclaimers, warnings, notices, labels, warranties, or other content required by applicable Law to be displayed, or that are necessary for the safe use of Your Product, in connection with the offer, merchandising, advertising, or sale of Your Product; (i) any vendor requirements, restocking fees or other terms and conditions applicable to such product that a customer should be aware of prior to purchasing the product; (j) brand; (k) model; (l) product dimensions; (m) weight; (n) a delimited list of technical specifications; (o) SKU and

UPC/EAN/JAN numbers (and other identifying information as we may reasonably request) for accessories related to Your Product that is available in our catalog; (p) the state or country Your Product ships from; and (q) any other information reasonably requested by us (e.g., the condition of used or refurbished products; and invoices and other documentation demonstrating the safety and authenticity of Your Products).

**"Seller-Fulfilled Products"** means any of Your Products that are not fulfilled using the Fulfillment by Amazon Service.

**"Shipment Information"** means, with respect to any of Your Products, the estimated or promised shipment and delivery date.

**"Street Date"** means the date(s), if any, specified by the manufacturer, distributor, and/or licensor of a product as the date before which specified information regarding such product (e.g., title of a book) should not be disclosed publicly, or such product should not be delivered or otherwise made available to customers.

**"URL Marks"** means any Trademark, or any other logo, name, phrase, identifier, or character string, that contains or incorporates any top level domain (e.g., .com, .edu, .ca, .fr, .jp) or any variation of a top level domain (e.g., dot com, dotcom, net, or com).

**"Your Transaction"** is defined in the General Terms of this Agreement; however, as used in these Selling on Amazon Service Terms, it means any and all such transactions through Selling on Amazon only.

**Fulfillment by Amazon Service Terms**

Fulfillment by Amazon (**"FBA"**) provides fulfillment and associated services for Your Products.

These FBA Service Terms are part of the Agreement, and, unless specifically provided otherwise, concern and apply only to your participation in FBA. BY REGISTERING FOR OR USING FBA, YOU (ON BEHALF OF YOURSELF OR THE BUSINESS YOU REPRESENT) AGREE TO BE BOUND BY THE AGREEMENT, INCLUDING THESE FBA SERVICE TERMS. You expressly agree that Amazon may engage its Affiliate(s) or a third party in order to complete one or more of the fulfillment and associated services outlined below.

**Fulfillment Services**

### F-1 Your Products

Once you are accepted into FBA, you must apply to register each product you offer that you wish to include in the FBA program. We may refuse registration in FBA of any product, including on the basis that it is an FBA Excluded Product or that it violates applicable Program Policies. You may at any time withdraw registration of any of Your Products from FBA.

### F-2 Product and Shipping Information

You will, in accordance with applicable Program Policies, provide accurate and complete information about Your Products registered in FBA, and will provide Fulfillment Requests for any Units fulfilled using FBA that are not sold through an Amazon Site (**"Multi-Channel Fulfillment Units"**). You will promptly update any information about Your Products in accordance with our requirements and as necessary so that the information is at all times accurate and complete.

### F-3 Shipping to Amazon

**F-3.1** Except as otherwise provided in Section F-3.4 and Section F-5, FBA is limited to Units that are shipped to and from fulfillment centers located within the applicable Elected Country, to be delivered to customers in the same Elected Country only. You will ship Units to us in accordance with applicable Program Policies. You will be responsible for all costs incurred to ship the Units to the shipping destination (including costs of freight and transit insurance) and Amazon will not pay any shipping costs. You are responsible for payment of all customs, duties, taxes, and other charges. In the case of any improperly packaged or labeled Unit, we may return the Unit to you at your expense (pursuant to Section F-7) or re-package or re-label the Unit and charge you an administrative fee.

**F-3.2** You will not deliver to us any Unsuitable Unit; we may reject any shipment of Your Products.

**F-3.3** We may, at our option, allow you to ship Units at your expense (as described in Section F-9.2) to fulfillment centers using discounted shipping rates that we may make available to you for certain carriers. In such event, you will use the processes and supply the information that we require for you to obtain such discounted rates. You also must comply with standard operating procedures, weight and size restrictions, and other shipping requirements of the applicable carriers. If we provide you with the estimated shipping costs prior to shipment, you acknowledge and agree that actual

shipping costs may vary from such estimates. In addition, if the weight of the Unit, as determined by the applicable carrier, differs from that submitted by you to us for purposes of determining the estimated shipping costs, then: (a) you may be charged more than the estimated shipping costs if the carrier determines that such Unit weighs more than as submitted by you; or (b) you may be charged the full amount of the estimated shipping costs even if the carrier determines the weight to be less than that submitted by you. You will not use carrier account information (e.g., carrier account number, amount of shipping rates, etc.) for any purpose, nor disclose such information to any third party, and you will protect such information as Amazon's confidential information in accordance with Section 11 of the General Terms of this Agreement. As between you, us, and the applicable carrier, you will be the shipper of record, and we will make payment to the carrier with respect to the shipment of all Units using such discounted rates. Title and risk of loss for any Unit shipped using discounted rates provided by us under this Section will remain with you, and our provision of such shipping rates will not create any liability or responsibility for us with respect to any delay, damage, or loss incurred during shipment. You authorize the applicable carrier to provide us with all shipment tracking information.

**F-3.4** If you ship Units from outside the applicable Elected Country to fulfillment centers, you will list yourself as the importer/consignee and nominate a customs broker. If Amazon is listed on any import documentation, Amazon reserves the right to refuse to accept the Units covered by the import documents and any costs assessed against or incurred by Amazon will be collected from Your Bank Account, deducted from amounts payable to you, or by other method at our election.

**F-4 Storage**

We will provide storage services as described in these FBA Service Terms once we confirm receipt of delivery. We will keep electronic records that track inventory of Units by identifying the number of Units stored in any fulfillment center. We will not be required to physically mark or segregate Units from other inventory units (e.g., products with the same Amazon standard identification number) owned by us, our Affiliates or third parties in the applicable fulfillment center(s). If we elect to commingle Units with such other inventory units, both parties agree that our records will be sufficient to identify which products are Units. We may move Units among facilities. If there is a loss of or damage to any Units while they are being stored, we will, compensate you in accordance with the FBA Guidelines, and you will, at our request, provide us a valid tax invoice for the compensation paid to you. If we compensate you for a Unit, we will be entitled to dispose of the Unit pursuant to Section F-7. At all other times, you will be solely responsible for

any loss of, or damage to, any Units. Our confirmed receipt of delivery does not: (a) indicate or imply that any Unit has been delivered free of loss or damage, or that any loss or damage to any Unit later discovered occurred after confirmed receipt of delivery; (b) indicate or imply that we actually received the number of Units of Your Product(s) specified by you for such shipment; or (c) waive, limit, or reduce any of our rights under this Agreement. We reserve the right to change scheduling restrictions and volume limitations on the delivery and storage of your inventory in fulfillment centers in accordance with Section 15 of the General Terms, and you will comply with any of these restrictions or limitations.

### F-5 Fulfillment

As part of our fulfillment services, we will ship Units from our inventory of Your Products to the shipping addresses in the Elected Country included in valid customer orders, or submitted by you as part of a Fulfillment Request. We may ship Units together with products purchased from other merchants, including any of our Affiliates. We also may ship Units separately that are included in a single Fulfillment Request. If you participate in our export fulfillment services, we will also ship Your Products that we determine to be eligible (each, a **"Foreign-Eligible Product"**) to Foreign Addresses within countries we determine to be eligible for foreign shipments, subject to the additional terms on foreign shipments in the applicable FBA Guidelines.

### F-6 Customer Returns

**F-6.1** You will be responsible for and will accept and process returns of, and provide refunds and adjustments for, any Multi-Channel Fulfillment Units in accordance with the Agreement (including the applicable Program Policies).

**F-6.2** We will receive and process returns of any Amazon Fulfillment Units that were shipped to addresses within the Elected Country in accordance with the terms of your Seller Agreement, these FBA Service Terms, and the Program Policies. Any Sellable Units that are also Amazon Fulfillment Units and that are properly returned will be placed back into the inventory of Your Products in the FBA Program. We may fulfill customer orders for Your Products with any returned Amazon Fulfillment Units. Except as provided in Section F-7, you will retake title of all Units that are returned by customers.

**F-6.3** Subject to Section F-7, we will, at your direction, either return or dispose of any Unit that is returned to us by a customer and that we determine is an Unsuitable Unit.

**F-6.4** If Amazon receives a customer return of a Multi-Channel Fulfillment Unit, you will direct us to return or dispose of the Unit at your own cost failing which we may dispose of the Unit as provided in Section F-7.

**F-7 Returns to You and Disposal**

**F-7.1** You may, at any time, request that Units be returned to you or that we dispose of Units.

**F-7.2** We may with notice return Units to you, including upon termination of these FBA Service Terms. Returned Units will be sent to your designated shipping address. However, if (a) the designated shipping address we have for you is outdated or incorrect, (b) you have not provided or, upon our request, confirmed a designated shipping address in the Elected Country, or (c) we cannot make arrangements for you to pay for the return shipment, then the Unit(s) will be deemed abandoned and we may elect to dispose of them as appropriate based on the inventory (e.g., by selling, recycling, donating, or destroying it) and retain any proceeds we may receive from the disposal.

We may dispose of any Unsuitable Unit (and you will be deemed to have consented to our action): (d) immediately if we determine that (i) the Unit creates a safety, health, or liability risk to Amazon, our personnel, or any third party; (ii) you have engaged in fraudulent or illegal activity; or (iii) we have cause to terminate your use of Services with immediate effect pursuant to Section 3 and are exposed to liability towards a third party; (e) if you fail to direct us to return or dispose of any Unsuitable Unit within thirty (30) days after we notify you that the Unit has been recalled; or (f) if you fail to direct us to return or dispose of any Unsuitable Unit within thirty (30) days (or as otherwise specified in the applicable Program Policies) after we notify you that its removal is required, for instance because your use of FBA is suspended or terminated or your seller account is suspended, terminated or closed. In addition, you will reimburse us for expenses we incur in connection with any Unsuitable Units.

We may dispose of any Unit we are entitled to dispose of (including any Unsuitable Units) in the manner we deem appropriate (e.g., by selling, recycling, donating, or destroying it) and retain any proceeds we may receive from the disposal.

**F-7.3** You may, at any time, request that we dispose of Units. In this case, we may dispose of these Units as appropriate based on the inventory (e.g., by selling, recycling, donating, or destroying it) and retain any proceeds we may receive from the disposal. Title to each disposed Unit will transfer to us (or a

third party we select such as a charity) at no cost, free and clear of any liens, claims, security interests or other encumbrances to the extent required to dispose of the Unit, and we may retain any proceeds, we may receive from the disposal.

**F-7.4** You will promptly notify us of any recalls or potential recalls, or safety alerts of any of Your Products and cooperate and assist us in connection with any recalls or safety alerts, including by initiating the procedures for returning items to you under our standard processes. You will be responsible for all costs and expenses you, we or any of our or your Affiliates incur in connection with any recall or potential recall or safety alerts of any of Your Products (including the costs to return, store, repair, liquidate, or deliver to you or any vendor any of these products).

### F-8 Customer Service

**F-8.1** For Multi-Channel Fulfillment Units we will have no customer service obligations other than to pass any inquiries to your attention at the contact you provide, and to make available a reasonable amount of information regarding the status of the fulfillment of Your Products if you request it and if and to the extent we possess the requested information. You will ensure that all of your policies and messaging to your customers regarding shipping of Your Products and other fulfillment-related matters, reflect our policies and requirements, including with regard to shipping methods, returns, and customer service; and, you will conspicuously display on your website(s), in emails or in other media or communications any specific disclosures, messaging, notices, and policies we require.

**F-8.2** We will be responsible for all customer service issues relating to packaging, handling and shipment, and customer returns, refunds, and adjustments related to Amazon Fulfillment Units. We will determine whether a customer will receive a refund, adjustment or replacement for any Amazon Fulfillment Unit and we will require you to reimburse us where we determine you have responsibility in accordance with the Agreement (including these FBA Service Terms and the Program Policies). We will promptly notify you when you are responsible for a customer refund. You may appeal if you disagree with our finding within thirty (30) days after our notification, in addition to your right to request that Units be returned to you under Section F-7.1. Except as provided in this Section F-8 regarding any Amazon Fulfillment Units, customer service will be handled in accordance with your Seller Agreement.

**F-8.3** In situations relating to Amazon Fulfillment Units where the wrong item was delivered or the item was damaged or lost or is missing, unless we

determine that the basis for such request is caused by you or any of your employees, agents, or contractors, we will, at our option: (a) for any Amazon Fulfillment Unit, (i) ship a replacement Unit to the customer and reimburse you in accordance with the FBA Guidelines for the replacement Unit, or (ii) process a refund to the customer and reimburse you in accordance with the FBA Guidelines for the Unit; or (b) for any Multi-Channel Fulfillment Unit, reimburse you in accordance with the FBA Guidelines for the Unit (and you will, at our request, provide us a valid tax invoice for the compensation paid to you). Any customer refund will be processed in accordance with the Selling on Amazon and the Transaction Processing Service Terms (if the Elected Country for a Service is the United States). Notwithstanding the Selling on Amazon Service Terms, we will be entitled to retain the applicable fees payable to us under the Selling on Amazon Service Terms and these FBA Service Terms, respectively. Except as expressly provided in this Section F-8.3, you will be responsible for all costs associated with any replacement or return.

**F-8.4** If we provide a replacement Unit or refund as described in Section F-8.3 to a customer and that customer returns the original Unit to us, we will be entitled to dispose of the Unit pursuant to Section F-7, or, if it is a Sellable Unit, we may, at our option, place such Unit back into your inventory in accordance with Section F-6. If we do put a Unit back into your inventory, you will reimburse us for the applicable Replacement Value (as described in the FBA Guidelines) of the returned Unit. Any replacement Unit shipped by us under these FBA Service Terms will be deemed to be, and will be treated in the same manner as, an order and sale of such Unit from you to the customer via the applicable Amazon Site or Service in accordance with, and subject to, the terms and conditions of this Agreement and your Seller Agreement.

**F-9 Compensation for Fulfillment Services**

**F-9.1 Handling and Storage Fees.** You will pay us the applicable fees described in the applicable Fulfillment by Amazon Fee Schedule. You will be charged the Storage Fees beginning on the day (up to midnight) that the Unit arrives at a fulfillment center and is available for fulfillment by Amazon (or in the case of any Unsuitable Unit, the arrival day (up to midnight)), until the earlier of: (a) the day (up to midnight) we receive a valid customer order for such product or a request from you to return or dispose of the Unit; or (b) the day (up to midnight) we actually ship the Unit to your designated return location or dispose of the Unit.

**F-9.2 Shipping and Gift Wrap.** For any Amazon Fulfillment Units we will determine the amounts charged to the customer for shipping and gift wrap

services for the Units that we fulfill through the FBA Program. As between you and us, these charges will be your charges to the customer, and we will report them to you. We will charge you (and you will pay us) a fee equal to the amount of such charges to the customer. In the case of shipments of Units sold through the Amazon Site that qualify for the "Free Shipping" promotion, the amounts charged to the customer for shipping the Selling on Amazon Units that Amazon fulfills will first be charged to the customer and will next be deducted from the total charges to the customer as your promotion and Amazon will not charge you the fee described above. If you ship Units to us using the shipping rates that we may make available pursuant to Section F-3.3, you will reimburse us for the actual amounts charged to us by the applicable carrier for such shipments.

**F-9.3 Proceeds.** We may as appropriate keep part of or all proceeds of any Units that we are entitled to dispose of pursuant to F-7 above, or to which title transfers, including returned, damaged, or abandoned Units. You will have no security interest, lien, or other claim to the proceeds that we receive in connection with the sale, fulfillment, and/or shipment of these Units.

### F-10 Indemnity

In addition to your obligations under Section 6 of the General Terms of this Agreement, you also agree to indemnify, defend, and hold harmless us, our Affiliates, and our and their respective officers, directors, employees, representatives, and agents against any Claim that arises from or relates to: (a) the Units (whether or not title has transferred to us, and including any Unit that we identify as yours pursuant to Section F-4), including any personal injury, death, or property damage; (b) any of Your Taxes or the collection, payment, or failure to collect or pay Your Taxes; and, if applicable (c) any sales, use, value added, personal property, gross receipts, excise, franchise, business, or other taxes or fees, or any customs, duties, or similar assessments (including penalties, fines, or interest on any of the foregoing) imposed by any government or other taxing authority in connection with the shipment of Foreign-Eligible Products to Foreign Addresses (collectively, **"Foreign Shipment Taxes"**).

### F-11 Release

You, on behalf of yourself and any successors, subsidiaries, Affiliates, officers, directors, shareholders, employees, assigns, and any other person or entity claiming by, through, under, or in concert with them (collectively, the **"Releasing Parties"**), irrevocably acknowledge full and complete satisfaction of and unconditionally and irrevocably release and forever fully discharge Amazon and each of our Affiliates, and any and all of our and their

predecessors, successors, and Affiliates, past and present, as well as each of our and their partners, officers, directors, shareholders, agents, employees, representatives, attorneys, and assigns, past and present, and each of them and all Persons acting by, through, under, or in concert with any of them (collectively, the **"Released Parties"**), from any and all claims, obligations, demands, causes of action, suits, damages, losses, debts, or rights of any kind or nature, whether known or unknown, suspected or unsuspected, absolute or contingent, accrued or unaccrued, determined or speculative (collectively, **"Losses"**) which the Releasing Parties now own or hold or at any time have owned or held or in the future may hold or own against the Released Parties, or any of them, arising out of, resulting from, or in any way related to the shipment, export, or delivery of Your Products to Foreign Addresses, including any tax registration or collection obligations. You, on behalf of yourself and all other Releasing Parties, recognize that you, and each of them, may have some Losses, whether in tort, product liability, contract, warranty, or otherwise, against the Released Parties of which you, or any of them, are totally unaware and unsuspecting, or which may arise or accrue after the date you register for or use FBA, which the Releasing Parties are giving up by agreeing to these FBA Service Terms. It is your intention in agreeing to these FBA Service Terms that these FBA Service Terms will deprive the Releasing Parties of each and all such Losses and prevent the Releasing Party from asserting any such Losses against the Released Parties, or any of them. In addition to the foregoing, you acknowledge, on behalf of yourself and all other Releasing Parties that you are familiar with Section 1542 of the Civil Code of the State of California, as follows:

**"A general release does not extend to claims that the creditor or releasing party does not know or suspect to exist in his or her favor at the time of executing the release and that, if known by him or her, would have materially affected his or her settlement with the debtor or released party."**

You, on behalf of yourself and all other Releasing Parties, expressly waive and relinquish any rights that you had or may have under Section 1542 of the Civil Code of the State of California or any similar provision of the law of any other jurisdiction, to the full extent that you may lawfully waive all such rights pertaining to the subject matter of these FBA Service Terms.

**F-12 Disclaimer**

IN ADDITION TO THE DISCLAIMER IN SECTION 7 OF THE GENERAL TERMS OF THIS AGREEMENT, WE DISCLAIM ANY DUTIES OF A BAILEE OR WAREHOUSEMAN, AND YOU WAIVE ALL RIGHTS AND REMEDIES OF A BAILOR (WHETHER ARISING UNDER COMMON LAW OR STATUTE OR

OTHERWISE), RELATED TO OR ARISING OUT OF ANY POSSESSION, STORAGE, OR SHIPMENT OF YOUR PRODUCTS BY US OR OUR AFFILIATES OR ANY OF OUR OR THEIR CONTRACTORS OR AGENTS.

### F-13 Effect of Termination

Your termination rights are set forth in Section 3 of this Agreement. Following any termination of the Agreement or these FBA Service Terms in connection with a particular Elected Country, we will, as directed by you, return to you or dispose of the Units held in that Elected Country as provided in Section F-7. If you fail to direct us to return or dispose of the Units within thirty (30) days (or as otherwise specified in the applicable Program Policies) after termination, then we may elect to return and/or dispose of the Units in whole or in part, as provided in Section F-7, and you agree to such actions. Upon any termination of these FBA Service Terms in connection with a particular Elected Country, all rights and obligations of the parties under these FBA Service Terms in connection with such Elected Country will be extinguished, except that the rights and obligations of the parties under Sections F-1, F-2, F-3, F-4, F-5, F-6, F-7, F-8, F-9, F-11, F-12, and F-13 with respect to Units received or stored by Amazon as of the date of termination will survive the termination.

### F-14 Tax Matters

You understand and acknowledge that storing Units at fulfillment centers may create tax nexus for you in any country, state, province, or other localities in which your Units are stored, and you will be solely responsible for any taxes owed as a result of such storage. If any Foreign Shipment Taxes or Your Taxes are assessed against us as a result of performing services for you in connection with the FBA Program or otherwise pursuant to these FBA Service Terms, you will be responsible for such Foreign Shipment Taxes and Your Taxes and you will indemnify and hold Amazon harmless from such Foreign Shipment Taxes and Your Taxes as provided in Section F-10 of these FBA Service Terms.

### F-15 Additional Representation

In addition to your representations and warranties in Section 5 of the General Terms of this Agreement, you represent and warrant to us that: (a) you have valid legal title to all Units and all necessary rights to distribute the Units and to perform under these FBA Service Terms; (b) you will deliver all Units to us in new condition (or in such condition otherwise described by you in the applicable Your Product listing) and in a merchantable condition; (c) all Units and their packaging will comply with all applicable marking,

labeling, and other requirements required by Law; (d) no Unit is or will be produced or manufactured, in whole or in part, by child labor or by convict or forced labor; (e) you and all of your subcontractors, agents, and suppliers involved in producing or delivering Units will strictly adhere to all applicable Laws of the Elected Country, its territories, and all other countries where Units are produced or delivered, regarding the operation of their facilities and their business and labor practices, including working conditions, wages, hours, and minimum ages of workers; and (f) that all Foreign-Eligible Products (i) can be lawfully exported from Canada, Mexico, or the United States, as applicable, without any license or other authorization; and (ii) can be lawfully imported into, and comply with all applicable Laws of, any eligible country.

**FBA Definitions**

**"Amazon Fulfillment Units"** means Units fulfilled using FBA that are sold through an Amazon Site. For avoidance of doubt, if you have successfully registered for or used both the FBA and Selling on Amazon Services, then the term "Amazon Fulfillment Units" and the defined term "Amazon Fulfilled Products" in the Selling on Amazon Service Terms both refer to the same items.

**"FBA Excluded Product"** means any Unit that is an Excluded Product or is otherwise prohibited by the applicable Program Policies.

**"Foreign Address"** means (a) if the Elected Country is the United States, any mailing address that is not (i) within the fifty states of the United States or Puerto Rico, or (ii) an APO/FPO address; and (b) if the Elected Country is not the United States, any mailing address that is not within the Elected Country.

**"Fulfillment Request"** means a request that you submit to us (in accordance with the standard methods for submission prescribed by us) to fulfill one or more Multi-Channel Fulfillment Units.

**"Multi-Channel Fulfillment Units"** has the meaning in Section F-2.

**"Sellable Unit"** means a Unit that is not an Unsuitable Unit.

**"Seller Agreement"** means the Selling on Amazon Service Terms, the Merchants@ Program Agreement, the Marketplace Participation Agreement, any successor to any of these agreements, or any other similar agreement (as determined by Amazon) between you and us that permits you to offer products and services via a particular Amazon Site.

**"Shipping Information"** means with respect to any purchased Unit(s), the following information: the name of the recipient, the shipping address, the quantity of Units to be shipped, and any other shipping-related information we may reasonably request.

**"Unit"** means a unit of Your Product that you deliver to Amazon in connection with the FBA Program.

**"Unsuitable Unit"** means a Unit: (a) that is defective, damaged, unfit for a particular purpose, or lacking required label(s); (b) the labels for which were not properly registered with Amazon before shipment or do not match the product that was registered; (c) that is an FBA Excluded Product or does not comply with the Agreement (including applicable Service Terms and Program Policies); (d) that Amazon determines is unsellable or unfulfillable; or (e) that Amazon determines is otherwise unsuitable.

**Amazon Advertising Service Terms**

The Amazon Advertising Service Terms govern your use of Amazon Advertising, a Service that allows you to advertise your products. The Amazon Advertising Service Terms apply to your use of the Ad Services.

Your use of the Ad Services (as defined in the Amazon Advertising Agreement) is governed by the Amazon Advertising Agreement. You accept the Amazon Advertising Agreement, which may be updated from time to time by Amazon in accordance with its terms. The Amazon Advertising Agreement is available at https://advertising.amazon.com/terms. In the event of any conflict between the General Terms or Program Policies and the Amazon Advertising Agreement with respect to the Ad Services, the Amazon Advertising Agreement will prevail to the extent of the conflict. If the Amazon Advertising Agreement is deemed unlawful, void, or for any reason unenforceable, then the General Terms will govern your access to and use of the Ad Services.

**Transaction Processing Service Terms**

BY REGISTERING FOR OR USING ANY SERVICE OTHER THAN AMAZON ADVERTISING FOR WHICH THE ELECTED COUNTRY IS THE UNITED STATES, YOU (ON BEHALF OF YOURSELF OR THE BUSINESS YOU REPRESENT) AGREE TO BE BOUND BY THESE TRANSACTION PROCESSING SERVICE TERMS FOR THAT SERVICE. **NOTWITHSTANDING THE FOREGOING, IF A SEPARATE AGREEMENT GOVERNS THE OFFER, SALE OR FULFILLMENT OF YOUR PRODUCTS ON THE US AMAZON SITE, THE TERMS OF THAT AGREEMENT**

**WILL CONTINUE TO GOVERN THE PROCESSING OF YOUR TRANSACTIONS TO THE EXTENT DESCRIBED IN THAT AGREEMENT.**

### P-1 Payments Processing Agency Appointment

For non-invoiced orders, you authorize Amazon Payments, Inc. to act as your agent for purposes of processing payments, refunds and adjustments for Your Transactions, receiving and holding Sales Proceeds on your behalf, remitting Sales Proceeds to Your Bank Account, charging your Credit Card, and paying Amazon and its Affiliates amounts you owe in accordance with this Agreement or other agreements you may have with Amazon Affiliates. For invoiced orders, you authorize: (a) Amazon Capital Services, Inc. to act as your agent for purposes of processing payments, refunds and adjustments for Your Transactions, and receiving and holding Sales Proceeds on your behalf; and (b) Amazon.com Services LLC to act as your agent for purposes of remitting Sales Proceeds to Your Bank Account, charging your Credit Card, and paying Amazon and its Affiliates amounts you owe in accordance with this Agreement or other agreements you may have with Amazon Affiliates. Amazon Payments, Inc., Amazon Capital Services, Inc., and Amazon.com Services LLC are each an **"Amazon Payments Agent"**. The applicable Amazon Payments Agents provide the services described in these Transaction Processing Service Terms and the related services described in Sections S-1.4, S-2.2, S-5, and F-8.3 of the Agreement (collectively, the **"Transaction Processing Services"**).

When a buyer instructs us to pay you, you agree that the buyer authorizes and orders us to commit the buyer's payment (less any applicable fees or other amounts we may collect under this Agreement) to you. You agree that buyers satisfy their obligations to you for Your Transactions when we receive the Sales Proceeds. We will remit funds to you in accordance with this Agreement.

### P-2 Remittance

Subject to Section 2 of the General Terms of this Agreement, the applicable Amazon Payments Agents will remit funds to you in accordance with Section S-5 of the Agreement and these Transaction Processing Service Terms. Each applicable Amazon Payments Agent's obligation to remit funds collected or received by it or otherwise credited to your available balance in connection with Your Transactions is limited to funds in your available balance that have become available in accordance with this Agreement less amounts owed to Amazon and any taxes that Amazon automatically calculates, collects and remits to a tax authority according to applicable law, as specified in the Tax Policies, subject to chargeback or reversal or withheld for anticipated claims

in accordance with this Agreement. Without limiting Amazon's rights to collect any amounts you owe, the applicable Amazon Payments Agent's receipt of Sales Proceeds or crediting of Sales Proceeds to your available balance discharges your obligation to pay applicable fees and other amounts under this Agreement to the extent the Sales Proceeds received or credited equal or exceed the fees and other amounts you owe and the Sales Proceeds are applied to the payment of those fees and amounts.

### P-3 Your Funds

Your Sales Proceeds will be held in an account with the applicable Amazon Payments Agent (a **"Seller Account"**) and will represent an unsecured claim against that Amazon Payments Agent. Your Sales Proceeds are not insured by the Federal Deposit Insurance Corporation, nor do you have any right or entitlement to collect Sales Proceeds directly from any customer. Prior to disbursing funds to you, an Amazon Payments Agent may combine Sales Proceeds held with the funds of other users of the Services, invest them, or use them for other purposes permitted by applicable Laws. You will not receive interest or any other earnings on any Sale Proceeds. To the extent required by applicable Laws, an Amazon Payments Agent will not use any funds held on your behalf for its corporate purposes, will not voluntarily make such funds available to its creditors in the event of bankruptcy or for any other purpose, and will not knowingly permit its creditors to attach such funds.

### P-4 Verification

We may at any time require you to provide any financial, business or personal information we request to verify your identity. You authorize us to obtain from time to time consumer credit reports to establish or update your Seller Account or in the event of a dispute relating to this Agreement or the activity under your Seller Account. You agree to update all Seller Account information promptly upon any change. The Amazon Payments Privacy Notice applies to transactions processed by Amazon Payments, Inc.

### P-5 Dormant Accounts

If there is no activity (as determined by us) in connection with your Seller Account for the period of time set forth in applicable unclaimed property laws and we hold Sales Proceeds on your behalf, we will notify you by means designated by us and provide you the option of keeping your Seller Account open and maintaining the Sales Proceeds in your Seller Account. If you do not respond to our notice(s) within the time period we specify, we will send the Sales Proceeds in your Seller Account to your state of residency, as

determined by us based on the information in your Seller Account. If we are unable to determine your state of residency or your Seller Account is associated with a foreign country, your funds may be sent to the State of Delaware.

## Selling Partner API Terms

### API-1 Description of the Selling Partner APIs

The "Selling Partner APIs" enable your systems to interface with certain features or functionality we make available to you. These Selling Partner API Terms concern and apply only to your use of the Selling Partner APIs unless specifically provided otherwise. Under the Selling Partner API Terms, you may authorize parties who (a) develop Applications to support you using the Selling Partner APIs or the API Materials, (b) have registered with us as Developers, and (c) who have agreed to the Marketplace Developer Agreement ("Developers") to access Confidential Information and Your Materials via the Selling Partner APIs provided, in each case, that where Confidential Information is disclosed to Developers, you shall remain liable for the acts or omissions of such Developers as if such acts or omissions were your own. If you wish to use the Selling Partner APIs directly or develop software or a website that interfaces with the Selling Partner APIs or the API Materials (an "Application"), you must register as a Developer.

We may make available Selling Partner APIs (including the Marketplace Web Services APIs) and software, data, text, audio, video, images, or other content we make available in connection with the Selling Partner APIs, including related documentation, software libraries, and other supporting materials, regardless of format (collectively the "API Materials") that permit your systems to interface with certain features or functionality available to you. You may authorize Developers to access Confidential Information and Your Materials via the Selling Partner APIs solely for the purpose of supporting your business on Amazon and provided, in each case, that where Confidential Information is disclosed to Developers, you shall remain liable for the acts or omissions of such Developers as if such act or omissions were your own. All terms and conditions applicable to the Selling Partner APIs and the API Materials in this Agreement are solely between you and us. API Materials that are public or open source software ("Public Software") may be provided to you under a separate license, in which case, notwithstanding any other provision of this Agreement, that license will govern your use of those API Materials. For the avoidance of doubt, except to the extent expressly prohibited by the license governing any API Materials that are Public Software, all of the non-license provisions of this Agreement will apply.

### API-2 License and Related Requirements

#### API-2.1 Generally.

We grant you a limited, revocable, non-exclusive, non-sublicenseable, nontransferable license during the term of the Agreement to allow Developers to access and use Confidential Information and Your Materials through the Selling Partner APIs and the API Materials solely in support of your use of the Services covered by this Agreement. As between you and us, we or our licensors own all right, title, and interest in and to the Confidential Information, the Selling Partner APIs, the API Materials, any technical and operational specifications, security protocols and other documentation or policies provided or made available by us with respect to the Selling Partner APIs or the API Materials (the "Selling Partner API Specifications"), and our internal data center facilities, servers, networking equipment, and host software systems that are within our or their reasonable control and are used to provide the Selling Partner APIs or the API Materials (the "Amazon Network").

#### API-2.2 License Restrictions.

You may authorize Developers to access Confidential Information and Your Materials through the Selling Partner APIs and the API Materials only through APIs documented and communicated by us in accordance with any applicable Selling Partner API Specifications. You may not authorize any other party to do any of the following with the Confidential Information, the Selling Partner APIs and the API Materials: (a) reverse engineer, decompile, or disassemble them; (b) modify or create derivative works based upon them in whole or in part; (c) distribute copies of them; (d) remove any proprietary notices or labels on them; (e) use any Public Software in any manner that requires, pursuant to the license applicable to such Public Software, that the Confidential Information, the Selling Partner APIs and the API Materials be disclosed, licensed, distributed, or otherwise made available to anyone; (f) resell, lease, rent, transfer, sublicense, or otherwise transfer rights to them; (g) access or use them in a way intended to avoid incurring any applicable fees or exceeding usage limits or quotas; (h) access or use them for any purpose unrelated to your use of Services; or (i) access or use them for fraudulent or illegal activities or activities that violate our policies or are otherwise harmful to us or any third parties. The limitations regarding Data Use in Section 11 above apply to any information you disclose or receive by the direct or indirect use of the Selling Partner APIs.

#### API-2.3 No License for Direct Access.

For the avoidance of doubt, these Selling Partner API Terms do not provide you a license to directly access or use the Selling Partner APIs, or install, copy, use, or distribute API Materials. Direct use of the Selling Partner APIs may only be licensed to Developers.

### API-2.4 Account Identifiers and Credentials.

You must use the account IDs and any unique public key/private key pair issued by us to provide access to your data via the Selling Partner APIs ("Account Identifiers and Credentials") in accordance with these Selling Partner API Terms to authorize Developers to access the Selling Partner APIs on your behalf. You may only authorize access to Confidential Information and Your Materials via the Selling Partner APIs in the way that we prescribe. Your Account Identifiers and Credentials are for your personal use only and you must maintain their secrecy and security. You are solely responsible for all activities that occur using your Account Identifiers and Credentials, regardless of whether the activities are undertaken by you or a third party (including your employees, contractors, or agents). You will provide us with notice immediately if you believe an unauthorized third party may be using your Account Identifiers and Credentials or if your Account Identifiers and Credentials are lost or stolen. We are not responsible for unauthorized use of your Account Identifiers and Credentials.

### API-2.5 Security of Your Materials and Confidential Information.

You are solely responsible for authorizing others to access the Selling Partner APIs on your behalf and taking your own steps to maintain appropriate security, protection, and backup of the Confidential Information and Your Materials processed pursuant to your access to the Selling Partner APIs and the API Materials, including any Confidential Information you have disclosed to Developers in accordance with this Agreement. We are not responsible for any unauthorized access to, alteration of, or deletion, destruction, damage, loss, or failure to store any of the Confidential Information or Your Materials in connection with the Selling Partner APIs (including as a result of your or any third party's errors, acts, or omissions). If you believe (acting reasonably) that a personal data breach has occurred in relation to any customer personal data in your possession or otherwise under your control (including in the possession of a Developer), you shall immediately notify Amazon of such personal data breach (in sufficient detail) for information purposes, and promptly take any actions (or require a Developer take such actions, if relevant) as applicable to you under data privacy Laws.

### API-3 Termination

**API-3.1 Termination of Your Access to the Selling Partner APIs and the API Materials.**

Without limiting the parties' rights and obligations under this Agreement, the Amazon Marketplace Developer Agreement, or the Amazon Marketplace API License Agreement, we may limit, suspend, or terminate your access to the Selling Partner APIs and the API Materials for convenience with 30 days' notice. We may terminate immediately if (a) we determine that you have materially breached this Agreement and failed to cure within 7 days of a cure notice; (b) you or your account have been engaged in deceptive, fraudulent, or illegal activity; or (c) your use of the Selling Partner APIs and the API Materials may harm our customers.

Upon any suspension or termination of your access to the Selling Partner APIs and the API Materials, you will immediately cease authorizing others to use the Selling Partner APIs and the API Materials. Upon any termination of your access to the Selling Partner APIs and the API Materials, you will also immediately destroy all API Materials. Upon any suspension or termination of your access to the Selling Partner APIs and the API Materials, we may cause your Account Identifiers and Credentials to cease to be recognized by the Amazon Network for the purposes of the Selling Partner APIs and the API Materials.

**API-4 Modifications to the Selling Partner APIs and the API Materials**

We may change or discontinue the Selling Partner APIs or the API Materials (including by changing or removing features or functionality of the Selling Partner APIs or the API Materials) from time to time. For any material changes that will negatively affect your business, we will provide notice under Section 18.

**API-5 Disclaimers**

THE SELLING PARTNER APIS AND THE API MATERIALS ARE PROVIDED "AS IS". WE AND OUR AFFILIATE COMPANIES AND LICENSORS MAKE NO REPRESENTATIONS OR WARRANTIES OF ANY KIND, WHETHER EXPRESS, IMPLIED, STATUTORY OR OTHERWISE REGARDING THE SELLING PARTNER APIS OR THE API MATERIALS, INCLUDING ANY WARRANTY THAT THE SELLING PARTNER APIS OR THE API MATERIALS WILL BE UNINTERRUPTED, ERROR FREE, OR FREE OF HARMFUL COMPONENTS, OR THAT ANY MATERIALS OR DATA YOU ACCESS, USE, STORE, RETRIEVE, OR TRANSMIT IN CONNECTION WITH THE SELLING PARTNER APIS, INCLUDING YOUR MATERIALS, WILL BE SECURE OR NOT OTHERWISE LOST OR DAMAGED. EXCEPT TO THE EXTENT PROHIBITED BY LAW, WE AND OUR AFFILIATE

COMPANIES AND LICENSORS DISCLAIM ALL WARRANTIES, INCLUDING ANY IMPLIED WARRANTIES OF MERCHANTABILITY, SATISFACTORY QUALITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT, OR QUIET ENJOYMENT, AND ANY WARRANTIES ARISING OUT OF ANY COURSE OF DEALING OR USAGE OF TRADE. FURTHER, NEITHER WE NOR ANY OF OUR AFFILIATE COMPANIES OR LICENSORS WILL BE RESPONSIBLE FOR ANY COMPENSATION, REIMBURSEMENT, OR DAMAGES ARISING IN CONNECTION WITH: (A) THE INABILITY TO USE THE SELLING PARTNER APIS OR THE API MATERIALS FOR ANY REASON; (B) THE COST OF PROCUREMENT OF SUBSTITUTE GOODS OR SERVICES; OR (C) ANY INVESTMENTS, EXPENDITURES, OR COMMITMENTS BY YOU IN CONNECTION WITH THIS AGREEMENT OR YOUR USE OF OR ACCESS TO THE SELLING PARTNER APIS OR THE API MATERIALS.


## Related articles

- Amazon Services Business Solutions Agreement
- Changes to the Amazon Services Business Solutions Agreement
- Program Policies
- Changes to program policies
- Intellectual Property for Rights Owners
- International selling agreements
- Additional Guidelines
- About the 2019 Novel Coronavirus (COVID-19)

Need more help?

See more on Seller Central

Visit Seller Forums

Reach Hundreds of Millions of Customers

Start Selling On Amazon

© 1999-2021, Amazon.com, Inc. or its affiliates

# EXHIBIT 2

amazon seller central

English

Sign in

Sell on Amazon

This article applies to selling in: **United States**

Help / Policies, agreements, and guidelines / Program Policies / Selling on Amazon fee schedule / **Selling Policies and Seller Code of Conduct**

# Selling Policies and Seller Code of Conduct

All sellers are expected to adhere to the following policies when listing products on Amazon. Seller offenses and prohibited content can result in suspension of your Amazon account.

## Seller code of conduct

This policy requires that sellers act fairly and honestly on Amazon to ensure a safe buying and selling experience. All sellers must:

- Provide accurate information to Amazon and our customers at all times
- Act fairly and not misuse Amazon's features or services
- Not attempt to damage or abuse another Seller, their listings or ratings
- Not attempt to influence customers' ratings, feedback, and reviews
- Not send unsolicited or inappropriate communications
- Not contact customers except through Buyer-Seller Messaging
- Not attempt to circumvent the Amazon sales process
- Not operate more than one selling account on Amazon without a legitimate business need
- Not engage in conduct that violates price fixing laws

Violating the Code of Conduct or any other Amazon policies may result in actions against your account, such as cancellation of listings, suspension or forfeiture of payments, and removal of selling privileges. More details about these policies are below.

### Accurate Information

You must provide accurate information to Amazon and our customers, and update the information if it changes. For example, this means that you must use a business name that accurately identifies your business and list your products in the correct category.

## Acting Fairly

You must act fairly and lawfully and may not misuse any service provided by Amazon. Examples of unfair activities include:

- Providing misleading or inappropriate information to Amazon or our customers, such as by creating multiple detail pages for the same product or posting offensive product images
- Manipulating sales rank (such as by accepting fake orders or orders that you have paid for, or refunded externally or orders that you discounted externally) or making claims about sales rank in product titles or descriptions
- Attempting to increase the price of a product after an order is confirmed
- Artificially inflating web traffic (using bots or paying for clicks, for example)
- Attempting to influence search results by inflating search ranking through keyword manipulation or incentivizing customers' searches to appear as organic behavior
- Attempting to damage another Seller, their listings or ratings
- Allowing other people to act on your behalf in a way that violates Amazon's policies or your agreement with Amazon

## Ratings, Feedback, and Reviews

You may not attempt to influence or inflate customers' ratings, feedback, and reviews. You may request feedback and reviews from your own customers in a neutral manner, but may not:

- Pay for or offer an incentive (such as coupons or free products) in exchange for providing or removing feedback or reviews
- Ask customers to write only positive reviews or ask them to remove or change a review
- Solicit reviews only from customers who had a positive experience
- Review your own products or a competitors' products

## Communications

You may not send unsolicited or inappropriate messages. All communications to customers must be sent through Buyer-Seller Messaging and be necessary for fulfilling the order or providing customer services. Marketing communications are prohibited.

## Customer Information

If you receive customer information such as addresses or phone numbers to fulfill orders, you may use that information only to fulfill orders and must delete it after the order has been processed. You may not use customer information to contact customers (except through Buyer-Seller Messaging) or share it with any third-party.

## Circumventing the Sales Process

You may not attempt to circumvent the Amazon sales process or divert Amazon customers to another website. This means that you may not provide links or messages that prompt users to visit any external website or complete a transaction elsewhere.

## Multiple Selling Accounts on Amazon

You may only maintain one Seller Central account for each region in which you sell unless you have a legitimate business need to open a second account and all of your accounts are in good standing. If any of your accounts are not in good standing, we may deactivate all of your selling accounts until all accounts are in good standing.

Examples of a legitimate business justification include:

- You own multiple brands and maintain separate businesses for each
- You manufacture products for two distinct and separate companies
- You are recruited for an Amazon program that requires separate accounts

## Filing Infringement Notices as an Agent or Brand Protection Agency

Amazon understands that many brands may choose to have brand protection agencies or agents report intellectual property infringement on their behalf

and accepts submissions from authorized agents. However, Amazon does not permit individuals with active selling accounts to file infringement notices as an agent of a brand when the filing of those notices could benefit their own selling account (through removing competing listings, for example). Any sellers filing notices as an agent to benefit their own status as a seller may have their selling account terminated.

To learn more about Amazon policy violations and review a few examples, please watch this short video.

## Selling Policies and Seller Code of Conduct

- Keeping Your Account Information Secure
- Identifying false (spoofed) e-mails
- Supported browsers and operating systems
- Why do I have to complete a PIN verification process?
- Why isn't the system recognizing my PIN when I enter it?
- Can I transfer my seller account?
- Do I have to have a land line to complete this process, or can I use a cell phone?
- Why didn't I receive a phone call?
- I closed my browser; how do I get to the next step of the verification process?
- Why can't I view some pages on Seller Central?
- How can I verify that my bank account information has been changed?
- What can I do if my bank account information is rejected?

### Related articles

Selling on Amazon Business fee schedule

Access the Fee Explainer

- Selling Policies and Seller Code of Conduct
- Category, product, and listing restrictions
- Product Detail Page Rules
- Prohibited seller activities and actions
- Drop Shipping Policy
- Recalled Products
- Expiration dates on seller-fulfilled products
- Understanding fee categories

**Need more help?**

- See more on Seller Central
- Visit Seller Forums

## Reach Hundreds of Millions of Customers

Start Selling On Amazon

© 1999-2022, Amazon.com, Inc. or its affiliates

# EXHIBIT 3

Performance notifications

April 28, 2022

## Your Amazon.ca selling privileges have been removed

FEEDBACK ✕

Hello,

Your Amazon.ca Seller account has been deactivated in accordance with section 3 of Amazon's Business Solutions Agreement. Your listings have been disabled. Funds will not be transferred to you but will be held in your account while we work with you to address this issue. This may take up to 90 days, but funds may be held longer. Please ship any open orders to avoid further impact to your account.

**Why is this happening?**

You have a separate account MIB SHOP which was enforced for violating one of our policies. As a result, you may no longer use the Dotcom LLC to sell on Amazon.ca.

**How do I reactivate my account?**

In order to reactivate this Selling account, Dotcom LLC please follow the below steps:

1. You must first reactivate the account associated with MIB SHOP by submitting an appeal. Please follow the instructions in the communication received for that account.

2. Once you have successfully reactivated that account, please submit an appeal to reactivate the current account, Dotcom LLC by using this link: https://sellercentral.amazon.ca/performance/notifications. When submitting the appeal, you will need to provide us with the name of the account that was reactivated and the date of reactivation.

**What if I don't own the account – MIB SHOP ?**

If you believe you do not own the other account, please follow the below steps:

1. If you once owned the account/were a rights owner but no longer own it/no longer have account rights, please submit an appeal following this https://sellercentral.amazon.ca/performance/notifications and provide supporting documentation to show that you no longer own it/no longer have any relationship to this account. Supporting documentation may include sales deed, purchase agreement, or business transfer agreement, contract termination, etc.

2. If you do not recognize the above account and believe this de-activation was in error, please submit an appeal following this link: https://sellercentral.amazon.ca/performance/notifications and confirm that this account does not belong to you. If we cannot substantiate the claim, your account will not be reinstated and this account will not be allowed to do business on Amazon in the future.

**What happens if I do not send the requested information?**

If you do not provide a valid appeal, or choose not to appeal the deactivation, after 90 days following this notification, you may separately request a funds disbursement by contacting disbursement-appeals@amazon.ca. We will conduct a separate investigation to evaluate your account and if we find that you have engaged in deceptive, fraudulent, or illegal activity; or have abused our systems or repeatedly violated our Policies that protect our customers and selling partners, we may withhold some or all funds in your account.

FEEDBACK ✕

Regards,

Seller Performance Team

https://www.amazon.ca

Was this e-mail helpful?

If you have any questions visit: Seller Central

To change your email preferences visit: Notification Preferences

Copyright 2022 Amazon, Inc, or its affiliates. All rights reserved.
Amazon.com, 410 Terry Avenue North, Seattle, WA 98109-5210

View appeal

Help | Program Policies | English | Download the Amazon Seller mobile app

© 1999-2023, Amazon.com, Inc. or its affiliates

FEEDBACK ✕

# EXHIBIT 4

# PLAN OF ACTION

**03/05/2022**

Dear Amazon,

Thank you for giving us a chance to appeal our suspension.

We investigated with our Virtual Assistants and Legal Team to confirm if they had any connection with the above said selling account knowingly or unknowingly but could not able to establish any connection. We again want to confirm we have never owned a separate account and believe this deactivation was in error.

As I have cleared that I do not have any association legally or friendly with any other seller account, I am attaching the following legal documents when my business was established in order to further distance my company from any other account:

1. EIN Certificate
2. Certificate of Organisation Domestic Limited Liability Company Document
3. Certificate of Formation
4. Revenue ID and sales tax account document
5. SUT Account document
6. Credit Card Statements last 3 months
7. Fulfilment Center Agreement ( 181 S WHITFIELD ST, NAZARETH PA 18064, NAZARETH, PA 18064-2156 US).

Here are the details of the **USER PERMISSIONS** which we have given to our Virtual Assistants:

| NAME | EMAIL ID | Location | Designation |
|---|---|---|---|
| Danny | dannywaak@gmail.com | Jammu & Kashmir, India | Listing Executive |
| Ankit | sevenonesevenankit@gmail.com | Uttar Pradesh, India | Account Health Executive |
| Registered eMail ID | dotcom1453@gmail.com | Nazareth, PA. USA 18064 | Owner |
| Customer Support | dotcomllc2020@gmail.com | Tarlac City, PH (Philippines) 2300 | Customer Support |
| Ebru Gurler | dotc.om0911@gmail.com | Nazareth, PA. USA 18064 | Fulfilment |



## User Permissions

User Permissions History

Use the Permissions Manager to grant access rights to other users. Learn more

Amazon takes the security of your account seriously. Only invite people or businesses that you trust to access your business information.

Current Users

| Name | E-mail Address | |
|---|---|---|
| Danny | dannywaak@gmail.com | Manage Permissions Delete |
| Ankit | sevenonesevenankit@gmail.com | Manage Permissions Delete |
| Customer Support | dotcom1453@gmail.com | Manage Permissions Delete |
| Ebru Gurler | dot.com0911@gmail.com | Manage Permissions |
| dotcomllc | dotcomllc2020@gmail.com | Manage Permissions Delete |

Add a New User

| Name | E-mail Address | Language |
|---|---|---|

We again want to confirm we have never owned a separate account and believe this deactivation was in error. We are losing our business due to this deactivation and request Amazon to reactivate our account as soon as possible.

Thank You

# EXHIBIT 5

Disbursement-appeals@amazon.ca
Payments-funds@amazon.ca

Dear Amazon Disbursements,

I am writing to you from the DOTCOM LLC Amazon Storefront to request the release of our funds which have been withheld for being related to MIB SHOP.

Account Info:
Name: Dotcom LLC
Email: dot.com0911@gmail.com

**Circumstances Regarding Account Violations – RELATED TO MIB SHOP Account**

On April 28, 2022, our selling privileges were deactivated, and pending funds were withheld. Please see below:

amazon

Hello,

Your Amazon.ca Seller account has been deactivated in accordance with section 3 of Amazon's Business Solutions Agreement. Your listings have been disabled. Funds will not be transferred to you but will be held in your account while we work with you to address this issue. This may take up to 90 days, but funds may be held longer. Please ship any open orders to avoid further impact to your account.

**Why is this happening?**

You have a separate account MIB SHOP which was enforced for violating one of our policies. As a result, you may no longer use the Dotcom LLC to sell on Amazon.ca.

**How do I reactivate my account?**

In order to reactivate this Selling account, Dotcom LLC please follow the below steps:

1. You must first reactivate the account associated with MIB SHOP by submitting an appeal. Please follow the instructions in the communication received for that account.

2. Once you have successfully reactivated that account, please submit an appeal to reactivate the current account, Dotcom LLC by using this link: https://sellercentral.amazon.ca/performance/notifications. When submitting the appeal, you will need to provide us with the name of the account that was reactivated and the date of reactivation.

**What if I don't own the account – MIB SHOP ?**

If you believe you do not own the other account, please follow the below steps:

1. If you once owned the account/were a rights owner but no longer own

Amazon alleged that our account was related to a store called "MIB SHOP." According to Section 2 of the Amazon Services Business Solutions Agreement (Service Fee Payments; Receipt of Sales Proceeds), **while Amazon may be able to temporarily withhold payment if they determine there are any related risks to Amazon or third parties, Amazon may only withhold funds permanently** if the seller **engages in prohibited, deceptive, fraudulent, abusive or illegal activity, or has repeatedly violated Amazon's Program Policies. Here, we have not engaged in any activity such that Amazon can justify the permanent withholding of our funds.**

## Limitation on Liability and Indemnification

No party has named Amazon or our store as a Defendant in any litigation. Since no party has further pursued this matter, we believe Amazon it is not exposed to any potential liability. Further, any potential liability is limited by our good faith efforts. Finally, per Amazon's Business Solutions Agreement, we already must indemnify Amazon if any party takes any further action. As such, we believe our funds should be released.

## Conclusion

The prolonged withholding of our funds is causing significant damage to our business and needs to be addressed by Amazon immediately. Although we have taken steps to correct and prevent future issues, Amazon refuses to reinstate our account. However, we should be rightfully permitted to have full accessibility of our funds.

Without these proceeds we cannot pay our bills, pay our staff, or replenish any inventory. Furthermore, we continue to suffer additional loses for each day these funds remain withheld. In accordance with section 2 of the Amazon Services Business Solutions Agreement, **we have not engaged in any deceptive, fraudulent, or illegal activity, or repeatedly violate any Program Policies such that Amazon can justify the permanent withholding of our funds.**

In the event Amazon fails to respond or address the issue regarding our withheld funds, we will be left with no recourse but to file for arbitration with the American Arbitration Association so that we can recover our funds. For these reasons stated above, **we respectfully request immediate access to the funds withheld in our Amazon account.**

Thank you,

DOTCOM LLC

# EXHIBIT 6

| Account Type | Settlement Period |
|---|---|
| Standard orders | 2023-09-08 – Present (Open) |

| | |
|---|---|
| **Beginning Balance** | **$321,722.60** |
| **Sales** | **$0.00** |
| **Expenses** | **$0.00** |
| **Account Level Reserve** | **-$321,722.60** |
| **Net Proceeds** | **$0.00** |

**Your next scheduled transfer initiation date is 2023-09-22*. However, if your available balance remains $0.00, no transfer will be initiated on this date.**

*Transfers can take 3-5 business days to complete and actual transfer amount is subject to change. View our Help page for more information about when you will be paid.

# EXHIBIT 7

misleading, and possibly criminally false or perjurious."[1553] In light of this concern, Subcommittee staff views Amazon's other claims and representations with a degree of skepticism in instances where they conflict with credible sources, such as investigative reporting, interviews with market participants, or other evidence uncovered by Subcommittee staff during the investigation.

## 2. Amazon.com

### a. Market Power

Amazon has significant and durable market power in the U.S. online retail market.[1554] The company's actual share of U.S. e-commerce is unknown outside of Amazon because it does not report the gross merchandise volume of third-party sales made on its marketplace. A frequently cited analysis by market research company eMarketer estimates that Amazon's share in this market is 38.7%.[1555] eMarketer's estimate, however, is likely understated because its definition of e-commerce is overly broad. For example, under eMarketer's approach to e-commerce, the Auto and Parts category includes online sales of cars.[1556] In contrast, marketing analytics company Jumpshot estimates that Amazon captures an average of 74% of digital transactions across a wide range of product categories.[1557] The Jumpshot analysis may overstate Amazon's share because it calculates market share as a percentage of transactions made on well-known market participants' websites, like Amazon, Walmart, and Target, but excludes small, online retailers.[1558] Based on the information Subcommittee staff gathered during its investigation, estimates that place Amazon's share of U.S. e-commerce at about 50% or higher are more credible than lower estimates of 30-40%.[1559]

---

[1553] Bipartisan Letter from the Chairman, Ranking Member, and Members of H. Comm. on the Judiciary to Jeff Bezos, CEO, Amazon.com, Inc. (May 1, 2020), https://judiciary.house.gov/uploadedfiles/2020-05-01_letter_to_amazon_ceo_bezos.pdf.

[1554] *See generally* Dig. Competition Expert Panel Report at 30 (finding that recent financial indicators suggest Amazon's "dominan[ce] in a meaningfully distinct sector of online retail" will endure and that "investors are expecting it to retain its dominant position, and to earn significantly higher profits in future"); Stigler Report at 78 ("[T]he evidence thus far does suggest that current digital platforms face very little threat of entry . . . . [T]he key players in this industry remained the same over the last two technology waves, staying dominant through the shift to mobile and the rise of AI. In the past, dominant business found it difficult to navigate innovation or disruption waves. By contrast, Facebook, Google, Amazon, Apple, and even Microsoft were able to ride these waves without significant impact on market share or profit margins.").

[1555] ANDREW LIPSMAN, TOP 10 US ECOMMERCE COMPANIES 2020, EMARKETER (Mar. 10, 2020), https://www.emarketer.com/content/top-10-us-ecommerce-companies-2020.

[1556] Production of Amazon, to H. Comm. on the Judiciary, AMAZON-HJC-00206583 (2019) (on file with Comm.) (eMarketer Inc. – Global Ecommerce 2019 Report).

[1557] *See* Kimberly Collins, *Google + Amazon: Data on Market Share, Trends, Searches from Jumpshot*, SEARCH ENGINE WATCH (Aug. 1, 2019), https://www.searchenginewatch.com/2019/08/01/amazon-google-market-share/.

[1558] *See id.*

[1559] *See* Submission from Source 11, to H. Comm. on the Judiciary, 2 (Oct. 14, 2019) (on file with Comm.) ("Amazon has amassed at least a 50% share of the ecommerce market and continues to expand, both its market share and the breadth of its offerings."); PYMNTS.COM, WALMART VS. AMAZON, WHOLE PAYCHECK TRACKER: BATTLE FOR THE DIGITAL FIRST CONSUMER 6 (2020), https://securecdn.pymnts.com/wp-content/uploads/2020/09/Amazon-Walmart-Whole-Paycheck-092020.pdf (estimating Amazon's market share at 51.2% in Q1 2020 and 44.4% in Q2 2020, but noting U.S. e-commerce

In a number of key product categories, ranging from household essentials to sports, fitness and outdoors, Amazon is reported to account for well over 50% of online sales.[1560] The platform also has significant market power over the entire book industry, including sales, distribution, and publishing. In the U.S. market, Amazon accounts for over half of all print book sales and over 80% of e-book sales.[1561]

Amazon is the dominant online marketplace. It reportedly controls about 65% to 70% of all U.S. online marketplace sales.[1562] The platform's market power is at its height in its dealings with third-party sellers, as well as many of its suppliers, which Amazon refers to as vendors. Increasingly, Amazon is also gaining market power in certain business-to-business (B2B) online markets through Amazon Business, its B2B marketplace.[1563]

In response to the Committee's requests for information, Amazon claims that "estimates of total retail share are the most appropriate and relevant method of estimating" Amazon's market share.[1564] This approach is inconsistent with evidence gathered by Subcommittee staff, conventional antitrust analysis of relevant product markets, and common sense. In a recent investigation, for example, the FTC concluded that a "relevant market may be divided by channel of sale, resulting in separate markets for brick-and-mortar sales and online sales."[1565] Illustrating the extent of Amazon's overly broad approach to identifying the relevant market and its top competitors, in response to the

---

increased by 44% over the same period, and that "[f]or Amazon to drop only 7 percent in total eCommerce share with that kind of overall increase is actually quite an achievement.").

[1560] *See, e.g.*, Kimberly Collins, *Google + Amazon: Data on Market Share, Trends, Searches from Jumpshot*, SEARCH ENGINE WATCH (Aug. 1, 2019), https://www.searchenginewatch.com/2019/08/01/amazon-google-market-share/; *see also* J.P. MORGAN REPORT: RETAIL VS. AMAZON: LIFE IN A POST COVID-19 WORLD 13 (Amazon's market share of online sales of Books & Magazines is 75%).

[1561] *See, e.g.*, Ben Evans, *What's Amazon market share?*, BENEDICT EVANS https://www.ben-evans.com/benedictevans/2019/12/amazons-market-share19#:~:text=Amazon%20has%2050%25%20or%20more,it%20has%20over%2050%25 ("Amazon has 50% or more of the US print book market"); Submission from Source 17, to H. Comm. on the Judiciary, 33 (Nov. 14, 2019) (on file with Comm.) ("Amazon accounts for roughly 83 percent of all e-book sales, about 90 percent of online print sales, and about 90 percent of digital audiobook sales."); Dig. Competition Expert Panel Report at 30 ("In the e-book market, Amazon was reported in February 2017 to account for around 88% of total annual unit sales.").

[1562] Submission from Top Shelf Brands, to H. Comm. on the Judiciary, 26 (Oct. 26, 2019) (on file with Comm.) (citing DIG. COMMERCE 360, 2019 ONLINE MARKETPLACES REPORT).

[1563] *See* MARKETPLACE PULSE, MARKETPLACES YEAR IN REVIEW 48 (2019), https://cdn.marketplacepulse.com/misc/marketplaces-year-in-review-2019.pdf ("Amazon's 'business-to-business', or B2B, marketplace is gaining market share faster than its retail operation."); Phone Interview with Nat'l Ass'n of Wholesaler-Distributors (Sept. 3, 2020); STACY MITCHELL & OLIVIA LAVECCHIA, REPORT: AMAZON'S NEXT FRONTIER: YOUR CITY'S PURCHASING 4 (2018), https://ilsr.org/amazon-and-local-government-purchasing/ ("Amazon is leveraging its growing relationship with local governments to induce more businesses to join its Marketplace.").

[1564] Production of Amazon, to H. Comm. on the Judiciary, 3 (Oct. 14, 2019).

[1565] *See* Complaint at 4, In the Matter of Edgewell Personal Care Co.& Harry's Inc., No. 9390 (F.T.C., Feb. 2, 2020), https://www.ftc.gov/system/files/documents/cases/public_p3_complaint_-_edgewell-harrys.pdf.

Committee's request for "A list of the Company's top ten competitors," Amazon identified 1,700 companies, including Eero (a company Amazon owns), a discount surgical supply distributor, and a beef jerky company.[1566]

Amazon also included single-category companies in response to the Committee's request for a list of Amazon's top ten competitors. Yet documents produced by Amazon suggest that even in its early days it did not view such retailers as direct competitors. For instance, a recap of an Amazon marketing presentation identified one of its key points as: "No direct competitors, closest competitors would be what you refer to as category driven i.e. Best Buy, Barnes and Noble...etc."[1567]

Regardless of the precise boundaries of e-commerce or online marketplaces, the sum of evidence that Subcommittee staff examined demonstrates that Amazon functions as a gatekeeper for e-commerce. Amazon is the most-visited website in the world for e-commerce and shopping.[1568] In a submission to the Committee, an e-commerce market participant said that "many of the 64% of American households that have Prime memberships are effectively locked into Amazon for their online shopping."[1569] Meanwhile, recent market analysis suggests that over 60% of all online product searches in the U.S. begin on Amazon.com.[1570]

At the Subcommittee's hearing on innovation and entrepreneurship, Stacy Mitchell, the Co-Director of the Institute for Local Self-Reliance, described one independent retailer's attempt to survive in e-commerce independent of Amazon:

> As its customers moved online, so too did the company. Gazelle Sports built a robust e-commerce site. With scores of enthusiastic reviews on Google and Yelp, the site came right up in online searches, yielding a brisk stream of customers and sales.
>
> But, in 2014, sales began to decline. The problem was that many people in Michigan and across the country were no longer starting their online shopping on a search engine, where they might find Gazelle Sports. Instead, they were going straight to Amazon. By

---

1566 *See* Production of Amazon, to H. Comm. on the Judiciary, 17 (Oct. 14, 2019) (on file with Comm.).

1567 Production of Amazon, to H. Comm. on the Judiciary, AMAZON-HJC-0059575 (Nov. 22, 2010) (on file with Comm.).

1568 SIMILARWEB, WORLDWIDE E-COMMERCE AND SHOPPING CATEGORY PERFORMANCE (July 2020), https://pro.similarweb.com/#/industry/overview/E-commerce_and_Shopping/999/1m/?webSource=Total (Amazon had 2.6 billion visits in July 2020 compared to 940.8 million visits for eBay).

1569 Submission from Source 11, to H. Comm. on the Judiciary, 5 (Oct. 14, 2019) (on file with Comm.).

1570 Lucy Koch, *Looking for a New Product? You Probably Searched Amazon*, EMARKETER (Mar. 31, 2019), https://www.emarketer.com/content/looking-for-a-new-product-you-probably-searched-amazon (citing FEEDVISOR, THE 2019 AMAZON CONSUMER BEHAVIOR REPORT 14 (2019)); *see also* WUNDERMAN THOMPSON, THE FUTURE SHOPPER REPORT 2020 11 (2020), https://insights.wundermanthompsoncommerce.com/hubfs/@UK/Landing%20Pages/2020/The%20Future%20Shopper%202020/WTC%20-%20The%20Future%20Shopper%20Report%202020.pdf?hsCtaTracking=24d37c38-db5d-4797-bd6c-2ea35127ad21%7C70cdff40-3236-48fb-a2ec-c4b298453df9.

> 2016, the share of online shoppers bypassing search engines and beginning their product search on Amazon had grown to 55 percent. With sales flagging and staff reductions underway, the owner of Gazelle Sports . . . made what seemed like a necessary decision: Gazelle Sports would join Amazon Marketplace, becoming a third-party seller on the digital giant's platform. "If the customer is on Amazon, as a small business you have to say, 'That is where I have to go,'" he explained. "Otherwise, we are going to close our doors."[1571]

Interviews with sellers, as well as documents that Subcommittee staff reviewed, make clear that Amazon has monopoly power over most third-party sellers and many of its suppliers.[1572] Numerous sellers told Subcommittee staff in interviews that they cannot turn to alternative marketplaces, regardless of how much Amazon may increase their costs of doing business or how badly they are treated. David Barnett, the CEO and Founder of PopSockets, a former third-party seller and current Amazon supplier, testified about Amazon's coercive tactics at one of the Subcommittee's hearings:

> I suspect that Amazon is accustomed to behaving this way because most brands cannot afford to leave Amazon. They evidently have no choice but to endure tactics that would be rejected out of hand in any ordinary relationship whereby the two parties enter into the relationship by preference rather than necessity.[1573]

Sellers feel forced to be on Amazon because that is where the buyers are.[1574] At the Subcommittee's sixth hearing, Representative Lucy McBath (D-GA) noted that the evidence the Subcommittee collected is at odds with how Amazon describes its relationship with third-party sellers. She asked Mr. Bezos:

> [Y]ou referred to third party sellers today as "Amazon's partners" and that your success depends on their success. But, over the past year, we've heard a completely different story. As part of this investigation, we've interviewed many small businesses, and they use the words like "bullying," "fear," and "panic" to describe their relationship with Amazon. . . . . You said that sellers have many other attractive options to reach customers, but that's not at all what we found in our investigation . . . . If Amazon

[1571] Innovation and Entrepreneurship Hearing at 3–4 (statement of Stacy F. Mitchell, Co-Dir., Inst. for Local Self-Reliance).

[1572] *See, e.g.*, Submission from Top Shelf Brands, to H. Comm. on the Judiciary, 49 (Oct. 26, 2019) ("98% of all of Top Shelf's transaction has taken place on Amazon's platform."); *see also* Dig. Competition Expert Panel Report at 30 ("Regardless of the view on dominance over a particular defined market, it is clear that for thousands of smaller independent online sellers in particular, Amazon's marketplace is a strategically important gateway to consumers.").

[1573] Competitors Hearing at 3 (statement of David Barnett, CEO & Founder, Popsockets LLC).

[1574] Submission from Source 11, to H. Comm. on the Judiciary, 5 (Oct. 14, 2019) (on file with Comm.).

didn't have monopoly power over these sellers, do you think they would choose to stay in a relationship that is characterized by bullying, fear, and panic?"[1575]

Mr. Bezos responded that "there are a lot of options" for sellers, and that "[t]here are more and more every day."[1576] This claim is inconsistent with the Subcommittee's investigative record. In a submission to the Committee, the Online Merchants Guild, a trade association for small and medium-sized online sellers, said that its members who try to diversify sales across multiple platforms often report that they are unable to generate many sales outside of Amazon.[1577]

An important limit on a seller's ability to switch from selling on Amazon to selling on its own site or a competing platform is that Amazon generally forbids sellers from contacting their customers.[1578] The packaging and even the order confirmation email for third-party sales feature the Amazon brand prominently and do not reference the seller. A typical Amazon customer is unaware of the source of the sale.[1579] According to the Online Merchants Guild, "Many Amazon sellers use websites such as Shopify to try and establish their own eCommerce presence, but without the ability to market to their supposed core customer base, their Amazon customers, it's pretty futile."[1580]

Subcommittee staff heard from several market participants that Amazon also has significant market power over suppliers. For example, third-party sellers told Subcommittee staff that Amazon frequently ignores manufacturer policies that bind sellers.[1581] For example, brand manufacturers may establish minimum advertised pricing guidelines (MAP) to prevent online retailers from freeriding off brick-and-mortar stores' investments in product display or expertise—such as how to fit a running shoe. Amazon's leverage over suppliers gives it the ability to "break" minimum advertised pricing

---

[1575] CEO Hearing Transcript at 88–89 (question of Rep. Lucy McBath (D-GA), Member, Subcomm. On Antitrust, Commercial and Admin. Law of the H. Comm. on the Judiciary).

[1576] *Id.* at 91 (statement of Jeff Bezos, CEO, Amazon.com, Inc.).

[1577] Submission from Online Merchants Guild, to H. Comm. on the Judiciary, 4 (Oct. 23, 2019) (on file with Comm.) ("Members who sell across multiple platforms often report the amount of revenue generated outside of Amazon including their own eCommerce site, is insignificant, with over 90% of their sales being generated on the platform."); *see also* Submission from Top Shelf Brands, to H. Comm. on the Judiciary, 60–61 (Oct. 26, 2019) (explaining that it has "no viable alternatives" to Amazon, where 98% of its transactions have taken place on Amazon's platform, eBay accounts for 1% of its income, and Walmart accounts for less than 1%).

[1578] *Selling Polices and Seller Code of Conduct*, AMAZON SELLER CENTRAL, https://sellercentral.amazon.com/gp/help/external/G1801?language=en_US&ref=efph_G1801_cont_200386250 (last visited Sept. 28, 2020); *see also* Submission from Source 100, to H. Comm. on the Judiciary (Sept. 26, 2020) (raising concerns that Amazon permits itself to contact customers about negative reviews for Amazon branded products, while third-party sellers are largely barred from customer engagement).

[1579] Submission from Online Merchants Guild, to H. Comm. on the Judiciary, 4 (Oct. 23, 2019) (on file with Comm.); *see also* Submission from Source 11, to H. Comm. on the Judiciary, 3 (Oct. 14, 2019) (on file with Comm.) (explaining that "[w]henever an order is shipped through [Fulfillment by Amazon], even if the purchase is made through another marketplace, it is likely to arrive in an Amazon-branded box, creating confusion" for customers).

[1580] Submission from Online Merchants Guild, to H. Comm. on the Judiciary, 5 (Oct. 23, 2019) (on file with Comm.).

[1581] *See, e.g.*, Phone Interview with Source 84 (Mar. 4, 2020).

rules and undercut competing sellers on price. In contrast, third-party sellers must abide by the rules. As a former third-party seller explained, "Given Amazon's immense clout, we believe that suppliers have no realistic threat to stop selling on Amazon in response to Amazon 'breaking' MAP."[1582] Amazon's internal documents suggest that it does not fear any consequences for failing to comply with most vendor policies.[1583]

Another way that Amazon leverages its market power is to force certain brand manufacturers that would prefer to be third-party sellers into being wholesalers. A discussion among Amazon executives suggests that certain brands may only be allowed to have a wholesale relationship with Amazon even if the brand would prefer to be a third-party seller. In 2016, Sebastian Gunningham, then senior vice president of Amazon Marketplace, commented on a list of proposed seller tenets, "I would add that there are x,000 suppliers around the world that do not get this choice... I am talking about the apple, nikes and p&g, etc... We don't want to open that door, relationship has to be reseller."[1584] Consistent with this stance, Popsockets CEO and Founder David Barnett testified that Amazon attempted to force him into maintaining a wholesale relationship with Amazon Retail despite his preference to be a third-party seller or make sales on the marketplace through an authorized distributor.[1585] A former Amazon employee confirmed that it was not uncommon for Amazon to use its brand standards policy to shut down a brand's third-party seller account and force brands into an exclusive wholesaler relationship.[1586]

Amazon also enjoys significant market power over online consumers. Amazon uses Prime and its other membership programs to lock consumers into the Amazon ecosystem. According to an internal analysis, Amazon was willing to pay a credit card company a significant sum in 2013 for signing up new Prime members under the assumption that each new member would contribute $527 to Amazon's gross merchandise sales and $46 of gross profit.[1587] Amazon estimated that the deal had a five-year net present value of $17 million, assuming that it delivered 100,000 paid Prime members.[1588]

---

[1582] Submission from Source 48, to H. Comm. on the Judiciary, 8 (Nov. 8, 2019) (on file with Comm.).

[1583] *See, e.g.*, Production of Amazon, to H. Comm. on the Judiciary, AMAZON-HJC-00151722 (Feb. 9, 2009) (on file with Comm.) ("[P]lease audit that we are price matching . . . any diapers.com pricing. If this puts us in the soup with P&G on their pampers map price, so be it."); AMAZON-HJC-00206714 (Mar. 8, 2018) ("Why did Walmart break MAP and we didn't?").

[1584] Production of Amazon, to H. Comm. on the Judiciary, AMAZON-HJC-00190108 (June 6, 2016) (on file with Comm.).

[1585] Competitors Hearing at 3 (statement of David Barnett, CEO & Founder, Popsockets LLC).

[1586] Submission from Source 91, to H. Comm. on the Judiciary (Sept. 22, 2020) (on file with Comm.).

[1587] Production of Amazon, to H. Comm. on the Judiciary, AMAZON-HJC-00199845 (Oct. 23, 2013) (on file with Comm.).

[1588] *Id.*

Once Prime members pay the upfront annual membership fee, they are likely to concentrate their online purchases with Amazon.[1589] According to a recent survey, Prime members spend an average of $1,400 annually on Amazon, versus $600 for non-members.[1590] As one market participant observed, "Prime members will continue to use Amazon and not switch to competing platforms, despite higher prices and lower-quality items on Amazon compared to other marketplaces, and despite recent increases in the price of a Prime membership."[1591]

Other retailers are unable to match Amazon on its ability to provide free and fast delivery for such a large volume and inventory of products. Even Walmart, with its extensive national distribution network, does not come close to matching Amazon on this measure.[1592] Amazon currently offers Prime members free, next-day delivery on over 10 million items anywhere in the continental United States.[1593] Walmart, by contrast, has only about 200,000 products eligible for two-day shipping in select markets.[1594]

Amazon's market power is durable and unlikely to erode in the foreseeable future. There are several factors that make successful entry or expansion by a challenger to Amazon unlikely. Barriers to entry include: (1) network effects, which make it difficult for another marketplace to achieve a comparable number of buyers and sellers; (2) switching costs associated with consumers shopping outside of the Amazon ecosystem; and (3) the steep costs of building a logistics network comparable in size and scope to Amazon's massive international footprint in fulfillment and delivery. Amazon's internal documents recognize that entry into online commerce "require[s] significant incremental investments in brand development, inventory, and marketing/customer acquisition."[1595] Further,

---

[1589] *See* Submission from Source 11, to H. Comm. on the Judiciary, 3 (Oct. 14, 2019) (on file with Comm.) ("Amazon has been quite frank about the reality that once consumers invest in Prime, they do most of their online shopping on Amazon in order to gain value from the investment in shipping, whereas they might otherwise multisource.").

[1590] Tonya Garcia, *Amazon Prime membership exceeds 100 million*, MARKETWATCH (Jan. 17, 2019), https://www.marketwatch.com/story/amazon-prime-membership-exceeds-100-million-2019-01-17; *see also* Brian Olsavsky, Sr. Vice Pres. and Chief Fin. Officer, Amazon.com, Inc., *Q1 2020 Earnings Call* (Apr 30, 2020, 5:30 PM) ("We see our Prime customers are shopping more often and they have larger basket sizes.").

[1591] Submission from Source 11, to H. Comm. on the Judiciary, 3 (Oct. 14, 2019) (on file with Comm.).

[1592] *See* J.P. MORGAN, RETAIL VS. AMAZON: LIFE IN A POST COVID-19 WORLD (2020), https://markets.jpmorgan.com/research/email/-lbk68f4/Alp1kP9tQUPS29jlzW_bOg/GPS-3397412-0 ("We believe there are no comparable unlimited free shipping offerings available at scale, with Amazon's large and growing infrastructure investments serving as a significant barrier to entry.")

[1593] *Prime*¸ AMAZON, https://www.amazon.com/b?ie=UTF8&node=15247183011 (last visited Sept. 28, 2020) ("Free One-Day Delivery . . . Available coast-to-coast on more than 10 million items with no minimum purchase.").

[1594] Press Release, Marc Lore, Pres. & CEO, Walmart eCommerce US, Free NextDay Delivery Without a Membership Fee (May 14, 2019), https://corporate.walmart.com/newsroom/2019/05/14/free-nextday-delivery-without-a-membership-fee; *Walmart Help Center: NextDay Delivery*, https://www.walmart.com/help/article/nextday-delivery/fd3f1c5cf0ec4682abca8c83f5f0e977 (last visited Sept. 28, 2020) ("Currently, NextDay Delivery is only available in select markets.").

[1595] Production of Amazon, to H. Comm. on the Judiciary, AMAZON-HJC-00154659 (Nov. 23, 2010) (on file with Comm.).

Amazon expanded its market power by avoiding taxes, extracting state subsidies, and engaging in anticompetitive conduct—tactics that have given the company an unfair advantage over actual and potential competitors.

As the COVID-19 pandemic pushes more American shoppers online, Amazon's market power has grown. Evidence shows that Amazon is willing to use its increased market power in e-commerce during this crisis to exert pressure on suppliers and favor its own first-party products over those sold by third-party sellers. Amazon initially responded to the sudden surge in sales by refusing to accept or deliver non-essential supplies from its third-party sellers—a stance that would seem reasonable except that Amazon continued to ship its own non-essential products while restricting third-party sellers' ability to use alternative distribution channels to continue selling through Prime.[1596] As for suppliers, Subcommittee staff heard concerns that the platform used its power as a large buyer to pressure suppliers into prioritizing Amazon over other retail customers such as independent grocers.[1597] Meanwhile, numerous reports suggest that Amazon is in talks to convert real estate in vacated malls into additional Amazon distribution centers, further highlighting how it will continue to amass further scale even as its brick-and-mortar counterparts crater.[1598]

b. <u>Merger Activity</u>

Amazon's acquisition strategy has primarily focused on purchasing its competitors and companies that operate in adjacent markets, providing access to additional valuable customer data. This strategy has effectively protected and expanded Amazon's market power in e-commerce and helped Amazon extend that power to other markets.

Over the past two decades, Amazon has acquired at least 100 companies.[1599] It has been particularly aggressive over the past few years, making deals that are bigger and more ambitious

---

[1596] Ron Knox & Shaoul Sussman, *How Amazon Used the Pandemic to Amass More Monopoly Power*, THE NATION (June 26, 2020), https://www.thenation.com/article/politics/amazon-bezos-pandemic-monopoly/.

[1597] Phone Interview with Nat'l Grocers Ass'n (May 28, 2020) (raising concerns that Amazon and some Big Box retailers may have used their buyer power over suppliers during the pandemic to secure inventory at the expense of smaller businesses); Letter from Int'l Bhd. Of Teamsters, Commc'n Workers of Am., United Food & Commercial Workers Int'l Union & Change to Win to Comm'rs of the Fed. Trade Comm'n, 6 (July 23, 2020) (stating that if seller reports are true, "Amazon's hold over sellers effectively took food from the shelves of neighborhood grocery stores . . . and moved it to Amazon's own warehouses, where it earned fees for Amazon."); *see also* Renee Dudley, *The Amazon Lockdown: How an Unforgiving Algorithm Drives Suppliers to Favor the E-Commerce Giant Over Other Retailers*, PROPUBLICA (Apr. 26, 2020), https://www.propublica.org/article/the-amazon-lockdown-how-an-unforgiving-algorithm-drives-suppliers-to-favor-the-e-commerce-giant-over-other-retailers.

[1598] Esther Fung & Sebastian Herrera, *Amazon and Mall Operator Look at Turning Sears, J.C. Penney Stores Into Fulfillment Centers*, WALL ST. J. (Aug. 9, 2017), https://www.wsj.com/articles/amazon-and-giant-mall-operator-look-at-turning-sears-j-c-penney-stores-into-fulfillment-centers-11596992863.

[1599] *See infra* Appendix.

relative to its historical approach.[1600] In 2017, the company made its largest acquisition to date by purchasing Whole Foods for $13.7 billion.[1601] Amazon's other large purchases include Ring, which it bought for $1.2 billion in 2018; PillPack, which it bought for $1 billion in 2018; and Zappos, which it bought for $1.2 billion in 2009.[1602] Over the years, Amazon has acquired an assortment of highly recognizable companies, including IMDB.com, which it bought in 1998; Audible, which it bought in 2008; Goodreads, which it bought in 2013; and Twitch, which it bought in 2014.[1603]

Amazon's acquisition strategy has led to fewer choices for consumers in terms of differentiated online retail channels, as well as reduced competitive pressure in terms of price and quality. Additionally, Amazon's expansion into a diverse array of business lines—from brick-and-mortar supermarkets to home security—has reinforced its significant stockpile of consumer data. With more data about online and offline consumer behavior, Amazon's acquisitions set in motion a self-reinforcing cycle, creating an ever-widening gap between the platform and its competitors. As one former Amazon employee told Subcommittee staff, "Amazon is first and foremost a data company, they just happen to use it to sell stuff."[1604]

Over its history, Amazon has acquired a number of its rivals.[1605] A decade ago, Amazon acquired two of its direct competitors: Zappos and Quidsi.[1606] Documents reviewed by Subcommittee staff show that Amazon viewed both online retailers as competitive threats prior to acquiring them.

Amazon's 2009 acquisition of Zappos, an online shoe-retailer, marked the company's first $1 billion-plus purchase.[1607] Acquiring Zappos provided Amazon with two important advantages. First, it

---

[1600] *Infographic: Amazon's Biggest Acquisitions*, CB INSIGHTS (June 19, 2019), https://www.cbinsights.com/research/amazon-biggest-acquisitions-infographic/.

[1601] *Id.*

[1602] *Id.*

[1603] *Amazon Acquisitions*, MICROACQUIRE, https://acquiredby.co/amazon-acquisitions/ (last visited Oct. 3, 2020).

[1604] Interview with Source 91 (May 8, 2020); *see also* Submission from Artist Rights Alliance, to H. Comm. on the Judiciary, 2 (July 31, 2019) (on file with Comm.) ("With respect to the music world, at the heart of this problem lies a simple, economic truth – companies like . . . Amazon are not music businesses. They are advertising platforms and data machines. As our then-President, Melvin Gibbs, told the *New York Times* back in 2017, 'None of these companies that are supposedly in the music business are actually in the music business. They are in the data-aggregation business. They're in the ad-selling business. The value of music means nothing to them.'").

[1605] *See* Stigler Report at 75 n.152 ("The number of potential competitors purchased by the tech giants is large. For example, Amazon has purchased Zappos, Fabric, CDNow, Quorus, Audible, Goodreads, and Quidsi"); TIM WU, THE CURSE OF BIGNESS: ANTITRUST IN THE NEW GILDED AGE 124 (Columbia Global Reports ed., 2018) ("Amazon acquired would-be competitors like Zappos, Diapers.com, and Soap.com.").

[1606] *Amazon Closes Zappos Deal, Ends Up Paying $1.2 Billion*, TECHCRUNCH (Nov. 2, 2009), https://techcrunch.com/2009/11/02/amazon-closes-zappos-deal-ends-up-paying-1-2-billion/; *Confirmed: Amazon Spends $545 Million on Diapers.com Parent Quidsi*, TECHCRUNCH (Nov. 8, 2010, 9:04 AM), https://techcrunch.com/2010/11/08/confirmed-amazon-spends-545-million-on-diapers-com-parent-quidsi/.

[1607] Eric Engleman, *Amazon and Zappos, Six Months Later: How They're Fitting Together*, PUGET SOUND BUS. J. (May 21, 2010), https://www.bizjournals.com/seattle/blog/techflash/2010/05/amazon_and_zappos_how_theyre_fitting_together.html.

enabled Amazon to add significant selection to its category of shoes and other fashion-related items at a time when expanding its selection was critical to the company's success.[1608] The added selection included access to "hold-out" brands, which had previously refused to sell on Amazon.com or Amazon's other online retail store Endless.com.[1609] Second, Zappos' unique approach to customer service, marked by "a deeply felt connection with customers," added an emotional and psychological element to Amazon's relationship with consumers.[1610] An Amazon internal planning document from 2008 referred to Zappos as one of Endless's "primary competitors," and notes that "Zappos offers the largest selection of brands and styles and carries all of our top holdouts including Nike, Merrell, Keen, Cole Haan and Michael Kors."[1611]

About a year later, Amazon acquired Quidsi, the parent company of Diapers.com and Soap.com, for about $540 million.[1612] Prior to buying it, Amazon identified Diapers.com as its "largest and fastest growing competitor in the on-line diaper and baby care space,"[1613] and its "#1 short term competitor."[1614] Amazon's internal documents said that Diapers.com "keep[s] the pressure on pricing on us" and provided extremely high customer service levels, which—prior to the merger—had forced Amazon to up its game.[1615] Amazon executives took swift and predatory action in response to this competitive threat. As Representative Mary Gay Scanlon (D-PA) summarized at the Subcommittee's sixth hearing, Amazon's internal documents "show that Amazon employees began strategizing about ways to weaken this company, and, in 2010, Amazon hatched a plot to go after Diapers.com and take it out."[1616] Specifically, Amazon's documents show that the firm entered into an aggressive price war, in which Amazon was willing to bleed over $200 million in losses on diapers in one month.[1617] Addressing Mr. Bezos, Representative Scanlon added, "Your own documents make clear that the price

---

[1608] Bill Taylor, *Amazon and Zappos: A Savvy Deal*, HARV. BUS. REV. (July 23, 2009), https://hbr.org/2009/07/a-savvy-deal-from-amazon-to-za.

[1609] Alistair Barr, *Amazon to Close Fashion Website endless.com*, REUTERS: INDUS., MATERIALS AND UTILS. (Sept. 18, 2012), https://www.reuters.com/article/amazon-endless/amazon-to-close-fashion-website-endless-com-idUSL1E8KINKD20120918 (quoting an Amazon spokesman who stated that Amazon shut down Endless.com as an independent site in 2012 and incorporated it into Amazon's main website, Amazon.com, "in order to focus on the Amazon Fashion experience").

[1610] Bill Taylor, *Amazon and Zappos: A Savvy Deal*, HARV. BUS. REV. (July 23, 2009), https://hbr.org/2009/07/a-savvy-deal-from-amazon-to-za.

[1611] Production of Amazon, to H. Comm. on the Judiciary, AMAZON-HJC-00170649 (Sept. 23, 2008) (on file with Comm.).

[1612] Claire Cain Miller, *Amazon Has a Reported Deal to Buy Parent of Diapers.com*, N.Y. TIMES (Nov. 7, 2010), https://www.nytimes.com/2010/11/08/technology/08amazon.html.

[1613] Production of Amazon, to H. Comm. on the Judiciary, AMAZON-HJC-00142833 (May 12, 2009) (on file with Comm.).

[1614] *Id.* at AMAZON-HJC-00151722 (Feb. 9, 2009).

[1615] *Id.* at AMAZON-HJC-00151722–24 (Feb. 9, 2009).

[1616] CEO Hearing Transcript at 81–82 (question of Rep. Mary Gay Scanlon (D-PA), Vice Chair, H. Comm. on the Judiciary).

[1617] Production of Amazon, to H. Comm. on the Judiciary, AMAZON-HJC-00057007 (Apr. 5. 2010) (on file with Comm.).

war against Diapers.com worked, and within a few months it was struggling, and so then Amazon bought it."[1618]

In 2017, Amazon shut down Diapers.com, citing profitability issues, though some industry experts questioned the legitimacy of this rationale.[1619] In shutting down the company, Amazon eliminated a differentiated online retailer that consumers loved[1620]—reducing the number of online options for consumers in the diaper and baby care markets. Further, it eliminated a potential competitor in other verticals such as household goods, toys, and pets.[1621]

More recently, Amazon acquired Whole Foods, a strategic move to acquire both a competitor,[1622] and a new source of customer data.[1623] Amazon purchased Whole Foods at around $13.7 billion, more than 10 times the cost of its second-most expensive acquisition.[1624] In addition to bolstering its position in the grocery market, Amazon's purchase of Whole Foods expanded its touchpoints with Prime members and gave it access to a unique set of customer information.[1625] Specifically, the deal enabled Amazon to monitor and compile data on how the same person shops

---

[1618] CEO Hearing Transcript at 82–83 (question of Rep. Mary Gay Scanlon (D-PA), Vice Chair, H. Comm. on the Judiciary).

[1619] *See, e.g.*, Jason Del Rey, *Why Amazon's Explanation for Shutting Down Diapers.com and Quidsi Stunned Employees*, VOX: RECODE (Apr. 2, 2017), https://www.vox.com/2017/4/2/15153844/amazon-quidsi-shutdown-explanation-profits.

[1620] *See, e.g.*, Production of Amazon, to H. Comm. on the Judiciary, AMAZON-HJC-00034097 (Nov. 8, 2010) (on file with Comm.) (email from Diapers.com founder Vinit Bharara forwarding a customer testimonial in the form of a poem titled "An Ode to Diapers.com," beginning, "Oh how do I love thee, my Diapers.com?" and ending with "Don't ever leave me, my Diapers.com").

[1621] *Id.* at AMAZON-HJC-00154656 (noting that "[a]lthough Quidsi is still primarily an online baby care specialty retailer, it has recently begun selling new items such as household goods and personal-care products with the launch of Soap.com . . . . In the future, management intends to launch additional vertical shopping categories such as beauty, toys and pets."); AMAZON-HJC-00132026 (June 8, 2010) (email from Doug Herrington, Vice President of Consumables, to Jeff Bezos stating, "While we find no evidence that alice.com has gotten traction with vendors or customers, and can't see an economic model for them that pencils out, soap.com feels like a more credible threat").

[1622] *Id.* at AMAZON-HJC-00172932 (June 22, 2017) (showing analysis that for Amazon Fresh customers who don't do 100% shopping on Amazon Fresh, Whole Foods is consistently among the top 5 stand-alone national chains where Amazon Fresh customers do their grocery shopping).

[1623] Lauren Hirsch, *A year after Amazon announced its acquisition of Whole Foods, here's where we stand*, CNBC (June 15, 2018), https://www.cnbc.com/2018/06/15/a-year-after-amazon-announced-whole-foods-deal-heres-where-we-stand.html.

[1624] *Infographic: Amazon's Biggest Acquisition*, CB INSIGHTS (June 19, 2019), https://www.cbinsights.com/research/amazon-biggest-acquisitions-infographic/.

[1625] Production of Amazon, to H. Comm. on the Judiciary, AMAZON-HJC-00172090 (June 22, 2017) (on file with Comm.) ("[A] survey said about 45% of WFM customers are Prime; and about 20% of Prime members shop at [Whole Foods Market]."); Production of Amazon, to H. Comm. on the Judiciary, AMAZON-HJC-00173652 (June 23, 2017) (on file with Comm.) ("Based on our survey results, we estimate that approximately 46% of Prime members have shopped at a [Whole Foods] store in the last four weeks.").

both online and in person, data that is particularly useful for targeted advertising and promotional campaigns.[1626]

While the deal was under review by the FTC, then-Ranking Member Cicilline raised concerns that "the proposed acquisition w[ould] result in additional consolidation in the retail sector, erode American jobs through increased automation, and threaten local communities through diminished economic opportunity for hardworking Americans."[1627] Amazon's acquisition of Whole Foods has added to the platform's market power in retail by increasing its buyer power over suppliers,[1628] adding to the platform's capabilities in online grocery, and expanding the company's brick-and-mortar retail footprint. In addition, it appears that concerns about diminished economic opportunities may have been well-founded as Amazon reportedly plans to implement cashier-less technology across all of its Whole Foods stores.[1629]

In recent years, Amazon has also made several significant acquisitions of home security companies, further expanding its reach and visibility into Americans' homes. An Amazon executive described the company's in-home strategy by noting, "Two senses matter – eyes and ears."[1630] In 2017, Amazon paid $90 million to acquire Blink, a home security camera company whose technology and energy-efficient chips could be used by Amazon in its Echo speakers and other products.[1631] In 2018, Amazon spent $1.2 billion to acquire Ring, a home-security system spanning cameras, doorbells, and floodlights.[1632] Ring's "eyes and ears" add significant value to Amazon's smart home, allowing customers to virtually interact with Amazon delivery personnel and instruct them on where to drop off Amazon packages.[1633] Amazon's significant investments in the Internet of Things ecosystem and its strategy, centered on Amazon's voice assistant, Alexa, are discussed in other parts of this Report.

---

[1626] Lauren Hirsch, *A Year After Amazon Announced Its Acquisition of Whole Foods, Here's Where We Stand*, CNBC (June 15, 2018), https://www.cnbc.com/2018/06/15/a-year-after-amazon-announced-whole-foods-deal-heres-where-we-stand.html.

[1627] Letter from Hon. David N. Cicilline, Chairman, Subcomm. on Antitrust, Commercial and Admin. Law of the H. Comm. on the Judiciary to Hon. Bob Goodlatte, Chairman, H. Comm. on the Judiciary, Hon. Tom Marino, Chairman, Subcomm. on Regulatory Reform, Commercial and Antitrust Law, 3 (July 13, 2017), https://cicilline.house.gov/sites/cicilline.house.gov/files/images/Amazon_Whole_Foods_Acquistion.pdf.

[1628] *See, e.g.*, Interview with Source 153 (May 11, 2020); Interview with Nat'l Grocers Ass'n (May 28, 2020).

[1629] Taylor Lyles, *Amazon Go's Cashierless Tech May Come to Whole Foods As Soon As Next Year*, THE VERGE (Aug. 24, 2020), https://www.theverge.com/2020/8/24/21399607/amazon-cashierless-go-technology-whole-foods-2021-rumor.

[1630] Production of Amazon, to H. Comm. on the Judiciary, AMAZON-HJC-00170877 (Oct. 11, 2017) (on file with Comm.).

[1631] Jeffrey Dastin, *Amazon Quietly Dropped $90 Million on a Camera Startup Last Year to Acquire its Unique Chip Technology*, BUS. INSIDER (Feb. 12, 2018), https://www.businessinsider.com/amazon-blink-camera-maker-acquisition-2018-2.

[1632] Dennis Green, *Amazon's $1 Billion Acquisition of the Door Camera Startup Ring is the Company Doing What It Does Best – and it Should Terrify Every Other Retailer*, BUS. INSIDER (Mar. 3, 2018), https://www.businessinsider.com/why-amazon-acquired-ring-2018-3.

[1633] *Id.*

Other notable acquisitions include Kiva Systems in 2012, which provided Amazon with a robotics company that accelerated its ability to streamline picking, packing, and shipping e-commerce products;[1634] and PillPack in 2018, which equips Amazon with an online pharmacy and marks its entry into the pharmaceutical market.[1635]

Amazon's acquisition of Kiva gave it power over an important input for competitors. When Amazon bought the robotics company, Kiva was supplying technology to a large number of retailers, including Gap, Staples, and Walgreens.[1636] Many of these customers had invested a sunk cost of $4 million to $6 million per warehouse in order to make use of Kiva's technologies.[1637] Kiva had promised to keep shipping its technology to non-Amazon customers—regardless of whether they competed with Amazon—but in 2015, Amazon rebranded the company as Amazon Robotics and announced it would stop servicing other firms.[1638] Amazon stated that retailers seeking to use Kiva's robots would need to use Amazon Services to fulfill orders with Amazon's technology in Amazon's warehouses.[1639]

Documents Subcommittee staff reviewed relating to the PillPack deal, meanwhile, give insight into how Amazon views some acquisitions as opportunities to collect additional customer data and to cross-sell across its different business lines. One Amazon executive summarized a potential upside of the PillPack deal, asking, "Is there a cross-selling opportunity with amazon.com based on known maladies from prescriptions? Or is this prohibited by privacy law? My understanding is there is a number of different ways we could cross-sell customers in both directions (Rx<>non-Rx)."[1640] Though it is unclear whether and the extent to which Amazon implemented this strategy, the exchange reveals how Amazon assesses potential acquisitions and the cross-business opportunities they create, suggesting that the firm views its vast operations in a highly integrated manner.

---

[1634] Leena Rao, *Amazon Acquires Robot-Coordinated Order Fulfillment Company Kiva Systems For $775 Million In Cash*, TECHCRUNCH (Mar. 19, 2012), https://techcrunch.com/2012/03/19/amazon-acquires-online-fulfillment-company-kiva-systems-for-775-million-in-cash/.

[1635] Christina Farr, *The Inside Story of Why Amazon Bought PillPack in its Effort to Crack the $500 Billion Prescription Market*, CNBC (May 13, 2019), https://www.cnbc.com/2019/05/10/why-amazon-bought-pillpack-for-753-million-and-what-happens-next.html.

[1636] Evelyn M. Rusli, Amazon.com to Acquire Manufacturer of Robotics, N.Y. TIMES: DEALBOOK (Mar. 19, 2012), https://dealbook.nytimes.com/2012/03/19/amazon-com-buys-kiva-systems-for-775-million/.

[1637] Mick Mountz, *Kiva the Disrupter*, HARV. BUS. REV. (Dec. 2012), https://hbr.org/2012/12/kiva-the-disrupter.

[1638] Adam Putz, M&A flashback: Amazon announces $775M Kiva Systems acquisition, PITCHBOOK (Mar. 19, 2018), https://pitchbook.com/news/articles/ma-flashback-amazon-announces-775m-kiva-systems-acquisition.

[1639] *Id.*

[1640] Production of Amazon, to H. Comm. on the Judiciary, AMAZON-HJC-00172665 (May 23, 2018) (on file with Comm.).

The FTC investigated several of these transactions, including Amazon's acquisition of Quidsi, the parent company of Diapers.com,[1641] and Whole Foods.[1642] The agency declined, however, to challenge any of them as a violation of antitrust law despite: (1) strong evidence, in some cases, of direct head-to-head competition on price and quality between the merging firms; and (2) evidence that many of these mergers would enable Amazon to expand or entrench its market power, particularly in e-commerce. For most, if not all, of the acquisitions discussed in this Report, the FTC had advance notice of the deals but did not attempt to block any of them.

In addition to eliminating competitive threats, Amazon's acquisition strategy has expanded and protected the company's dominance. The company's significant expansion into new markets, paired with Amazon's wealth of data from its retail business, has fueled the platform's increasing market power. Amazon Associate General Counsel Nate Sutton testified at the Subcommittee's hearing last July that "Amazon is proud to be a company of builders and we have built our company from within, not through acquisitions."[1643] But the evidence examined during the investigation demonstrates that Amazon's acquisitions—including acquisitions of its direct competitors—have been key to Amazon's attainment, maintenance, and expansion of market power.

c. <u>Conduct</u>

i. <u>Treatment of Third-Party Sellers</u>

1) <u>Bullying</u>

While Amazon has referred to third-party sellers on its Marketplace as "partners," and "customers,"[1644] numerous small and medium-sized businesses told the Subcommittee that Amazon routinely bullies and mistreats them. The Online Merchants Guild, a trade association representing the interests of sellers engaged in online commerce, stated that they "have seen Amazon use their position of strength to take advantage of sellers."[1645]

Underlying Amazon's public-facing rhetoric is the reality that it views many of the sellers on its platform as competitors. In its internal documents, Amazon refers to third-party sellers as "internal

---

[1641] Letter from April Tabor, Acting Sec. of the Fed. Trade Comm'n, to Thomas Barnett (Aug. 22, 2012).

[1642] Press Release, Fed. Trade Comm'n, Statement of Federal Trade Commission's Acting Director of the Bureau of Competition on the Agency's Review of Amazon.com, Inc.'s Acquisition of Whole Foods Market Inc. (Aug. 23, 2017), https://www.ftc.gov/news-events/press-releases/2017/08/statement-federal-trade-commissions-acting-director-bureau.

[1643] Innovation and Entrepreneurship Hearing Transcript at 39 (statement of Nate Sutton, Assoc. Gen. Counsel, Competition, Amazon.com, Inc.).

[1644] *See, e.g.*, CEO Hearing at 44 (response to Questions for the Record of Jeff Bezos, CEO, Amazon.com, Inc.) ("Amazon makes significant investments to support Amazon's selling partners."); 41 ("Amazon recognizes that third-party sellers are our customers too, and their trust is critical to Amazon's success.").

[1645] Submission from Online Merchants Guild, to H. Comm. on the Judiciary, 3 (Oct. 29, 2019) (on file with Comm.).

competitors."[1646] At the Subcommittee's sixth hearing, Subcommittee Chairman Cicilline asked Mr. Jeff Bezos about Amazon's apparent doublespeak.[1647] In response, Mr. Bezos conceded, "[I]t wouldn't surprise me. In some ways, we are competing."[1648]

Over the course of the investigation, the Subcommittee heard from numerous sellers who described abusive tactics or mistreatment by Amazon in a variety of circumstances. For example, at the Subcommittee's fifth hearing, CEO and Founder of PopSockets David Barnett testified about Amazon's bullying tactics, which he said were enabled by "the asymmetry in power between Amazon and its partners."[1649] He stated that after the two companies decided on a minimum price at which Amazon would sell PopSockets, Amazon sold the products for a lower price and then demanded that PopSockets pay for the lost margin.[1650] As a result, PopSockets decided to end its relationship with Amazon Retail.[1651] When PopSockets communicated this intent to Amazon, its response was, "No, you are not leaving the relationship."[1652] PopSockets did sever its relationship with Amazon Retail for a period of time, but reestablished it about a year later.[1653] Mr. Barnett estimates that in 2019 his company incurred losses of $10 million in revenue from when he stopped selling to Amazon Retail and Amazon blocked one of his authorized distributors from selling on the marketplace.[1654]

Subcommittee staff learned about numerous other instances of Amazon employing strong-arm tactics in negotiations. A company that conducts business with multiple divisions of Amazon described how the platform leveraged its dominance in e-commerce to force acceptance of certain terms and conditions during negotiations over a different part of its business.[1655] According to this company, Amazon knows the power they have as a retailer. In the midst of negotiations, the platform repeatedly referenced its power to destock the company's products on Amazon.com as a "bargaining chip to force terms" unrelated to retail distribution on the company.[1656] The company added, "Amazon know[s] they

---

[1646] *See, e.g.*, Production from Amazon, to H. Comm. on the Judiciary, AMAZON-HJC-00206715 (Mar. 8, 2016) (on file with Comm.) (describing change to manual Pricing Rules when Amazon offer is competing with "internal 3P competitor" offers); AMAZON-HJC-00038917 (Sept. 2009) (describing proposal on "how to treat FBA sellers differently from other Buy Box (BB) eligible 3P sellers when we're matching *internal* competitors for non-media categories."); AMAZON-HJC-00142724 (defining Amazon's "Standard Price Matching Policy," and conditions when "Internal competitors (3P merchants) are matched" on price").

[1647] CEO Hearing Transcript at 93 (question of Rep. David N. Cicilline (D-RI), Chairman, Subcomm. on Antitrust, Commercial and Admin. Law of the H. Comm. on the Judiciary).

[1648] *Id.* (statement of Jeff Bezos, CEO, Amazon, Inc.)

[1649] Competitors Hearing at 5 (statement of David Barnett, CEO & Founder, Popsockets LLC),

[1650] *Id.* at 22 (statement of David Barnett, CEO & Founder, Popsockets LLC).

[1651] *Id.*

[1652] *Id.* at 23.

[1653] *Id.* at 3–4 (statement of David Barnett, CEO & Founder, Popsockets LLC).

[1654] *Id.* at 4 (statement of David Barnett, CEO & Founder, Popsockets LLC).

[1655] Interview with Source 148 (Aug. 26, 2020).

[1656] *Id.*

have a lot of power [in retail e-commerce] and they are not afraid to use it to get terms they want in other markets."[1657]

Book publishers described a similar asymmetric power dynamic with Amazon. According to one publisher, "Amazon has used retaliation . . . to coerce publishers to accept contractual terms that impose substantial penalties for promoting competition" with Amazon's rivals.[1658] The publisher added that the platform's retaliatory conduct shows "Amazon's ability and willingness to leverage its market power to prevent publishers from working effectively with rival e-book retailers and, thereby, maintain and enhance its dominance in e-book distribution."[1659] Amazon's retaliatory tactics against publishers include removing the "buy" button, which blocks a customer's ability to purchase a publisher's current titles;[1660] and removing the "pre-order" button, which eliminates the ability for a consumer to pre-order a publishers' forthcoming titles.[1661] Another form of retaliation that Amazon reportedly engaged in was showing publishers' titles as out of stock or with delayed shipping times.[1662] According to credible reports, Amazon used these tactics in its public battle with Hachette Book Group in 2014 over e-book pricing,[1663] and has used them or threatened to use them in more recent negotiations.[1664] Publishers, authors, and booksellers have "significant fear" because of Amazon's dominance.[1665]

Amazon can treat sellers in this manner because it knows that sellers have no other realistic alternatives to the platform. As Mr. Barnett noted in his testimony:

> When there is bullying by an extremely successful company with all these partners that continue to do business with it, one has to ask how is it that such a successful business maintains partnerships with so many companies while bullying them. It is because of the power asymmetry . . . that companies tolerate this.[1666]

---

[1657] *Id.*

[1658] Submission from Source 17, to H. Comm. on the Judiciary, 13 (Nov. 14, 2019) (on file with Comm.).

[1659] *Id.* at 3 (Sept. 22, 2020) (on file with Comm.).

[1660] *See, e.g.*, David Streitfeld, *Amazon Pulls Thousands of E-Books in Dispute*, N.Y TIMES: Bits (Feb. 22, 2012), https://bits.blogs.nytimes.com/2012/02/22/amazon-pulls-thousands-of-e-books-in-dispute/?hpw.

[1661] *See, e.g.*, Polly Mosendz, *Amazon Blocks Pre-orders Of Hachette Books*, THE ATLANTIC (May 23, 2014), https://www.theatlantic.com/business/archive/2014/05/amazon-blacklists-hachette-books/371545/.

[1662] *See, e.g.*, David Streitfeld, *Writers Feel an Amazon-Hachette Spat*, N.Y. TIMES (May 9, 2014), https://www.nytimes.com/2014/05/10/technology/writers-feel-an-amazon-hachette-spat.html.

[1663] *Id.*

[1664] *See* Interview with Source 155 (Sept. 29, 2020); Submission from Source 17, to H. Comm. on the Judiciary, 13–18 (Nov. 14, 2019) (on file with Comm.).

[1665] Interview with Ass'n of Am. Publishers, Authors Guild & Am. Booksellers Ass'n (Aug. 26, 2020).

[1666] Competitors Hearing at 23 (statement of David Barnett, CEO & Founder, Popsockets LLC).

A recent complaint filed against Amazon described the situation as follows, "From the third-party retailers' perspective, Amazon Marketplace is like Hotel California, a lovely place to start or expand an online retail business, but check out from Amazon Marketplace and you can quickly find your business in bankruptcy."[1667] Additional comments from sellers that Subcommittee staff interviewed include, "We're stuck. We don't have a choice but to sell through Amazon,"[1668] and, referring to Amazon, "They've never been a great partner, but you have to work with them."[1669]

As Stacy Mitchell, Co-Director of the Institute for Local Self-Reliance, noted during the Subcommittee's hearing on Innovation and Entrepreneurship, "Among the most egregious examples of Amazon's arbitrary treatment of sellers are its abrupt suspensions of their accounts, frequently made without explanation."[1670] Once Amazon suspends a seller's account or delists its products, the business is left with largely ineffective remedies as they watch their sales disappear. Sellers shared with Subcommittee staff that communications to Amazon's Seller Support Central generally prompt automated, unhelpful responses, which may be entirely unrelated to the specific case, question, or concern raised by the seller.[1671]

The founder of an infant product sold on Amazon told Subcommittee staff that after her products were mistakenly delisted, "[i]t would take weeks of repeated calls—at least 10 or 15 contacts with Seller Support—before somebody inside would determine that it was a mistake and error," and take action to fix the problem.[1672] She stated that this happened at least six times, and that in each instance her listings would be down for two to three weeks at a time.[1673] Describing how Amazon's mistakes can threaten a new business's survival, this small-business owner said:

> When you're a new company and Amazon suddenly delists you, it creates fear in the customer. "Where did it go? Is there something wrong with the product? What happened?" If a customer searched and it's no longer there, they're unlikely to ever come back and buy it . . . You've probably lost that customer for good.[1674]

---

[1667] Class Action Complaint at 20, Frame-Wilson v. Amazon.com, Inc., No. 20-cv-00424 (W.D. Wash., Mar. 9, 2020).

[1668] Interview with Source 150 (July 11, 2020).

[1669] Interview with Source 151 (July 2, 2020).

[1670] Innovation and Entrepreneurship Hearing at 9 (statement of Stacy F. Mitchell, Co-Dir., Inst. for Local Self-Reliance).

[1671] Interview with Source 125 (Jan. 9, 2020); *see also* Submission from Joel Hellmann, to H. Comm. on the Judiciary (July 31, 2019) (on file with Comm.) (responding to automated messaged, "If you were a person and not a robot you would have read that I already tried this and it failed.").

[1672] Interview with Source 149 (July 22, 2020).

[1673] *Id.*

[1674] *Id.*

In another example, a third-party bookseller told Subcommittee staff that Amazon delisted 99% of his business's inventory in September 2019.[1675] The bookseller requested that Amazon return its products, which were stored in Amazon's warehouses.[1676] As of July 2020, Amazon had only returned a small fraction of the bookseller's inventory and continued to charge him storage fees.[1677] Amazon blocked the bookseller both from selling its products on its marketplace and retrieving its inventory, precluding the seller from trying to recover some of his losses by making sales through another, albeit lesser, channel. At the Subcommittee's sixth hearing, Representative Lucy McBath (D-GA) presented the bookseller's story to Mr. Bezos, who responded that this treatment is "not the systematic approach that [Amazon] take[s]."[1678] However, evidence Subcommittee staff collected through extensive seller interviews shows that Amazon's poor treatment of sellers is far from an isolated incident—a fact supported both by public posts on Amazon's Seller Central forum,[1679] as well as pleas for help routinely sent directly to Mr. Bezos.[1680]

Because of the severe financial repercussions associated with suspension or delisting, many Amazon third-party sellers live in fear of the company.[1681] For sellers, Amazon functions as a "quasi-state," and many "[s]ellers are more worried about a case being opened on Amazon than in actual court."[1682] This is because Amazon's internal dispute resolution system is characterized by uncertainty, unresponsiveness, and opaque decision-making processes.

---

[1675] Interview with Source 125 (July 7, 2020).

[1676] *Id.*

[1677] *Id.*

[1678] CEO Hearing Transcript at 89 (statement of Jeff Bezos, CEO, Amazon.com, Inc.).

[1679] *See, e.g.*, iNOVATECH_MEDICAL, *Inventory being held hostage by Amazon for 3 months*, AMAZON SERVICES SELLER FORUMS (Apr. 8, 2020, 10:30 PM), https://sellercentral.amazon.com/forums/t/inventory-being-held-hostage-by-amazon-for-3-months/607892.

[1680] *See* Josh Dzieza, *Prime and Punishment: Dirty Dealing in the $175 Billion Amazon Marketplace*, THE VERGE (Dec. 19, 2018), https://www.theverge.com/2018/12/19/18140799/amazon-marketplace-scams-seller-court-appeal-reinstatement ("Emailing the richest man in the world is actually the standard method of escalating an Amazon seller appeal. It's called a Jeff Bomb, or . . . a Jeff Letter."); Interview with Chris McCabe, Founder, ecommerceChris LLC (Dec. 30, 2019) ("Out of desperation, some sellers try to email Jeff Bezos directly."); Submission from Source 125, to H. Comm. on the Judiciary (Jan. 27, 2020) (on file with Comm.); Submission from Source 150, to H. Comm. on the Judiciary (Aug. 16, 2017) (on file with Comm.).

[1681] *See, e.g.*, Submission from Source 125, to H. Comm. on the Judiciary (July 17, 2020) (on file with Comm.) ("My pregnant wife had to visit the ER due to increased anxiety and fear for the future . . . . Due to Amazon's stature, influence, and bullying nature, we are afraid of retaliation."); Interview with Source 154 (July 2, 2019) ("[Amazon] know[s] that small sellers have no power and no ability to avoid them," because "they are the powerhouse giant in the transaction and they could crush us."). *See also* Submission from Nat'l Ass'n of Wholesaler-Distributors, to H. Comm. on the Judiciary, 3 (July 22, 2020) (on file with Comm.) ("Small businesses that depend upon Amazon for access to their markets, including many of our members, fear retribution by Amazon if they speak up.").

[1682] Josh Dzieza, *Prime and Punishment: Dirty Dealing in the $175 Billion Amazon Marketplace*, THE VERGE (Dec. 19, 2018), https://www.theverge.com/2018/12/19/18140799/amazon-marketplace-scams-seller-court-appeal-reinstatement.

Additionally, the sellers interviewed by Subcommittee staff generally indicated that Amazon's customer service and treatment towards them have declined significantly in recent years. One business owner, who has been selling on Amazon for over a decade, told Subcommittee staff that in the past, a seller could get meaningful assistance by talking to an Amazon representative over the phone.[1683] He said, "I used to think that Amazon was a partner," but, now, "I don't think they care about the third party seller . . . . They treat us as a commodity."[1684] Internal Amazon documents suggest that the company's hyper-focus on a cost-cutting strategy to adopt automated processes for nearly everything—which Amazon refers to as "HOTW" or "Hands off the wheel"[1685]—combined with the platform's monopoly power over sellers may be to blame for Amazon's atrocious levels of customer service for sellers.

Amazon has recently monetized the degradation of its seller services, rolling out a program where sellers can pay an extra fee for a dedicated account representative. Sellers are supposed to pay for representatives to help them solve the very problems that Amazon created in the first place. Many sellers say, however, that even with paid Amazon account managers they are often unable to get their issues resolved. One seller told Subcommittee staff, "It [i]s a problem that an algorithm can make a decision that just shuts off my income stream and there's nothing I can do to get it back . . . . The only thing I can do to get it back is pay $6,000 a month for a dedicated rep and even then, it doesn't always work."[1686]

The last resort for sellers facing these circumstances is the "Jeff Bomb," or "Jeff Letter," in which a seller sends an email to Mr. Bezos to plead their case.[1687] As the Online Merchants Guild explained in its submission, "a 'Jeff Letter' is almost like a Writ of Certiorari within Amazon's internal kangaroo court system."[1688] But by the time this point is reached, "a seller could be locked out of their account, or denied funds, for weeks, losing hundreds of thousands of dollars even if the mistake was

---

[1683] Interview with Source 152 (Sept. 18, 2020).

[1684] *Id.*

[1685] *See, e.g.*, Production from Amazon, to H. Comm. on the Judiciary, AMAZON-HJC-00227277 (on file with Comm.) ("The implementation of Hands Off the Wheel in [Site Merchandising] will mean that through automation . . . there is less work for humans. . . . Project Tiger combines all Hands off the Wheel (HOTW) programs and Amazon spans of control guidelines."); AMAZON-HJC-00227278 (Apr. 27, 2017) ("We are pursuing three tracks to drive Productivity savings: 1) FCF initiatives; 2) HOTW; and 3) Defect Reduction & Catalog Improvement.").

[1686] Interview with Source 149 (July 22, 2020). *See also* Submission from Source 100, to H. Comm. on the Judiciary (identifying one concern with Amazon's treatment of sellers as, "Pay or Die - Forcing sellers to pay for their support services to correct Amazon's wrong doings").

[1687] Josh Dzieza, *Prime and Punishment: Dirty Dealing in the $175 Billion Amazon Marketplace*, THE VERGE (Dec. 19, 2018), https://www.theverge.com/2018/12/19/18140799/amazon-marketplace-scams-seller-court-appeal-reinstatement ("Emailing the richest man in the world is actually the standard method of escalating an Amazon seller appeal. It's called a Jeff Bomb, or . . . a Jeff Letter."). *See also* Interview with Chris McCabe, Founder, ecommerceChris LLC (Dec. 30, 2019) ("Out of desperation, some sellers try to email Jeff Bezos directly."); Submission from Source 125, to H. Comm. on the Judiciary (Jan. 27, 2020) (on file with Comm.); Submission from Source 150, to H. Comm. on the Judiciary (Aug. 16, 2017) (on file with Comm.).

[1688] Submission from Online Merchants Guild, to H. Comm. on the Judiciary, 3 (Oct. 29, 2019) (on file with Comm.).

Amazon's."[1689] Because of the large volume of sellers who reach this point of last resort, sending a "Jeff Letter" is not a realistic avenue for most sellers to get their issues addressed.

2) <u>Forced Arbitration</u>

All of Amazon's third-party sellers and most of its vendors are subject to a pre-dispute, binding ("forced") arbitration clause,[1690] requiring them to sign away the right to their day in court if a dispute with Amazon arises. Subcommittee staff heard from sellers who said that if it were not for Amazon's market power over them, they would not agree to this term.[1691] As noted by the Online Merchants Guild, "Through arbitration, Amazon knows it holds all the cards, and in many ways has the final say whenever there is a dispute."[1692] As a result, sellers rarely initiate arbitration actions against Amazon. Between 2014 and 2019, even as the number of Amazon sellers continued to grow by hundreds of thousands per year, only 163 sellers and 16 vendors initiated arbitration proceedings.[1693] Because sellers are generally aware that the process is unfair and unlikely to result in a meaningful remedy, they have little incentive to bring an action.

As extensive scholarship has shown, forced arbitration often fails to provide a legitimate forum for resolving disputes and instead usually serves to insulate those engaging in wrongdoing from liability.[1694] The case of Amazon sellers is no different. In practice, arbitration functions as a way for Amazon to keep disputes within its control, with the scales tipped heavily in its favor. As such, Amazon can withhold payments from sellers, suspend their accounts without cause, and engage in other abusive behavior without facing any legal consequences for its actions.[1695]

3) <u>Seller Fee Increases</u>

Amazon's treatment of sellers indicates that it sees them as a source of profit, rather than "Amazon's treatment of sellers indicates that it sees them as a source of profit, rather than

---

[1689] *Id.*

[1690] Data and Innovation Hearing at 49–50 (response to Questions for the Record, Nate Sutton, Assoc. Gen. Counsel, Competition, Amazon.com, Inc.); *Amazon Services Business Solutions Agreement*, AMAZON SELLER CENTRAL, https://sellercentral.amazon.com/gp/help/external/G1791 (last visited Sept. 29, 2020).

[1691] *See, e.g.*, Interview with Source 125 (Jan. 9, 2020) (explaining reason for agreeing to Amazon's terms, "What can I do? They don't give me much choice. You are so small that you don't have any leverage.").

[1692] Submission from Online Merchants Guild, to H. Comm. on the Judiciary, 3 (Oct. 29, 2019) (on file with Comm.).

[1693] Data and Innovation Hearing at 49–51 (response to Questions for the Record, Nate Sutton, Assoc. Gen. Counsel, Competition, Amazon.com, Inc.).

[1694] *See* Cynthia Estlund, *The Black Hole of Mandatory* Arbitration, 96 N.C. L. REV. 679, 684 (2018) (stating that mandatory arbitration "effectively enables employers to nullify employee rights and to insulate themselves from the liabilities that back up crucial public policies"); see *also* Judith Resnik, *Diffusing Disputes: The Public in the Private of Arbitration, the Private in Courts, and the Erasure of Rights*, 124 YALE L.J. 2804, 2873 (2015) ("Mandated arbitration is also common in web-based sales.").

[1695] *See* Submission from Online Merchants Guild, to H. Comm. on the Judiciary, 3 (Oct. 29, 2019) (on file with Comm.).

"partners."[1696] Individuals and small businesses who depend on access to the platform to make sales report that Amazon has raised seller fees significantly over the past decade. Over the past five years, a recent Institute for Local Self-Reliance report estimates that Amazon added an extra 11% to its cut of third-party sales.[1697] The platform now takes an average of 30% of each sale compared to 19% in 2015.[1698] In 2018, third-party sellers paid Amazon $39.7 billion in fees, which totaled about 25% of Amazon's $160 billion in Gross Merchandise Volume.[1699] This amount includes commissions, fulfillment and shipping fees, and other third-party seller services, but does not include revenue from the advertising fees for third-party sellers,[1700] which are often substantial.[1701] An internal Amazon document suggests the company can increase fees to third-party sellers without concern for them switching to another marketplace. The document notes that the amount of "seller attrition as a result of [2018] fee increases" for its Fulfillment by Amazon program was "[n]othing significant."[1702]

Amazon's pattern of exploiting sellers, enabled by its market dominance, raises serious competition concerns. For many sellers, there is no viable alternative to Amazon, and a significant number of sellers rely on its marketplace for their entire livelihood.[1703]

4) Appropriation of Third-Party Seller Data

One of the widely reported ways in which Amazon treats third-party sellers unfairly centers on Amazon's asymmetric access to and use of third-party seller data.[1704] During the investigation, the Subcommittee heard repeated concerns that Amazon leverages its access to third-party sellers' data to

---

[1696] *See, e.g.*, Production of Amazon, to H. Comm. on the Judiciary, AMAZON-HJC-00206936 (Nov. 8, 2013) (on file with Comm.) ("Seems like we should be making more on the seller loans. . . . Net takeaway is that sellers may be getting too good of a deal… There are different ways to fix… commitment fees, higher rates, etc.. We should get rewarded for satisfying a timing spike like this.").

[1697] STACY MITCHELL, RON KNOX & ZACH FREED, INST. OF LOCAL SELF-RELIANCE, REPORT: AMAZON'S MONOPOLY TOLLBOOTH 3 (2020), https://ilsr.org/amazons_tollbooth/.

[1698] *Id. See also* Interview with Jason Boyce, Founder & CEO, Avenue7Media, LLC (Sept. 15, 2020) (estimating that most sellers are currently paying an average of 35% in fees to Amazon when you add up the referral fees and payments for ads based on his experience).

[1699] MARKETPLACE PULSE, MARKETPLACES YEAR IN REVIEW 4 (2019), https://cdn.marketplacepulse.com/misc/marketplaces-year-in-review-2019.pdf.

[1700] *Id.*

[1701] *See, e.g.*, Interview with Top Shelf Brands (Sept. 29. 2020) (estimating Top Shelf paid Amazon over $1 million in fees for advertising in one year); Submission from Top Shelf, to H. Comm. on the Judiciary, Ex. 1 (Oct. 26, 2019) (on file with Comm.).

[1702] Production of Amazon, to H. Comm. on the Judiciary, AMAZON-HJC-00186540 (Jan. 30, 2018) (on file with Comm.).

[1703] *See, e.g.*, JUNGLESCOUT, THE STATE OF THE AMAZON SELLER 2020 4 (2020), https://www.junglescout.com/wp-content/uploads/2020/02/State-of-the-Seller-Survey.pdf ("More than a third (37%) of sellers [surveyed] earn income from Amazon sales alone.").

[1704] Innovation and Entrepreneurship Hearing at 5 (statement of Stacy Mitchell, Co-Dir., Inst. for Local Self-Reliance) ("Amazon's [gatekeeper power] allows it to maintain a God-like view of the transactions of rival businesses and customers, and use this data to move into new markets with a built-in advantage.").

identify and replicate popular and profitable products from among the hundreds of millions of listings on its marketplace.[1705] Armed with this information, it appears that Amazon would: (1) copy the product to create a competing private-label product[1706]; or (2) identify and source the product directly from the manufacturer to free ride off the seller's efforts, and then cut that seller out of the equation.[1707]

Amazon claims that it has no incentive to abuse sellers' trust because third-party sales make up nearly 60% of its sales, and that Amazon's first-party sales are relatively small.[1708] Amazon has similarly pointed out that third-party listings far outnumber Amazon's first-party listings.[1709] In a recent shareholder letter, CEO Jeff Bezos wrote, "Third-party sellers are kicking our first-party butt. Badly."[1710] In response to a question from the Subcommittee, however, Amazon admitted that by percentage of sales—a more telling measure—Amazon's first-party sales are significant and growing in a number of categories. For example, in books, Amazon owns 74% of sales, whereas third-party sellers only account for 26% of sales.[1711] At the category level, it does not appear that third-party sellers are kicking Amazon's first-party butt. Amazon may, in fact, be positioned to overtake its third-party sellers in several categories as its first-party business continues to grow.

---

[1705] *See, e.g.*, Interview with Source 158 (July 2, 2020); Submission from Nat'l Ass'n of Wholesaler-Distributors, to H. Comm. on the Judiciary (July 22, 2020) (on file with Comm.).

[1706] *See, e.g.*, Interview with Jason Boyce, Founder & CEO, Avenue7Media (Sept. 15, 2020).

[1707] *See, e.g.*, Submission from Nat'l Ass'n of Wholesaler-Distributors, to H. Comm. on the Judiciary (July 22, 2020) (on file with Comm.).

[1708] CEO Hearing at 23 (response to Questions for the Record of Jeff Bezos, CEO, Amazon.com, Inc.).

[1709] *Id.* at 24.

[1710] Jeff Bezos, *2018 Letter to Shareholders*, THE AMAZON BLOG: DAY ONE (Apr. 11, 2019), https://blog.aboutamazon.com/company-news/2018-letter-to-shareholders.

[1711] CEO Hearing at 25 (response to Questions for the Record of Jeff Bezos, CEO, Amazon.com, Inc.).

**Third-Party vs. First-Part Listings and Sales on Amazon**[1712]




Amazon recognizes that it competes against many of its third-party sellers.[1713] In response to concerns about its unfair use of third-party seller data, Amazon points to its Seller Data Protection Policy, which it instituted in 2014.[1714] According to the company:

> Amazon recognizes that third-party sellers are our customers too, and their trust is critical to Amazon's success. In an effort to further this partnership, Amazon decided years ago to take additional voluntary steps to protect seller data by instituting its voluntarily-adopted Seller Data Protection Policy, which prohibits Amazon Retail teams from using non-public seller-specific data to compete against third-party sellers.[1715]

Following up on public reporting and information collected during the investigation suggesting that Amazon might be abusing its access to third-party sellers' data, Representative Pramila Jayapal (D-WA) asked Amazon lawyer Nate Sutton about this precise issue at a Subcommittee hearing in July 2019. Sutton testified: "We do not use [third-party sellers'] individual data when we're making decisions to launch private brands."[1716]

---

[1712] *Id.* at 24–25 (response to Questions for the Record of Jeff Bezos, CEO, Amazon.com, Inc.).

[1713] Production of Amazon, to H. Comm. on the Judiciary, AMAZON-HJC-00142724 (on file with Comm.).

[1714] CEO Hearing at 2 (response to Questions for the Record of Jeff Bezos, CEO, Amazon.com, Inc.).

[1715] *Id.* at 41 (response to Questions for the Record of Jeff Bezos, CEO, Amazon.com, Inc.).

[1716] Innovation and Entrepreneurship Hearing Transcript at 51 (statement of Nate Sutton, Assoc. Gen. Counsel, Competition, Amazon.com, Inc.).

Since the July 2019 hearing, public reporting has made clear that, contrary to its own internal policy and testimony before Congress, Amazon routinely appropriates seller data to benefit its own private-label and retail businesses. After the hearing, according to a July 2019 report, a former employee who worked in product management told *The Capitol Forum*, "I used to pull sellers' data to look at what the best products were when I was there … That was my job."[1717] In September 2019, employees reported to *Yahoo Finance* that access to data is a "free-for-all" and that Amazon Retail and Marketplace teams "share the same access to the data warehouse, which makes it possible for the retail team to use the data from marketplace sellers to develop private labels."[1718]

Earlier this year, in a groundbreaking article, the *Wall Street Journal* reported that executives in Amazon's private-label division "had access to data containing proprietary information that they used to research bestselling items they might want to compete against, including on individual sellers on Amazon's website."[1719] In one case, Amazon employees reportedly used non-public sales data about a third-party seller of car-trunk organizers named Fortem to develop an Amazon private-label version of the very same product.[1720]

In light of the April 2020 report from the *Wall Street Journal*, the Committee requested that Jeff Bezos testify before Congress to address the possibility that Amazon's lawyer had misled Congress.[1721] Despite significant public reporting on the issue and references to it in Amazon's internal documents, Mr. Bezos claimed to be unaware of these practices. According to Mr. Bezos, "Amazon first learned about the alleged violations of Amazon's voluntarily adopted Seller Data Protection Policy recently reported in the *Wall Street Journal* from the *Wall Street Journal*."[1722] When Representative Pramila Jayapal (D-WA) again asked in July 2020 about whether Amazon uses third-party seller data to benefit its private-label products, Bezos could only respond: "I can't answer that

---

[1717] *Amazon: Former Employee Challenges Executives' Denial About Company's Use of Sellers' Data*, THE CAPITOL FORUM (July 18, 2019).

[1718] Krystal Hu, *Amazon Uses Third-Party Seller Data to Build a Private Label Juggernaut*, YAHOO FIN. (Sept. 27, 2019), https://finance.yahoo.com/news/amazon-uses-thirdparty-sellers-data-to-build-private-labels-145813238.html.

[1719] Dana Mattioli, *Amazon Scooped Up Data From Its Own Sellers to Launch Competing Products*, WALL ST. J. (Apr. 23, 2020), https://www.wsj.com/articles/amazon-scooped-up-data-from-its-own-sellers-to-launch-competing-products-11587650015.

[1720] *Id.*

[1721] Letter from Hon. Jerrold Nadler, Chairman, H. Comm. on the Judiciary, Hon. David N. Cicilline, Chairman, Subcomm. on Antitrust, Commercial and Admin. Law of the H. Comm. on the Judiciary, Hon. F. James Sensenbrenner, Ranking Member, Subcomm. on Antitrust, Commercial and Admin. Law of the H. Comm. on the Judiciary, Hon. Joe Neguse, Vice-Chair, Subcomm. on Antitrust, Commercial and Admin. Law of the H. Comm. on the Judiciary, Hon. Pramila Jayapal, Member, Subcomm. on Antitrust, Commercial and Admin. Law of the H. Comm. on the Judiciary, Hon. Ken Buck, Member, Subcomm. on Antitrust, Commercial and Admin. Law of the H. Comm. on the Judiciary & Hon. Matt Gaetz, Member, Subcomm. on Antitrust, Commercial and Admin. Law of the H. Comm. on the Judiciary, to Jeff Bezos, CEO, Amazon.com, Inc. (May 1, 2020) (on file with Subcomm.).

[1722] CEO Hearing at 1 (response to Questions for the Record of Jeff Bezos, CEO, Amazon.com, Inc.).

question yes or no . . . we have a policy against using seller-specific data to aid our private-label business, but I can't guarantee you that that policy has never been violated."[1723]

Representative Ken Buck (R-CO) similarly raised this issue with Mr. Bezos, stating, "I'm concerned that you've used Amazon's dominant market position to unfairly harm competition. We've heard from a number of companies that Amazon uses proprietary data from third-party companies to launch its own private-label products."[1724] Later in the hearing, Representative Kelly Armstrong (R-ND) described this as an "important issue," and asked whether "Amazon is conducting an internal investigation into the use of third-party data," to which Mr. Bezos answered in the affirmative. Mr. Bezos agreed to inform the Subcommittee of the outcome of that investigation.

In October 2020, approximately six months after Amazon said that it had initiated the investigation,[1725] the company informed the Committee that it had completed it.[1726] According to Amazon's Vice President of Public Policy, Brian Huseman, "Amazon's records of past data queries related to the two products cited in the *Wall Street Journal* report show that a single former employee pulled and analyzed only aggregate data for both products in compliance with the Seller Data Protection Policy."[1727] The results of this limited investigation do not alter the views of Subcommittee staff on Amazon's use of third-party seller data as set forth in this Report.

Subcommittee staff uncovered evidence in interviews with former Amazon employees, as well as current and former sellers, that is consistent with the public reporting about Amazon's misuse of seller data.[1728] In a submission to the Subcommittee, a former employee said:

> In 2010, I started working on the Amazon marketplace team … It was widely known that many (10+) of my peers were running very successful [third-party] accounts, where they were pulling private data on Amazon seller activity, so they could figure out

---

[1723] CEO Hearing Transcript at 66 (statement of Jeff Bezos, CEO, Amazon.com, Inc.).

[1724] *Id.* at 128 (question of Rep. Ken Buck (R-CO), Member, Subcomm. on Antitrust, Commercial and Admin. Law of the H. Comm. on the Judiciary).

[1725] Amazon Policy (@amazon_policy), TWITTER (Apr. 24, 2020, 3:36 PM), https://twitter.com/amazon_policy/status/1253769684425625601.

[1726] Letter from Brian Huseman, Vice Pres., Public Pol'y, Amazon.com, Inc., to Hon. Jerrold Nadler, Chairman, H. Comm. on the Judiciary, Hon. David N. Cicilline, Chairman, Subcomm. on Antitrust, Commercial and Admin. Law of the H. Comm. on the Judiciary, Hon. F. James Sensenbrenner, Ranking Member, Subcomm. on Antitrust, Commercial and Admin. Law of the H. Comm. on the Judiciary & Hon. Jim Jordan, Ranking Member, H. Comm. on the Judiciary (Oct. 4, 2020) (on file with Comm.).

[1727] *Id.*

[1728] *See* Submission from Nat'l Ass'n of Wholesaler-Distributors, to H. Comm. on the Judiciary (July 22, 2020) (on file with Comm.) (describing a member's experience in which Amazon allowed a distributor to sell a product for about a year, "then went out and replicated the product and began selling their own branded product, terminating the distributor . . . Amazon became the winner and the distributor was left empty handed").

> market opportunity, etc. Totally not legitimate, but no one monitored or seemed to care.[1729]

Referring to accessibility of third-party seller data, the same individual told Subcommittee staff, "It's a candy shop, everyone can have access to anything they want," and added, "There's a rule, but there's nobody enforcing or spot-checking. They just say, don't help yourself to the data … it was 'wink wink,' don't access."[1730]

Subcommittee staff interviewed a third-party seller who described how Amazon uses a request for proof of authenticity to collect proprietary information about a seller's business. According to the seller, Amazon will submit a product authenticity claim to sellers, forcing the retailer to submit their original sales receipts as proof that the items are authentic.[1731] Although a seller is supposed to be able to black out price information, sometimes the platform will reject a submission on the basis that is an "altered document."[1732] With insight into the seller's costs and supplier, combined with its knowledge of the seller's retail price among a virtually unfathomable amount of other data, it appears that Amazon Retail can easily replicate the seller's listing to offer a competing product.

A former third-party seller and retired U.S. Marine told Subcommittee staff about several instances over his seventeen years as a seller when Amazon leveraged his work, undercut him on price, and eventually drove him out of business. In each instance, he had to change his business model after Amazon took over the Buy Box for his listings, "killing" his sales.[1733] On at least two different occasions, his company did all the legwork to create a new, top-selling product or product line, as well as creating the product listings, only to have Amazon copy the idea and offer a competing product. Amazon used different tactics each time, but the result was always the same: Amazon profited from his work and made it impossible for him to fairly compete.[1734]

As part of his last attempt to sell on Amazon, his business created its own line of table game products with a unique design and color palette. Once these products became top sellers, Amazon again swooped in to reap the rewards of his work. Amazon copied his designs, down to the color palette, and started selling their competing products at unsustainable prices. Ultimately, he exited his seller business, gave up on trying to bring new products to consumers, and founded a consulting agency for Amazon sellers.[1735]

---

[1729] Submission from Source 91, to H. Comm. on the Judiciary (Sept. 16, 2020) (on file with Comm.).

[1730] *Id.*

[1731] Interview with Source 154 (July 2, 2019).

[1732] *Id.*

[1733] Interview with Jason Boyce, Founder & CEO, Avenue7Media (Sept. 15, 2020).

[1734] *Id.*

[1735] *Id.*

In addition to its private-label business, Amazon also uses third-party seller data to benefit its Amazon Retail business, where the company functions more like a retailer. At the Subcommittee's sixth hearing, Chairman David N. Cicilline (D-RI) asked Mr. Bezos about this conduct, recounting the story that a former third-party seller shared with Subcommittee staff:

> During this investigation, we have heard so many heartbreaking stories of small businesses who sunk significant time and resources into building a business and selling on Amazon, only to have Amazon poach their best-selling items and drive them out of business.
>
> So I want to talk to you about one company that really stood out from the rest. I want you to pay close attention to how they described your partnership, Mr. Bezos. We heard from a small apparel company that makes and sells what they call "useful apparel" for people who work on their feet and with their hands, like construction workers and firefighters.
>
> This particular business discovered and started selling a unique item that had never been a top seller for the brand. They were making about $60,000 a year on just this one item. One day, they woke up and found that Amazon had started listing the exact same product, causing their sales to go to zero overnight. Amazon had undercut their price, setting it below what the manufacturer would generally allow it to be sold so that, even if they wanted to, they couldn't match the price.[1736]

Amazon has tried to draw a meaningful distinction between individual and aggregate data, but this is largely beside the point when it comes to the concerns that Subcommittee members have about the platform's conduct and its effect on competition. Amazon says it only uses "aggregate" seller data across multiple sellers, not "individual" data about any specific seller.[1737] Importantly, though, it chooses how those terms are defined and uses various methods to deem seller data as aggregate rather than individual. According to the *Wall Street Journal* report, because Fortem accounted for 99.95% of total sales in the car-trunk organizer product category, not 100%, Amazon considered that data aggregate rather than individual.[1738] And at the Subcommittee's hearing in July 2020, Bezos confirmed that Amazon indeed allows the use of aggregate data to inform private-label brands when there are

---

[1736] CEO Hearing Transcript at 117 (question of Rep. David N. Cicilline (D-RI), Chairman, Subcomm. on Antitrust, Commercial and Admin. Law of the H. Comm. on the Judiciary).

[1737] Letter from David Zapolsky, Gen. Counsel, Amazon.com, Inc., to Hon. David N. Cicilline, Chairman, Subcomm. on Antitrust, Commercial and Admin. Law of the H. Comm. on the Judiciary (July 26, 2019) (on file with Comm.).

[1738] Dana Mattioli, *Amazon Scooped Up Data From Its Own Sellers to Launch Competing Products*, WALL ST. J. (Apr. 23, 2020), https://www.wsj.com/articles/amazon-scooped-up-data-from-its-own-sellers-to-launch-competing-products-11587650015.

only two or three sellers of a product.[1739] Separately, if there is only one seller of an item, and Amazon is selling returned or damaged versions of that item through its Amazon Warehouse Deals program, that data is considered aggregate.[1740]

An Amazon "Frequently Asked Questions" (FAQ) document from 2014 suggests that Amazon was aware that the Seller Data Protection Policy had significant loopholes. For example, the document indicates that even seller-specific data can be used for "strategic business decision at the category level or above."[1741] The answer to an FAQ also makes clear that the line between "aggregated" data and "Seller-specific" data is fuzzy: "As a general rule, if information isn't directly tied or easily attributed to a specific Seller, it can be considered aggregated and non-Seller-specific." As to how aggregated information attributed to a small group of Sellers should be treated, the guidance is also ambiguous: "This is a high judgment area. If Seller-specific information could be easily derived from aggregated information, it should be treated as Seller-specific."[1742]

In addition to collecting data relating to sales, Amazon may also be able to reverse engineer third-party sellers' cost structures through the tools that it offers sellers to track profits, costs, ad spend, and other expenses, as well as fulfillment services through Fulfillment by Amazon (FBA). An internal document suggests that Amazon may use its FBA service as an avenue to identify popular third-party seller items and gather competitively sensitive information about them.[1743] FBA provides another avenue for Amazon to access competing sellers' third-party data.

The documents and information that Subcommittee staff reviewed suggest that instances of Amazon's data misappropriation go beyond what is in the public domain. Furthermore, Subcommittee staff rejects Amazon's contention that Amazon's use of third-party seller data is no different from a traditional brick-and-mortar retailer's use of data. Subcommittee staff also does not believe that the marketplace-derived data the platform uses to inform Amazon Retail's product pipeline, among other decisions, is equally available to all Amazon Marketplace sellers.

On many fronts, Amazon makes inconsistent arguments depending on the forum and issue in support of its attempts to escape liability. In the context of lawsuits regarding liability for counterfeits

---

[1739] CEO Hearing Transcript at 155 (statement of Jeff Bezos, CEO, Amazon.com, Inc.).

[1740] Dana Mattioli, *Amazon Scooped Up Data From Its Own Sellers to Launch Competing Products*, WALL ST. J. (Apr. 23, 2020), https://www.wsj.com/articles/amazon-scooped-up-data-from-its-own-sellers-to-launch-competing-products-11587650015.

[1741] Production of Amazon, to H. Comm. on the Judiciary, AMAZON-HJC-00221869 (June 30, 2014) (on file with Comm.).

[1742] *Id.*

[1743] *See, e.g.*, Production of Amazon, to H. Comm. on the Judiciary, AMAZON-HJC-00207035–36 (Sept. 19, 2013) (on file with Comm.) ("On the top selling Owl necklace . . . we should go deep and see what we can learn including how much it would costs [sic] to manufacture this?").

and unsafe products sold on its site, Amazon insists it is a marketplace and not a retailer.[1744] By contrast, in his testimony before the Subcommittee, Mr. Bezos referred to Amazon as a "store" and a "retailer."[1745] Similarly, when Nate Sutton testified before the Subcommittee, he stated, "Amazon is one of the leading retailers."[1746] In response to price gouging allegations, Amazon switches back to the position that it is just a marketplace. As Public Citizen observed in a recent report titled *Prime Gouging*:

> Amazon is trying to have the best of both worlds by enabling third-party sellers to exploit the crisis (and benefiting from facilitating those sales), but also seeking to immunize itself from responsibility for directly engaging in price gouging by shifting the focus on to the unscrupulous actions of third-party sellers, not only in the eye of the public but also in the eye of the law.[1747]

Amazon identified a few types of non-public seller data that it has access to, but which are supposed to be protected by its Seller Data Protection Policy.[1748] It is obvious from this small glimpse into the data Amazon has at its disposal that the type and scope of data the platform can access is very different from the information available to traditional brick-and-mortar stores. Physical stores have much less detailed information about the competing products they offer for sale alongside their private-label items. Physical stores also have far less information about customers' shopping habits and preferences.[1749]

5) Self-Preferencing

By virtue of its role as an intermediary in the marketplace, Amazon can give itself favorable treatment relative to competing sellers. It has done so through its control over the Buy Box, as well as by granting itself access to data and tools that are off-limits for third-party sellers. Most recently, there have been reports that Amazon has given preferential treatment to its own non-essential products over competitors' non-essential products during the pandemic.

---

[1744] *See* Colin Lecher, *How Amazon escapes liability for the riskiest products on its site*, THE VERGE (Jan. 28, 2020), https://www.theverge.com/2020/1/28/21080720/amazon-product-liability-lawsuits-marketplace-damage-third-party.

[1745] *See generally* CEO Hearing (statements of Jeff Bezos, CEO, Amazon.com, Inc.).

[1746] *See generally* Innovation and Entrepreneurship Hearing (statements of Nate Sutton, Assoc. Gen. Counsel, Competition, Amazon.com, Inc.).

[1747] PUBLIC CITIZEN, PRIME GOUGING: HOW AMAZON RAISED PRICES TO PROFIT FROM THE PANDEMIC 5 (2020), https://www.citizen.org/article/prime-gouging/ (also noting "a pattern of significant price increases on essential products sold directly by Amazon, as well as price gouging by third-party sellers").

[1748] Production of Amazon, to H. Comm. on the Judiciary, AMAZON-HJC-00221867 (June 30, 2014) (on file with Comm.) (listing information protected by the Seller Data Protection policy as "Seller pricing plans (e.g., future promotions), Seller inventory levels, Seller sourcing information, Seller sales (e.g., unit sales, GMS), [and] Seller performance (e.g., non-public metrics)").

[1749] *See* Stigler Report at 45 ("Traditional brick-and-mortar stores and online platforms differ greatly in their advertising and personalization capabilities.").

a) Critical Inputs

Amazon has control over critical inputs for competing sellers and other types of competitors—including consumer data, fulfillment and delivery services, and advertising and other marketing tools—that give it the ability to advantage itself over rivals. During the investigation, Subcommittee staff conducted numerous interviews with market participants that, along with credible public reporting and Amazon's documents, confirm that Amazon employed this business strategy as early as 2009 and continues to do so today.

b) Access to Market Data

Amazon has access to data that gives it greater insight into consumer behavior and preferences than competing sellers on its platform. A former Amazon employee that Subcommittee staff interviewed summarized the significance of this information asymmetry:

> It's important to understand that Amazon has access to every piece of data on what products each customer has searched and purchased [or] not purchased. . . . With information about what customers have searched, Amazon is able to create customized marketing [and] targeting of products for the individual customer. "Is Amazon using a particular [third-party] seller's data here? No," but it is using all of the aggregate site data to develop a highly targeted marketing plan for each customer. Should Amazon choose to use that targeting information to focus [on] its own products, it can, while [third-party] sellers don't have access to similar data.[1750]

Although Amazon provides its sellers with access to some helpful data and tools—which is a key differentiator from other marketplaces with no or limited seller tools—there is a large amount of data that is off-limits, only available at a largely prohibitive cost, or unhelpful because it is outdated or inaccurate. One paid service that Amazon offered sellers was called Amazon Retail Analytics Premium. Sellers who paid extra to participate in this program could access some, but not all, of the data Amazon collected on marketplace activity. But the program was expensive: vendors reportedly had to pay a minimum of $30,000 to get access to this database.[1751]

Another example of this asymmetric access to data is evident from an Amazon internal email discussion. The discussion began with a consultant alerting Amazon employees about a problem with its Marketplace Web Services APIs that caused it to report information to sellers that is "disconnected

---

[1750] Submission from Source 91, to H. Comm. on the Judiciary (Sept. 22, 2020) (on file with Comm.).

[1751] Robyn Johnson, *Amazon Just Made the $30k Amazon Retail Analytics Premium Data Free*, SEARCH ENGINE J. (Feb. 26, 2020), https://www.searchenginejournal.com/amazon-retail-analytics-premium-data-free/350692.

from the reality and often misleading."[1752] According to the representative, "This is a huge issue and causes sellers losses and inconvenience."[1753] In response, an Amazon employee said that there was not a problem with the API functionality; rather, the Pricing APIs just do not provide sellers with information at the level of granularity requested. Further, she explained that this is "a feature request for adding location aware information to the Pricing APIs," which is "currently below the line for 2018 for the pricing team."[1754]

#### c) Marketing Tools

One tool that Amazon Retail uses to benefit its own business is Amazon Vine, a review-generating program.[1755] In interviews with market participants, many sellers said that good reviews are critical for a product to be successful online.[1756] Accordingly, sellers aim to obtain as many positive reviews as possible early in a product's life cycle. At one time, it was permissible for Amazon sellers to provide incentives such as free samples to reviewers. However, in 2016, it was widely reported that some sellers were generating fake reviews.[1757] In response to these reports, Amazon announced that it would ban incentivized reviews except for those obtained through its own incentivized review program, Amazon Vine.[1758] As a result, sellers lost access to this program, regardless of whether they were engaged in bad conduct or not.

For many years, including after the incentivized-reviews ban, the Amazon Vine program was not available to third-party sellers, while Amazon continued to enjoy the program's ability to "minimize marketing costs associated with generating awareness early in a product's lifecycle," among other benefits.[1759] An Amazon internal document describes other advantages of the program as,

---

[1752] Production of Amazon, to H. Comm. on the Judiciary, AMAZON-HJC-00188405–06 (Dec. 14, 2017) (on file with Comm.).

[1753] *Id.*

[1754] *Id.* at AMAZON-HJC-00188536 (Dec. 15, 2017).

[1755] Innovation and Entrepreneurship Hearing at 13 (response to Questions for the Record of Nate Sutton, Assoc. Gen. Counsel, Competition, Amazon.com, Inc.).

[1756] *See, e.g.*, Interview with Source 125 (July 7, 2020) (explaining that the inability to move customer reviews from Amazon to other marketplaces is a barrier to use of other marketplaces, due to the importance of customer feedback for seller reputation).

[1757] Elizabeth Weise, *Amazon Bans 'Incentivized' Reviews*, USA TODAY (Oct. 3, 2016), https://www.usatoday.com/story/tech/news/2016/10/03/amazon-bans-incentivized-reviews/91488702/.

[1758] *Id.*

[1759] Production of Amazon, to H. Comm. on the Judiciary, AMAZON-HJC-00146732 (Dec. 14, 2017) (on file with Comm.); Spencer Soper, *Amazon Doles out Freebies to Juice Sales of Its Own Brands*, BLOOMBERG NEWS (Oct. 16, 2018), https://www.bloomberg.com/news/articles/2018-10-16/amazon-doles-out-freebies-to-juice-sales-of-its-own-brands.

"[d]rive conversion and sales with more insightful reviews on detail pages," and "can contribute to higher order counts and sales."[1760]

By both banning incentivized reviews and excluding third-party sellers from the Amazon Vine program, Amazon allocated to itself a significant marketing advantage over the other businesses with which it competes on its platform.

Amazon's dual position as both operator and seller on its online marketplace also provides it with the ability to disadvantage competitors that seek to sell or advertise on its platform. One way that Amazon does this is by limiting certain rivals' ability to buy Amazon.com search advertising—ads that present products at the top of the search results when consumers enter specific search terms or a product name. Although "search advertising is a lucrative part of the company's business," Amazon "won't let some of its own large competitors buy sponsored-product ads tied to searches for Amazon's own devices."[1761] The *Wall Street Journal* reported this month that Roku, Inc. "can't even buy [] Amazon ads tied to its own products."[1762] Consistent with this report, a competitor of Amazon that manufacturers voice-enabled devices told Subcommittee staff that Amazon prohibited it from buying ads on Amazon.com.[1763] The competitor expressed concerns about the harm this could cause consumers, who may be confused or deceived when they receive ads promoting Amazon products even when they specifically search for a competitor's product on Amazon.com.[1764]

The Subcommittee's investigation also uncovered internal documents showing that Amazon executives have long understood the competitive advantage Amazon wields due to the company's control over search advertising on Amazon.com. In an internal email describing an ad block against Groupon and other "deal site ecommerce competitors,"[1765] an Amazon executive wrote that "Groupon is blocked + let's keep a clear line on this. No deal site ecommerce competitors allowed to advertise on amazon.x sites."[1766]

Similarly, an email discussion in 2009 among high-level Amazon executives discussed the possibility of implementing an ad block against Diapers.com, saying:

---

[1760] Production of Amazon, to H. Comm. on the Judiciary, AMAZON-HJC-00146732 (Dec. 14, 2017) (on file with Comm.); *see also* AMAZON-HJC-0059576 (Nov. 22, 2010) (describing program as "[g]reat for new product launches - good for seeding").

[1761] Dana Mattioli, et al., *Amazon Restricts How Rival Device Makers Buy Ads on Its Site*, WALL ST. J. (Sept. 22, 2020), https://www.wsj.com/articles/amazon-restricts-advertising-competitor-device-makers-roku-arlo-11600786638.

[1762] *Id.*

[1763] Interview with Source 148 (Aug. 26, 2020).

[1764] *Id.*

[1765] Production of Amazon, to H. Comm. on the Judiciary, AMAZON-HJC-00129156 (Dec. 14, 2017) (on file with Comm.).

[1766] *Id.*

> Do we really think it is ok that Diapers.com flipped from selling on the platform to being a large scale user of Product Ads totally unscrrutinized [sic]? I don't. . . . We're under no obligation to allow them to advertise on our site. I'd argue we should block them from buying Product Ads immediately or at minimum price those ads so they truly reflect the opportunity cost of a lost diaper buyer (or to reflect the true value of a new customer to such a competitor.).[1767]

The executive suggests that Amazon should maintain a "watch list" of strategic competitors and set up "[a]n automatic trigger when a merchant on [the] watch list . . . attempts to launch a significant quantity of product ads-with escalated approval required to allow their ads to launch."[1768] The *Wall Street Journal* report, based on discussions with Amazon employees, confirms that Amazon ultimately implemented a plan of this type. According to the report, "Tier 1 Competitors" are blocked from buying certain ads and employees are allegedly instructed to "mark any discussion of this practice . . . with 'privileged and confidential' to evade regulators."[1769]

In March 2020, Amazon announced that it would begin temporarily delaying shipments of all non-essential products from its warehouses, regardless of whether they were sold by Amazon or by competing third-party sellers.[1770] The company claimed it was doing so to better serve customers in need while also helping to ensure the safety of warehouse workers. The effect of this change was to block third-party sellers of items that Amazon designated "non-essential" from shipping new inventory using fulfillment by Amazon.

Amazon reportedly excepted itself from this policy and continued to ship non-essential items sold by Amazon Retail from its warehouses. According to a survey of Amazon workers conducted by Change to Win between April 29 and May 9, 2020, workers reported that Amazon had "continued to ship non-essential items such as hammocks, fish tanks, sex toys, and pool floaties."[1771] More than two-thirds of fulfillment center workers reported that 50% or more of the items they handled during this period were non-essential. Based on the survey results, Change to Win concluded that "Amazon has continued to place workers in danger of contracting COVID-19 in order to ship non-essential goods."[1772] A number of market participants that Subcommittee staff interviewed also indicated that

---

[1767] *Id.* at AMAZON-HJC-00065094 (May 28, 2009) (on file with Comm.).

[1768] *Id.*

[1769] Dana Mattioli, et al., *Amazon Restricts How Rival Device Makers Buy Ads on Its Site*, WALL ST. J. (Sept. 22, 2020), https://www.wsj.com/articles/amazon-restricts-advertising-competitor-device-makers-roku-arlo-11600786638.

[1770] CEO Hearing Transcript at 7–8 (response to Questions for the Record of Jeff Bezos, CEO, Amazon.com, Inc.)

[1771] CHANGE TO WIN, AMAZON COVID-19 WORKER SURVEY DATA BRIEF 3 (2020), https://static1.squarespace.com/static/5d374de8aae9940001c8ed59/t/5ec67b15a155792a0f9ef435/1590065963743/Amazon-Worker-COVID-19-Data-Brief.pdf.

[1772] *Id.*

Amazon prioritized shipping its own items over those sold by third-party sellers.[1773] Amazon confirmed that it did give preferential treatment to its own products for a period of time, but claimed it was "unintentional."[1774]

6) Tying and Bundling – Fulfillment by Amazon and Advertising

a) Fulfillment by Amazon

There is a strong link between Amazon Marketplace and Fulfillment by Amazon (FBA), Amazon's paid logistics service. Amazon uses its dominance in each of these markets to strengthen and reinforce its position in the other.

Amazon's FBA program combines warehousing, packing, and shipping services, and most importantly, access to Prime customers.[1775] For a seller's products to get the Prime badge, which is essential to making sales on the platform, a seller must either qualify for Amazon's Seller Fulfilled Prime (SFP) program or use Amazon's FBA service. On August 18, 2020, Amazon informed sellers of changes to Seller Fulfilled Prime which render it an entirely impractical option for most sellers.[1776] Even before this change, only a very small percentage of sellers could meet the onerous eligibility requirements for Seller Fulfilled Prime.[1777] This means FBA is functionally the only way for sellers to get the Prime badge for their product listings.[1778] A document setting forth draft Q&A before a 2018 earnings call for Amazon Chief Financial Officer Brian Olsavsky explained the connection between Prime and FBA: "Prime and FBA reinforce each other – they are inextricably linked. FBA adds Prime eligible selection. Prime member growth and purchasing habits attract sellers to FBA."[1779]

---

[1773] *See, e.g.*, Submission from Source 91, to H. Comm. on the Judiciary (Sept. 16, 2020) ("When we looked at Amazon private-label products during April/early May, they were almost all available for immediate Prime delivery, while comparable national brands were not able to get the same shipment times. Definitely preference was given to many Amazon private-label products during times of "essential"/"non-essential" classification."); Interview with Source 152 (Sept. 18, 2020).

[1774] CEO Hearing at 8 (response to Questions for the Record of Jeff Bezos, CEO, Amazon.com, Inc.) ("After instituting these changes, Amazon became aware that shipments of certain Amazon devices that did not fall into the priority categories had been inadvertently included in the list of products with faster delivery promises. This was unintentional.").

[1775] *Fulfillment by Amazon*, AMAZON, https://sell.amazon.com/fulfillment-by-amazon.html (last visited Oct. 4, 2020).

[1776] Pascal, The Seller Fulfilled Prime Team, *Important Updates to Seller Fulfilled Prime*, AMAZON SERVICES SELLER FORUMS (Aug. 18, 2020), https://sellercentral.amazon.com/forums/t/important-updates-to-seller-fulfilled-prime/682240.

[1777] *See, e.g.*, Interview with Jason Boyce, Founder & CEO, Avenue7Media, LLC (Sept. 15, 2020) ("It used to be possible, but hard, to be a Seller Fulfilled Prime seller. There were only 200 sellers that were able to meet the requirements. What's changing recently is that they used to allow you to have the Prime badge in certain regions, but now they say you need the Prime badge nationally, i.e., you need to have multiple warehouses across the country plus ship on Saturdays, etc.").

[1778] Regan McPhee, *How to Sell on Amazon Prime in 2020*, JUNGLESCOUT (May 27, 2020), https://www.junglescout.com/blog/how-to-sell-on-amazon-prime/.

[1779] Production of Amazon, to H. Comm. on the Judiciary, AMAZON-HJC-00186643 (July 23, 2018) (on file with Comm.).

Due to a lack of alternatives, third-party sellers have no choice but to purchase fulfillment services from Amazon. More than 73% of all Marketplace sellers worldwide reportedly rely on FBA services.[1780] Numerous third-party sellers told the Subcommittee that they feel they have no choice but to pay for FBA to maintain a favorable search result position, to reach Amazon's more than 112 million Prime members, and to win the Buy Box—through which the vast majority of Amazon sales are made.[1781] A recent consumer survey indicated that 75% of Amazon Prime customers specifically search for products flagged as Prime-eligible.[1782] As a result, as the Online Merchant's Guild told Subcommittee staff, many sellers will "say that without Prime you are dead."[1783]

In response to concerns about Amazon tying a seller's ability to make sales on its platform to participation in FBA, Amazon has offered contradictory statements. In the Subcommittee's second hearing, Representative Lucy McBath (D-GA) asked Amazon's Associate General Counsel Nate Sutton whether Amazon "privileged vendors who use Amazon Fulfillment Services over those who chose not to."[1784] Mr. Sutton asserted that Amazon "do[es] not favor . . . products that use FBA over others."[1785] He also indicated that Fulfillment by Amazon is not a factor in Amazon's ranking algorithm.[1786]

At the Subcommittee's sixth hearing, Representative Mary Gay Scanlon (D-PA) asked Mr. Bezos about whether there is a connection between a seller's use of FBA and its ability to win the Buy Box.[1787] In response, Mr. Bezos said, "I'm not sure if it's direct, but, indirectly, I think the Buy Box does favor products that can be shipped with Prime."[1788] Given that FBA is effectively the only way for sellers to get a Prime badge, this indicates that Amazon does favor sellers who use FBA over those who do not for both its search rankings and the Buy Box. Amazon claims that it favors sellers who use FBA because it is in the best interest of consumers and that it "does not consider profitability as part of the Featured Merchant Algorithm."[1789] Documents reviewed by Subcommittee staff, however, suggest

---

[1780] *See* J. Clament, *Fulfillment by Amazon (FBA) Usage Among Top Marketplace Sellers Worldwide 2017–2018*, STATISTA (Jan. 7, 2020) https://www.statista.com/statistics/1020046/global-fba-usage-top-amazon-sellers/.

[1781] *See, e.g.*, Submission from Source 43, to H. Comm. on the Judiciary, 30 (Oct. 26, 2019) (on file with Comm.).

[1782] FEEDVISOR, THE 2019 AMAZON CONSUMER BEHAVIOR REPORT 10 (2019), https://fv.feedvisor.com/CN_2019_Amazon-Consumer-Behavior-Report.html.

[1783] Submission from Online Merchants Guild, to H. Comm. on the Judiciary, 7 (Oct. 23, 2019) (on file with Comm.).

[1784] Innovation and Entrepreneurship Hearing Transcript at 53 (question of Rep. Lucy McBath (D-GA), Member, Subcomm. on Antitrust, Commercial and Admin. Law of the H. Comm. on the Judiciary).

[1785] *Id.*

[1786] *Id.* at 3 (response to Questions for the Record of Nate Sutton, Associate Gen. Counsel, Competition, Amazon.com, Inc.).

[1787] CEO Hearing Transcript at 175 (question of Rep. Mary Gay Scanlon (D-PA), Vice Chair, H. Comm. on the Judiciary).

[1788] *Id.* (statement of Jeff Bezos, CEO, Amazon.com, Inc.).

[1789] CEO Hearing at 3 (response to Questions for the Record of Jeff Bezos, CEO, Amazon.com, Inc.).

that Amazon has used profitability—also referred to internally as "contribution profit" or "CP"—as a factor in awarding the Buy Box.[1790]

Furthermore, Amazon's own documents show that it has considered FBA participation for purposes of determining the Buy Box winner.[1791] An Amazon document that sets forth pricing rules for a pilot program appears to favor third-party sellers that use FBA over those who do not for awarding the Buy Box.

**Internal Pricing Strategy Document**[1792]

**From:** Wales, Chance
**To:** VanDuine, Jason
**Sent:** 3/25/2010 11:26:35 AM
**Subject:** RE: SIGN OFF REQUESTED: Pre-WBR Follow-up: Healthcare Pricing Strategy

ok

**From:** VanDuine, Jason
**Sent:** Thursday, March 25, 2010 9:46 AM
**To:** Wales, Chance
**Cc:** VanDuine, Jason
**Subject:** SIGN OFF REQUESTED: Pre-WBR Follow-up: Healthcare Pricing Strategy
Chance – please sign off (or provide fdbk) before I send to Doug
Jason
Doug,
You had asked me to help you understand the 'size of the issue' with regards to diverted product as well as clarification on pricing rules/matching for the image competitor simulation in the Healthcare category. Some current data (from February):

1. The top 25 negative CP ASINs in Health & Beauty (all Image ASINs) accounted for $265k in negative CP, 46k units and $1.6M in product revenue.
2. The diverted product ASINs (8 of the top 25) accounted for $109k in negative CP (41% of ttl), 14k units (31% of ttl) and $366k (21% of ttl) in product revenue.
3. Babycare products accounted for 14 of the top 25 ASINs (13 diaper and 1 wipe ASIN) and the remaining 3 ASINs are vendor or operational cost issues that are being addressed.
4. The image competitor pilot in Healthcare will address 6 of the 8 ASINs referenced in #2 (it will not address Align and Alli – both in Nutrition & Wellness)

We do not plan any manipulation to pricing rules in the Healthcare category other than the setting of number of image ASINs to zero.
Use cases (for Pricing Rules): using Prilosec as the example (CP neutral = $27)

| Ref # | Use Case | Amazon Landed Cost | Comp Box Price | Comp Shipping Cost | Comp Landed Price | Amazon Match Price | Non-Prime (1% pad to FBA, 2% pad to 3P) | Prime (5% pad) |
|---|---|---|---|---|---|---|---|---|
| 1 | Walmart (Image Competitor) | $27.00 | $28.00 | $0.97 | $28.97 | $28.00 | Amzn wins buy box | Amzn wins buy box |
| 2 | DAB Nutrition (3P) + FBA | $27.00 | $26.50 | $0.00 | $26.50 | $27.00 | 3P wins buy box | Amzn wins buy box |
| 3 | DAB Nutrition (3P) + no FBA | $27.00 | $26.50 | $0.00 | $26.50 | $27.00 | Amzn wins buy box | Amzn wins buy box |
| 4 | AlltheTimeWholesale + no FBA | $27.00 | $22.00 | $4.50 | $26.50 | $27.00 | Amzn wins buy box | Amzn wins buy box |

The primary change coming is that we will now lose the buy box if 3P merchants continue to price below CP neutral (we will stop at CP neutral unless matching to an image competitor). As long as Prilosec is priced below $27 landed price (excluding buffers), we will lose the buy box. Currently, the lowest landed is under $20.
Estimated impact (based on simulation completed by the Pricing team) is a 6% negative impact on Healthcare category growth and a $.74/unit positive impact on CP. Using OP2 as the base, this would translate to ($750k) in revenue loss and ($775k) gain in CP. We will begin the pilot in April and will measure results on a weekly basis (with highlights in the pre-WBR as appropriate).
If you have any further questions, please let me know.
Jason

One third-party seller provided the Subcommittee with anecdotal evidence that Amazon favors sellers who participate in Amazon's fulfillment program over sellers who do not. The seller set up an experiment where he sold the same product, one self-fulfilled and the other fulfilled through FBA, and ran different test cases.[1793] The seller found that "Even when the consumer price of the self-fulfilled

[1790] Production of Amazon, to H. Comm. on the Judiciary, AMAZON-HJC-00141750 (Mar. 25, 2010) (on file with Comm.).

[1791] *Id.* at AMAZON-HJC-00142724.

[1792] Prepared by Subcomm. based on Production of Amazon, to H. Comm. on the Judiciary, AMAZON-HJC-00141750 (Mar. 25, 2010) (on file with Comm.).

[1793] Submission from Source 43, to H. Comm. on the Judiciary, 29 (Oct. 26, 2019) (on file with Comm.).

order was reduced and sold for a lower price (7% lower) than the FBA offer, the FBA still 'won' the 'Buy Box.'"[1794] The seller indicated that, without this favorable treatment for FBA, they would not choose to use FBA, as they found Amazon's fulfillment service was often slower and less reliable than self-fulfillment.[1795]

Although Jeff Bezos told the Subcommittee that Fulfillment by Amazon "is probably the greatest invention that we ever created for sellers," and that "it's working for sellers," information that Subcommittee staff reviewed suggests that it has significant shortfalls.[1796] One third-party seller told Subcommittee staff, "We use both FBA and self-fulfillment, all of our negative comments are on items shipped through FBA."[1797] According to another seller that uses FBA, at one point, Amazon decided to change the packaging on her products from cardboard boxes to padded envelopes, causing damage to her products in transit. When the damaged items started arriving at her customers' homes in a damaged state, this caused a surge of negative reviews and requests for returns. When she asked Amazon to remove these bad reviews, which were caused by FBA's shipping methods, Amazon refused.[1798]

A competing online marketplace described how Amazon effectively forcing sellers into its FBA program makes it more difficult to compete with Amazon for sellers, stating, "[T]hrough anticompetitive strategies and practices by Amazon, many . . . sellers are being pulled into Amazon's tied marketplace-and-ecommerce-fulfilment ecosystem in a manner that makes them not only less independent but directly dependent on Amazon."[1799] It further explained that because of Amazon's dominance in online commerce, "Even sellers who sell on other marketplaces are pushed into FBA, because it is the only practicable way to obtain sales on the Amazon marketplace.[1800] In addition to the Subcommittee's investigation, antitrust enforcement agencies are currently investigating Amazon for tying these two services together.[1801]

---

[1794] *Id.*

[1795] *Id*; *see also* Interview with Source 920 (July 14, 2020); Interview with Source 100 (July 24, 2020).

[1796] CEO Hearing Transcript at 174 (statement of Jeff Bezos, CEO, Amazon.com, Inc.).

[1797] Interview with Source 89 (July 22, 2020).

[1798] Interview with Source 149 (Feb. 26, 2020).

[1799] Submission from Source 11, to H. Comm. on the Judiciary, 1 (Oct. 14, 2019) (on file with Comm.).

[1800] *Id.* at 2.

[1801] *See. e.g.*, Press Release, Ital. Competition Auth., Amazon: Investigation Launched on Possible Abuse of a Dominant Position in Online Marketplaces and Logistic Services (Apr. 15, 2019), https://en.agcm.it/en/media/press-releases/2019/4/A528 (announcing launch of investigation into whether "Amazon would unduly exploit its dominant position in the market for e-commerce platforms intermediary services in order to significantly restrict competition in the e-commerce logistics market, as well as - potentially - in the e-commerce platform market, to the detriment of final consumers").

b) Advertising

Consistent with public reporting,[1802] evidence that Subcommittee staff reviewed suggests that Amazon may require sellers to purchase their advertising services as a condition of making sales on the platform. Because 44% of consumers tend to only look through the first two search pages when shopping on Amazon, a seller is practically invisible if it does not show up on one of the first two pages.[1803] Amazon's Sponsored Products and Sponsored Brand tools allow sellers to ensure they are prioritized in search results for specific key terms. A 2020 survey of large brands found that at least 73% used Amazon's advertising services, with 65% spending at least $40,000 a month on advertising on the site.[1804] In just one year, the number of brands with this monthly advertising spend increased by 33%.[1805]A recent report issued by the Institute for Local Self-Reliance explained:

> Sellers that decline to advertise risk losing their place in Amazon's organic search results, no matter how many glowing customer reviews they have. That's because the Amazon algorithm that delivers the search results favors products with more sales. As more orders are driven by ads, sellers than don't advertise lose out on those sales and, as their share of sales declines, they also slip in the search rankings, further reducing their sales in a negative cycle.[1806]

Similarly, the Online Merchants Guild told the Subcommittee in a submission, "[i]t is now common belief in the Amazon seller community that the only way to sell on Amazon is through Amazon's Pay-Per-Click ('PPC') offering." The submission describes the situation as "pay-to-play," adding that "[Pay-Per-Click advertising] has become a major point of frustration for many sellers, with many sellers left feeling as if they are paying a mandatory fee, and have even described [Pay-Per-Click] as a way for Amazon to increase their seller fees without looking like they are increasing their seller fees."[1807]

At the same time that advertising services have become "less of an option and more of a requirement for sellers to compete" on the platform, Amazon's ads have also become more

---

[1802] *See, e.g.*, Shira Ovide, Amazon Advertising Is Just a Toll in Disguise, BLOOMBERG (July 15, 2019), https://www.bloomberg.com/opinion/articles/2019-07-15/amazon-advertising-is-just-a-toll-in-disguise.

[1803] FEEDVISOR, THE 2019 AMAZON CONSUMER BEHAVIOR REPORT 5 (2019), https://fv.feedvisor.com/CN_2019_Amazon-Consumer-Behavior-Report.html.

[1804] FEEDVISOR, BRANDS AND AMAZON IN THE AGE OF E-COMMERCE, 2020 EDITION 12 (2020), https://fv.feedvisor.com/CN_2020_Brands-and-Amazon-in-the-Age-of-E-Commerce.html.

[1805] *Id.*

[1806] STACY MITCHELL, RON KNOX & ZACH FREED, INST. OF LOCAL SELF-RELIANCE, REPORT: AMAZON'S MONOPOLY TOLLBOOTH 9 (2020), https://ilsr.org/amazons_tollbooth/.

[1807] Submission from Online Merchants Guild, to H. Comm. on the Judiciary, 8 (Oct. 23, 2019) (on file with Comm.); *see also* Interview with Jason Boyce, Founder & CEO, Avenue7Media, LLC (Sept. 15, 2020) ("Pay-Per-Click is now mandatory.").

expensive.[1808] The ads' costs are determined by reverse auction—businesses bid on keywords that customers may use to search for a given product. In just a year, "the cost-per-click for sponsored ads increased by about 15% on average," and for some, by as much as 127%.[1809] A former third-party seller told Subcommittee staff that this harms both sellers and consumers, adding that "the good old days before [Pay-Per-Click], products would rise on the merits."[1810] Similarly, the Online Merchants Guild said, "[i]n the past, the belief was more reviews would create a trending product."[1811]

In response to concerns about tying, Amazon claims that it provides non-discriminatory access to the Buy Box and that participation in fulfillment by Amazon and its pay-per-click advertising program is voluntary.[1812] Amazon's revenue from these sources is increasing, however, and sellers continue to raise concerns that increased fees for compulsory fulfillment and advertising services are squeezing their business.

7) Strategic Platform Management and Mismanagement

During the investigation, the Subcommittee also heard concerns that Amazon engages in strategic mismanagement of its platform by: (1) allowing the proliferation of counterfeit and unsafe goods; (2) using its ability to control the flow of counterfeits as leverage; and (3) putting in place ineffective counterfeit prevention tools that result in the suspension of a large number of innocent sellers.[1813]

As Amazon's dominance in e-commerce has grown, so has the proliferation of dangerous and counterfeit products on its marketplace.[1814] A 2019 *Wall Street Journal* investigation found that

---

[1808] Submission from Online Merchants Guild, to H. Comm. on the Judiciary, 8 (Oct. 23, 2019) (on file with Comm.).

[1809] STACY MITCHELL, RON KNOX & ZACH FREED, INST. OF LOCAL SELF-RELIANCE, REPORT: AMAZON'S MONOPOLY TOLLBOOTH 10 (2020), https://ilsr.org/amazons_tollbooth/.

[1810] Interview with Jason Boyce, Founder & CEO, Avenue7Media, LLC (Sept. 15, 2020).

[1811] Submission from Online Merchants Guild, to H. Comm. on the Judiciary, 8 (Oct. 23, 2019) (on file with Comm.).

[1812] *See, e.g.*, CEO Hearing Transcript at 134 (statement of Jeff Bezos, CEO, Amazon.com, Inc.) ("I think what you're referring to is the fact that we offer an advertising service basically for third party sellers to drive additional promotion to their products. That is a voluntary program. Some sellers use it. Some don't.").

[1813] During the investigation, the Committee also heard concerns about Amazon using "brand gating" to block competitors from selling certain products on its platform. *See, e.g.*, Submission from Source 5, to H. Comm. on the Judiciary (Sept. 15, 2020) (on file with Comm.) (raising concerns about "brand gating," which allows Amazon, on its own, or in concert with "a trademark owner/manufacturer/seller, who is registered on the Brand Registry, to block other third party sellers from selling a particular brand, unless certain conditions are met"); Source 100, to H. Comm. on the Judiciary (Jan. 10, 2020) (on file with Comm.) (raising concerns that Amazon "gates" a brand when it decides that it wants to source items directly from the manufacturer and limit competition from third-party sellers and stating, "[w]e have lost literally millions of dollars on [inventory from] brands that Amazon has gated, purchases directly from manufacturers and we are no longer able to sell on Amazon").

[1814] Alexandra Berzon, Shane Shifflett & Justin Scheck, *Amazon Has Ceded Control of Its Site. The Result: Thousands of Banned, Unsafe or Mislabeled Products*, WALL ST. J. (Aug. 23, 2019), https://www.wsj.com/articles/amazon-has-ceded-control-of-its-site-the-result-thousands-of-banned-unsafe-or-mislabeled-products-11566564990.

# EXHIBIT 3

amazon seller central English Sign in Sell on Amazon

This article applies to selling in: **United States**

Help / Policies, agreements, and guidelines / **Amazon Services Business Solutions Agreement**

# Amazon Services Business Solutions Agreement

The version of this Agreement in English is the definitive legal version. A translation into Chinese is available for your ease of reference.

**General Terms**

Welcome to **Amazon Services Business Solutions**, a suite of optional services for sellers including: Selling on Amazon, Fulfillment by Amazon, Amazon Advertising, Transaction Processing Services, and the Selling Partner API.

THIS AMAZON SERVICES BUSINESS SOLUTIONS AGREEMENT (THE **"AGREEMENT"**) CONTAINS THE TERMS AND CONDITIONS THAT GOVERN YOUR ACCESS TO AND USE OF THE SERVICES AND IS AN AGREEMENT BETWEEN YOU OR THE BUSINESS YOU REPRESENT AND AMAZON. BY REGISTERING FOR OR USING THE SERVICES, YOU (ON BEHALF OF YOURSELF OR THE BUSINESS YOU REPRESENT) AGREE TO BE BOUND BY THE TERMS OF THIS AGREEMENT, INCLUDING THE SERVICE TERMS AND PROGRAM POLICIES THAT APPLY FOR EACH COUNTRY FOR WHICH YOU REGISTER OR ELECT TO USE A SERVICE (IN EACH CASE, THE **"ELECTED COUNTRY"**).

As used in this Agreement, **"we," "us,"** and **"Amazon"** means the applicable Amazon Contracting Party and any of its applicable Affiliates, and **"you"** means the applicant (if registering for or using a Service as an individual), or the business employing the applicant (if registering for or using a Service as a business) and any of its Affiliates. Capitalized terms have the meanings given to them in this Agreement. If there is any conflict between these General Terms and the applicable Service Terms and Program Policies, the

General Terms will govern and the applicable Service Terms will prevail over the Program Policies.

1. **Enrollment.**

To begin the enrollment process, you must complete the registration process for one or more of the Services. Use of the Services is limited to parties that can lawfully enter into and form contracts under applicable Law (for example, the Elected Country may not allow minors to use the Services). As part of the application, you must provide us with your (or your business') legal name, address, phone number and e-mail address, as well as any other information we may request. Any personal data you provide to us will be handled in accordance with Amazon's Privacy Notice.

2. **Service Fee Payments; Receipt of Sales Proceeds.**

Fee details are described in the applicable Service Terms and Program Policies. You are responsible for all of your expenses in connection with this Agreement. To use a Service, you must provide us with valid credit card information from a credit card or credit cards acceptable by Amazon (**"Your Credit Card"**) as well as valid bank account information for a bank account or bank accounts acceptable by Amazon (conditions for acceptance may be modified or discontinued by us at any time without notice) (**"Your Bank Account"**). You will use only a name you are authorized to use in connection with a Service and will update all of the information you provide to us in connection with the Services as necessary to ensure that it at all times remains accurate, complete, and valid. You authorize us (and will provide us documentation evidencing your authorization upon our request) to verify your information (including any updated information), to obtain credit reports about you from time to time, to obtain credit authorizations from the issuer of Your Credit Card, and to charge Your Credit Card or debit Your Bank Account for any sums payable by you to us (in reimbursement or otherwise). All payments to you will be remitted to Your Bank Account through a banking network or by other means specified by us.

**If we determine that your actions or performance may result in returns, chargebacks, claims, disputes, violations of our terms or policies, or other risks to Amazon or third parties, then we may in our sole discretion withhold any payments to you for as long as we determine any related risks to Amazon or third parties persist. For any amounts that we determine you owe us, we may (a) charge Your Credit Card or any other payment instrument you provide to us; (b) offset any amounts that are payable by you to us (in reimbursement or otherwise) against any payments we may make to you or amounts we may owe you; (c) invoice you for amounts due to us, in which case you will pay the invoiced**

**amounts upon receipt; (d) reverse any credits to Your Bank Account; or (e) collect payment or reimbursement from you by any other lawful means. If we determine that your account—or any other account you have operated—has been used to engage in deceptive, fraudulent, or illegal activity (including the sale of counterfeit goods), or to repeatedly violate our Program Policies, then we may in our sole discretion permanently withhold any payments to you.** Except as provided otherwise, all amounts contemplated in this Agreement will be expressed and displayed in the Local Currency, and all payments contemplated by this Agreement will be made in the Local Currency.

In addition, we may require that you pay other amounts to secure the performance of your obligations under this Agreement or to mitigate the risk of returns, chargebacks, claims, disputes, violations of our terms or policies, or other risks to Amazon or third parties. These amounts may be refundable or nonrefundable in the manner we determine, and failure to comply with terms of this Agreement, including any applicable Program Policies, may result in their forfeiture.

As a security measure, we may, but are not required to, impose transaction limits on some or all customers and sellers relating to the value of any transaction or disbursement, the cumulative value of all transactions or disbursements during a period of time, or the number of transactions per day or other period of time. We will not be liable to you: (i) if we do not proceed with a transaction or disbursement that would exceed any limit established by us for a security reason, or (ii) if we permit a customer to withdraw from a transaction because an Amazon Site or Service is unavailable following the commencement of a transaction.

3. **Term and Termination.**

The term of this Agreement will start on the date of your completed registration for use of a Service and continue until terminated by us or you as provided below. You may at any time terminate your account or this Agreement immediately on notice to us via Seller Central, email, the Contact Us form, or similar means. We may terminate your account or this Agreement for convenience with 30 days' advance notice. We may suspend or terminate your account or this Agreement immediately if we determine that (a) you have materially breached the Agreement and failed to cure within 7 days of a cure notice unless your breach exposes us to liability toward a third party, in which case we are entitled to reduce, or waive, the aforementioned cure period at our reasonable discretion; (b) your account has been, or our controls identify that it may be used for deceptive or fraudulent, or illegal activity; or (c) your use of the Services has harmed, or our controls identify that it might harm, other sellers, customers, or

Amazon's legitimate interests. We will promptly notify you of any such termination or suspension via email or similar means including Seller Central, indicating the reason and any options to appeal, except where we have reason to believe that providing this information will hinder the investigation or prevention of deceptive, fraudulent, or illegal activity, or will enable you to circumvent our safeguards. On termination of this Agreement, all related rights and obligations under this Agreement immediately terminate, except that (d) you will remain responsible for performing all of your obligations in connection with transactions entered into before termination and for any liabilities that accrued before or as a result of termination, and (e) Sections 2, 3, 4, 5, 6, 7, 8, 9, 11, 14, 15, and 18 of these General Terms survive.

4. **License.**

You grant us a royalty-free, non-exclusive, worldwide right and license for the duration of your original and derivative intellectual property rights to use any and all of Your Materials for the Services or other Amazon product or service, and to sublicense the foregoing rights to our Affiliates and operators of Amazon Associated Properties; provided, however, that we will not alter any of Your Trademarks from the form provided by you (except to re-size trademarks to the extent necessary for presentation, so long as the relative proportions of such trademarks remain the same) and will comply with your removal requests as to specific uses of Your Materials (provided you are unable to do so using standard functionality made available to you via the applicable Amazon Site or Service); provided further, however, that nothing in this Agreement will prevent or impair our right to use Your Materials without your consent to the extent that such use is allowable without a license from you or your Affiliates under applicable Law (e.g., fair use under United States copyright law, referential use under trademark law, or valid license from a third party).

5. **Representations.**

Each party represents and warrants that: (a) if it is a business, it is duly organized, validly existing and in good standing under the Laws of the country in which the business is registered and that you are registering for the Service(s) within such country; (b) it has all requisite right, power, and authority to enter into this Agreement, perform its obligations, and grant the rights, licenses, and authorizations in this Agreement; (c) any information provided or made available by one party to the other party or its Affiliates is at all times accurate and complete; (d) it is not subject to sanctions or otherwise designated on any list of prohibited or restricted parties or owned or controlled by such a party, including but not limited to the lists maintained by the United Nations Security Council, the US Government (e.g., the US Department of Treasury's Specially Designated Nationals list and

Foreign Sanctions Evaders list and the US Department of Commerce's Entity List), the European Union or its member states, or other applicable government authority; and (e) it will comply with all applicable Laws in performance of its obligations and exercise of its rights under this Agreement.

6. **Indemnification.**

**6.1 Your indemnification obligations**. You will defend, indemnify, and hold harmless Amazon, and our officers, directors, employees, and agents, against any third-party claim, loss, damage, settlement, cost, expense, or other liability (including, without limitation, attorneys' fees) (each, a "Claim") arising from or related to (a) your non-compliance with applicable Laws; (b) Your Products, including the offer, sale, fulfillment (except to the extent attributable to the FBA service), refund, cancellation, return, or adjustments thereof, Your Materials, any actual or alleged infringement of any Intellectual Property Rights by any of the foregoing, and any personal injury, death (to the extent the injury or death is not caused by Amazon), or property damage related thereto; (c) Your Taxes and duties or the collection, payment, or failure to collect or pay Your Taxes or duties, or the failure to meet tax registration obligations or duties; or (d) actual or alleged breach of any representations you have made.

**6.2 Amazon's indemnification obligations**. Amazon will defend, indemnify, and hold harmless you and your officers, directors, employees, and agents against any third-party Claim arising from or related to: (a) Amazon's non-compliance with applicable Laws; or (b) allegations that the operation of an Amazon Site infringes or misappropriates that third party's intellectual property rights.

**6.3 Process**. If any indemnified Claim might adversely affect us, we may, to the extent permitted by applicable Law, voluntarily intervene in the proceedings at our expense. No party may consent to the entry of any judgment or enter into any settlement of an indemnified Claim without the prior written consent of the other party, which may not be unreasonably withheld; except that a party may settle any claim that is exclusively directed at and exclusively affects that party.

7. **Disclaimer & General Release.**

**a.** THE AMAZON SITES AND THE SERVICES, INCLUDING ALL CONTENT, SOFTWARE, FUNCTIONS, MATERIALS, AND INFORMATION MADE AVAILABLE ON OR PROVIDED IN CONNECTION WITH THE SERVICES, ARE PROVIDED "AS-IS." AS A USER OF THE SERVICES, YOU USE THE AMAZON SITES, THE SERVICES, AND SELLER CENTRAL AT YOUR OWN RISK. EXCEPT THOSE SET

FORTH IN SECTION 5 ABOVE, TO THE FULLEST EXTENT PERMISSIBLE BY LAW, WE AND OUR AFFILIATES DISCLAIM: (i) ANY REPRESENTATIONS OR WARRANTIES REGARDING THIS AGREEMENT, THE SERVICES OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT, INCLUDING ANY IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, OR NON-INFRINGEMENT; (ii) IMPLIED WARRANTIES ARISING OUT OF COURSE OF DEALING, COURSE OF PERFORMANCE, OR USAGE OF TRADE; AND (iii) ANY OBLIGATION, LIABILITY, RIGHT, CLAIM, OR REMEDY IN TORT, WHETHER OR NOT ARISING FROM OUR NEGLIGENCE. WE DO NOT WARRANT THAT THE FUNCTIONS CONTAINED IN THE AMAZON SITES AND THE SERVICES WILL MEET YOUR REQUIREMENTS OR BE AVAILABLE, TIMELY, SECURE, UNINTERRUPTED, OR ERROR FREE, AND WE WILL NOT BE LIABLE FOR ANY SERVICE INTERRUPTIONS, INCLUDING BUT NOT LIMITED TO SYSTEM FAILURES OR OTHER INTERRUPTIONS THAT MAY AFFECT THE RECEIPT, PROCESSING, ACCEPTANCE, COMPLETION, OR SETTLEMENT OF ANY TRANSACTIONS.

**b.** BECAUSE AMAZON IS NOT INVOLVED IN TRANSACTIONS BETWEEN CUSTOMERS AND SELLERS OR OTHER PARTICIPANT DEALINGS, IF A DISPUTE ARISES BETWEEN ONE OR MORE PARTICIPANTS, EACH PARTICIPANT RELEASES AMAZON (AND ITS AGENTS AND EMPLOYEES) FROM CLAIMS, DEMANDS, AND DAMAGES (ACTUAL AND CONSEQUENTIAL) OF EVERY KIND AND NATURE, KNOWN AND UNKNOWN, SUSPECTED AND UNSUSPECTED, DISCLOSED AND UNDISCLOSED, ARISING OUT OF OR IN ANY WAY CONNECTED WITH SUCH DISPUTES.

8. **Limitation of Liability.**

WE WILL NOT BE LIABLE (WHETHER IN CONTRACT, WARRANTY, TORT (INCLUDING NEGLIGENCE, PRODUCT LIABILITY, OR OTHER THEORY), OR OTHERWISE) TO YOU OR ANY OTHER PERSON FOR COST OF COVER, RECOVERY, OR RECOUPMENT OF ANY INVESTMENT MADE BY YOU OR YOUR AFFILIATES IN CONNECTION WITH THIS AGREEMENT, OR FOR ANY LOSS OF PROFIT, REVENUE, BUSINESS, OR DATA OR PUNITIVE OR CONSEQUENTIAL DAMAGES ARISING OUT OF OR RELATING TO THIS AGREEMENT, EVEN IF AMAZON HAS BEEN ADVISED OF THE POSSIBILITY OF THOSE COSTS OR DAMAGES. FURTHER, OUR AGGREGATE LIABILITY ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED WILL NOT EXCEED AT ANY TIME THE TOTAL AMOUNTS DURING THE PRIOR SIX MONTH PERIOD PAID BY YOU TO AMAZON IN CONNECTION WITH THE PARTICULAR SERVICE GIVING RISE TO THE CLAIM.

9. **Insurance.**

If the gross proceeds from Your Transactions exceed the applicable Insurance Threshold during any month if the Elected Country is the United States, or each month over any period of three (3) consecutive months if the Elected Country is Canada or Mexico, or otherwise if requested by us, then within thirty (30) days thereafter, you will maintain at your expense throughout the remainder of the Term for each applicable Elected Country commercial general, umbrella or excess liability insurance with the Insurance Limits per occurrence and in aggregate covering liabilities caused by or occurring in conjunction with the operation of your business, including products, products/completed operations and bodily injury, with policy(ies) naming Amazon and its assignees as additional insureds. At our request, you will provide to us certificates of insurance, the full insurance policy, or other documents we may request for the coverage to the following address: c/o Amazon, P.O. Box 81226, Seattle, WA 98108-1226, Attention: Risk Management.

10. **Tax Matters.**

As between the parties, you will be responsible for the collection, reporting, and payment of any and all of Your Taxes, except to the extent that (i) Amazon automatically calculates, collects, or remits taxes on your behalf according to applicable law; or (ii) Amazon expressly agrees to receive taxes or other transaction-based charges on your behalf in connection with tax calculation services made available by Amazon and used by you. You agree to and will comply with the Tax Policies. All fees and payments payable by you to Amazon under this Agreement or the applicable Service Terms are exclusive of any applicable taxes, deductions or withholding (including but not limited to cross-border withholding taxes), and you will be responsible for paying Amazon any of Your Taxes imposed on such fees and any deduction or withholding required on any payment.

11. **Confidentiality and Personal Data.**

During the course of your use of the Services, you may receive Confidential Information. You agree that for the term of the Agreement and 5 years after termination: (a) all Confidential Information will remain Amazon's exclusive property; (b) you will use Confidential Information only as is reasonably necessary for your participation in the Services; (c) you will not otherwise disclose Confidential Information to any other Person except as required to comply with the Law; (d) you will take all reasonable measures to protect the Confidential Information against any use or disclosure that is not expressly permitted in this Agreement; and (e) you will retain Confidential Information only for so long as its use is necessary for participation in the Services or to fulfill your statutory obligations (e.g. tax) and in all cases will delete such information upon termination or as soon as no longer required for the fulfillment of statutory obligations. The foregoing sentence does not restrict

your right to share Confidential Information with a governmental entity that has jurisdiction over you, provided that you limit the disclosure to the minimum necessary and explicitly indicate the confidential nature of the shared information to the governmental entity. You may not issue any press release or make any public statement related to the Services, or use our name, trademarks, or logo, in any way (including in promotional material) without our advance written permission, or misrepresent or embellish the relationship between us in any way. You may only use the "Available at Amazon" badge as defined in and according to the Trademark Usage Guidelines available in Seller Central; you may not use our name, trademarks, or logos in any way (including in promotional material) not covered by the Trademark Usage Guidelines without our advance written permission.

Generally, you may not use customer personal data in any way inconsistent with applicable Law. You must keep customer personal data confidential at all times (the above 5 years' term limit does not apply to customer personal data).

12. **Force Majeure.**

We will not be liable for any delay or failure to perform any of our obligations under this Agreement by reasons, events or other matters beyond our reasonable control.

13. **Relationship of Parties.**

Subject to the Transaction Processing Service Terms (if the Elected Country for a Service is the United States), you and we are independent contractors, and nothing in this Agreement will create any partnership, joint venture, agency, franchise, sales representative, or employment relationship between us. You will have no authority to make or accept any offers or representations on our behalf. This Agreement will not create an exclusive relationship between you and us. Nothing expressed or mentioned in or implied from this Agreement is intended or will be construed to give to any person other than the parties to this Agreement any legal or equitable right, remedy, or claim under or in respect to this Agreement. This Agreement and all of the representations, warranties, covenants, conditions, and provisions in this Agreement are intended to be and are for the sole and exclusive benefit of Amazon, you, and customers. As between you and us, you will be solely responsible for all obligations associated with the use of any third party service or feature that you permit us to use on your behalf, including compliance with any applicable terms of use. You will not make any statement, whether on your site or otherwise, that would contradict anything in this section.

14. **Suggestions and Other Information.**

If you or any of your Affiliates elect to provide or make available suggestions, comments, ideas, improvements, or other feedback or materials to us in connection with or related to any Amazon Site or Service (including any related Technology), we will be free to use, disclose, reproduce, modify, license, transfer and otherwise distribute, and exploit any of the foregoing information or materials in any manner. In order to cooperate with governmental requests, to protect our systems and customers, or to ensure the integrity and operation of our business and systems, we may access and disclose any information we consider necessary or appropriate, including but not limited to user contact details, IP addresses and traffic information, usage history, and posted content. If we make suggestions on using the Services, you are responsible for any actions you take based on our suggestions.

15. **Modification.**

15.1. We will provide at least 15 days' advance notice in accordance with Section 18 for changes to the Agreement.

15.2 However, we may change or modify the Agreement at any time with immediate effect (a) for legal, regulatory, fraud and abuse prevention, or security reasons; (b) to change existing features or add additional features to the Services (where this does not materially adversely affect your use of the Services); or (c) to restrict products or activities that we deem unsafe, inappropriate, or offensive. We will notify you about any change or modification in accordance with Section 18.

15.3 Your continued use of the Services after the effective date of any change to this Agreement in accordance with this Section 15 will constitute your acceptance of that change. If any change is unacceptable to you, you agree not to use the Services and to end the Agreement as described in Section 3.

16. **Password Security.**

Any password we provide to you may be used only during the Term to access Seller Central (or other tools we provide, as applicable) to use the Services, electronically accept Your Transactions, and review your completed transactions. You are solely responsible for maintaining the security of your password. You may not disclose your password to any third party (other than third parties authorized by you to use your account in accordance with this Agreement) and are solely responsible for any use of or action taken under your password. If your password is compromised, you must immediately change your password.

17. **Export.**

You will not directly or indirectly export, re-export, transmit, or cause to be exported, re-exported or transmitted, any commodities, software or technology to any country, individual, corporation, organization, or entity to which such export, re-export, or transmission is restricted or prohibited, including any country, individual, corporation, organization, or entity under sanctions or embargoes administered by the United Nations, US Departments of State, Treasury or Commerce, the European Union, or any other applicable government authority.

18. **Miscellaneous.**

The Governing Laws will govern this Agreement, without reference to rules governing choice of laws or the Convention on Contracts for the International Sale of Goods. If the Elected Country is the United States, Canada, or Mexico, **Amazon and you both consent that any dispute with Amazon or its Affiliates or claim relating in any way to this Agreement or your use of the Services will be resolved by binding arbitration as described in this paragraph, rather than in court**, except that (i) you may assert claims in a small claims court that is a Governing Court if your claims qualify; (ii) you or we may bring suit in the Governing Courts, submitting to the jurisdiction of the Governing Courts and waiving our respective rights to any other jurisdiction, to enjoin infringement or other misuse of intellectual property rights; and (iii) we may bring any claims related to your sale of counterfeit products on the Amazon Site in the Governing Courts and seek any remedy available under law related to those claims. **There is no judge or jury in arbitration, and court review of an arbitration award is limited. However, an arbitrator can award on an individual basis the same damages and relief as a court (including injunctive and declaratory relief or statutory damages), and must follow the terms of this Agreement as a court would.** Before you may begin an arbitration proceeding, you must send a letter requesting arbitration and describing your claim to our registered agent, CSC 300 Deschutes Way SW, Suite 208 MC-CSC1, Tumwater, WA 98501. The arbitration will be conducted by the American Arbitration Association (AAA) under its commercial rules. Payment of all filing, administration and arbitrator fees will be governed by the AAA's rules. We will reimburse those fees for claims totaling less than $10,000 unless the arbitrator determines the claims are frivolous. The expedited procedures of the AAA’s rules will apply only in cases seeking exclusively monetary relief under $50,000, and in such cases the hearing will be scheduled to take place within 90 days of the arbitrator’s appointment. Likewise, Amazon will not seek attorneys' fees and costs from you in arbitration unless the arbitrator determines the claims are frivolous. You may choose to have the arbitration conducted by telephone, based on written submissions, or in person at a mutually agreed location. **Amazon and you each agree that any dispute**

**resolution proceedings will be conducted only on an individual basis and not in a class, consolidated or representative action.** If for any reason a claim proceeds in court rather than in arbitration **Amazon and you each waive any right to a jury trial**.

You may not assign this Agreement, by operation of law or otherwise, without our prior written consent. Any attempt to assign or otherwise transfer in violation of this section is void; provided, however, that upon notice to Amazon, you may assign or transfer this Agreement, in whole or in part, to any of your Affiliates as long as you remain liable for your obligations that arose prior to the effective date of the assignment or transfer under this Agreement. You agree that we may assign or transfer our rights and obligations under this Agreement: (a) in connection with a merger, consolidation, acquisition or sale of all or substantially all of our assets or similar transaction; or (b) to any Affiliate or as part of a corporate reorganization; and effective upon such assignment, the assignee is deemed substituted for Amazon as the party to this Agreement. Subject to that restriction, this Agreement will be binding on, inure to, and be enforceable against the parties and their respective successors and assigns. We may perform any of our obligations or exercise any of our rights under this Agreement through one or more of our Affiliates. Amazon retains the right to immediately halt any of Your Transactions, prevent or restrict access to the Services or take any other action to restrict access to or availability of any inaccurate listing, any inappropriately categorized items, any unlawful items, or any items otherwise prohibited by applicable Program Policies. Because Amazon is not your agent (except for the limited purpose set out in the Transaction Processing Service Terms (if the Elected Country for a Service is the United States)), or the customer's agent for any purpose, Amazon will not act as either party's agent in connection with resolving any disputes between participants related to or arising out of any transaction.

Amazon will provide notice to you under this Agreement by posting changes to Seller Central or to the applicable Amazon Services site to which the changes relate (such as the Developer Site accessible through your account), by sending you an email notification, or by similar means. You must send all notices and other communications relating to Amazon to our Selling Partner Support team via Seller Central, email, the Contact Us form, or similar means. We may also communicate with you electronically and in other media, and you consent to such communications. You may change your e-mail addresses and certain other information in Seller Central, as applicable. You will ensure that all of your information is up to date and accurate at all times.

If any provision of this Agreement is deemed unlawful, void, or for any reason unenforceable, then that provision will be deemed severable from these terms and conditions and will not affect the validity and enforceability of any remaining provisions. If the Elected Country is Canada, then it is the express wish of the parties that this Agreement and the applicable Service Terms and Program Policies have been drafted in English. (The following is a French translation of the preceding sentence: Si le pays de service est le Canada, les parties conviennent que la présente autorisation et tous les termes et conditions applicables s'y rattachant soient rédigés en anglais.) We may make available translations to this Agreement and the applicable Service Terms and Program Policies, but the English version will control. This Agreement represents the entire agreement between the parties with respect to the Services and related subject matter and supersedes any previous or contemporaneous oral or written agreements and understandings.

**Definitions**

As used in this Agreement, the following terms have the following meanings:

**"Affiliate"** means, with respect to any entity, any other entity that directly or indirectly controls, is controlled by, or is under common control with that entity.

**"Amazon Associated Properties"** means any website or other online point of presence, mobile application, service or feature, other than an Amazon Site, through which any Amazon Site, or products or services available on any of them, are syndicated, offered, merchandised, advertised, or described.

**"Amazon Contracting Party"** means the party outlined below.

- If the Elected Country is Canada:

| Service | Amazon Contracting Party |
| --- | --- |
| Selling on Amazon | Amazon.com.ca, Inc. |
| Selling on Amazon (if your account is enabled to list Optional Coverage Plans) | Amazon.com.ca, Inc. |
| Fulfillment by Amazon | Amazon.com.ca, Inc. |
| Amazon Advertising | Amazon Advertising Canada, Inc. |

- If the Elected Country is Mexico:

| Service | Amazon Contracting Party |
|---|---|
| Selling on Amazon | Servicios Comerciales Amazon México S. de R.L. de C.V. |
| Fulfillment by Amazon | Servicios Comerciales Amazon México S. de R.L. de C.V. |
| Amazon Advertising | Servicios Comerciales Amazon México S. de R.L. de C.V. |

- If the Elected Country is the United States:

| Service | Amazon Contracting Party |
|---|---|
| Selling on Amazon | Amazon.com Services LLC |
| Selling on Amazon (if your account is enabled to list Optional Coverage Plans) | Amazon.com Services LLC |
| Fulfillment by Amazon | Amazon.com Services LLC |
| Amazon Advertising | Amazon.com Services LLC |
| Transaction Processing Services | Amazon Payments, Inc., Amazon Capital Services, Inc., or Amazon.com Services LLC, according to the Transaction Processing Services Terms |

If you register for or use the Selling Partner API, the Amazon Contracting Party is the Contracting Party that provides the applicable Service you use in connection with the Selling Partner API.

**"Amazon Site"** means, as applicable, the CA Amazon Site, the MX Amazon Site, or the US Amazon Site.

**"CA Amazon Site"** means the website, the primary home page of which is identified by the url www.amazon.ca, and any successor or replacement of such website.

**"Confidential Information"** means information relating to us, to the Services, or Amazon customers that is not known to the general public

including, but not limited to, any information identifying or unique to specific customers; reports, insights, and other information about the Services; data derived from the Services except for data (other than customer personal data) arising from the sale of your products comprising of products sold, prices, sales, volumes and time of the transaction; and technical or operational specifications relating to the Services. For the purposes of this Agreement, customer personal data constitutes Confidential Information at all times.

**"Content"** means copyrightable works under applicable Law and content protected by database rights under applicable Law.

**"Excluded Products"** means the items described on the applicable Restricted Products pages in Seller Central, any other applicable Program Policy, or any other information made available to you by Amazon.

**"Governing Courts"** means the applicable one of the following:

- the state or Federal court in King County, Washington (if the Elected Country is Canada, Mexico, or the United States),

**"Governing Laws"** means the applicable one of the following:

- the laws of the State of Washington, United States together with the Federal Arbitration Act and other applicable federal law (if the Elected Country is Canada, Mexico, or the United States),

**"Insurance Limits"** means the applicable one of the following:

- One Million Canadian Dollars ($1,000,000) (if the Elected Country is Canada),
- Ten Million Mexican Pesos ($10,000,000) (if the Elected Country is Mexico),
- One Million U.S. Dollars ($1,000,000) (if the Elected Country is the United States).

**"Insurance Threshold"** means the applicable one of the following:

- Ten Thousand Canadian Dollars ($10,000) (if the Elected Country is Canada),
- One Hundred Thousand Mexican Pesos ($100,000) (if the Elected Country is Mexico),
- Ten Thousand U.S. Dollars ($10,000) (if the Elected Country is the United States).

**"Intellectual Property Right"** means any patent, copyright, Trademark, domain name, moral right, trade secret right, or any other intellectual property right arising under any Laws and all ancillary and related rights, including all rights of registration and renewal and causes of action for violation, misappropriation or infringement of any of the foregoing.

**"Law"** means any law, ordinance, rule, regulation, order, license, permit, judgment, decision, or other requirement, now or in the future in effect, of any governmental authority (e.g., on a federal, state, or provincial level, as applicable) of competent jurisdiction.

**"Local Currency"** means the applicable one of the following:

- U.S. Dollars (if the Elected Country is the United States),
- Canadian Dollars (if the Elected Country is Canada),
- Mexican Pesos (if the Elected Country is Mexico),

**"MX Amazon Site"** means the website, the primary home page of which is identified by the url www.amazon.com.mx, and any successor or replacement of such website.

**"Optional Coverage Plans"** means warranties, extended service plans and related offerings, in each case as determined by us, that you offer.

**"Order Information"** means, with respect to any of Your Products ordered through an Amazon Site, the order information and shipping information that we provide or make available to you.

**"Person"** means any individual, corporation, partnership, limited liability company, governmental authority, association, joint venture, division, or other cognizable entity, whether or not having distinct legal existence.

**"Program Policies"** means all policies and program terms provided on the Program Policies page.

**"Sales Proceeds"** means the gross proceeds from any of Your Transactions, including (a) all shipping and handling, gift wrap and other charges; (b) taxes and customs duties to the extent specified in the applicable Tax Policies; and (c) in the case of invoiced orders, any amounts that customers fail to pay to us or our Affiliates on or before the applicable invoice due date.

**"Seller Central"** means the online portal and tools made available by Amazon to you, for your use in managing your orders, inventory, and presence on a particular Amazon Site or any other online point of presence.

**"Service"** means each of the following services: Selling on Amazon, Fulfillment by Amazon, Amazon Advertising (including Amazon Sponsored Products), the Selling Partner APIs, and, if the Elected Country for a Service is the United States, the Transaction Processing Services, together in each case with any related services and materials we make available.

**"Service Terms"** means the service terms applicable to each Service, which are made part of this Agreement upon the date you elect to register for or use the applicable Service, and any subsequent modifications we make to those terms.

**"Technology"** means any: (a) ideas, procedures, processes, systems, methods of operation, concepts, principles, and discoveries protected or protectable under the Laws of any jurisdiction; (b) interfaces, protocols, glossaries, libraries, structured XML formats, specifications, grammars, data formats, or other similar materials; and (c) software, hardware, code, technology, or other functional item.

**"Trademark"** means any trademark, service mark, trade dress (including any proprietary "look and feel"), trade name, other proprietary logo or insignia, or any other source or business identifier, protected or protectable under any Laws.

**"US Amazon Site"** means that website, the primary home page of which is identified by the URL www.amazon.com, and any successor or replacement of such website.

**"Your Materials"** means all Technology, Your Trademarks, Content, Your Product information, data, materials, and other items or information provided or made available by you or your Affiliates to Amazon or its Affiliates.

**"Your Personnel"** means any third party warranting, administering or otherwise involved in the offer, sale, performance, or fulfillment of Your Products, including any of your employees, representatives, agents, contractors, or subcontractors.

**"Your Product"** means any product or service (including Optional Coverage Plans) that you: (a) have offered through the Selling on Amazon Service; (b) have made available for advertising through the Amazon Advertising Service; or (c) have fulfilled or otherwise processed through the Fulfillment by Amazon Service.

**"Your Sales Channels"** means all sales channels and other means through which you or any of your Affiliates offers products or services, other than physical stores.

**"Your Taxes"** means any and all sales, goods and services, use, excise, premium, import, export, value added, consumption, and other taxes, regulatory fees, levies (specifically including environmental levies), or charges and duties assessed, incurred, or required to be collected or paid for any reason (a) in connection with any advertisement, offer or sale of products or services by you on or through or in connection with the Services; (b) in connection with any products or services provided for which Your Products are, directly or indirectly, involved as a form of payment or exchange; or (c) otherwise in connection with any action, inaction, or omission of you or your Affiliates, or any Persons providing products or services, or your or their respective employees, agents, contractors, or representatives, for which Your Products are, directly or indirectly, involved as a form of payment or exchange. Also, if the Elected Country is the United States, Mexico, or Canada as it is used in the Fulfillment by Amazon Service Terms, this defined term also means any of the types of taxes, duties, levies, or fees mentioned above that are imposed on or collectible by Amazon or any of its Affiliates in connection with or as a result of fulfillment services including the storage of inventory or packaging of Your Products and other materials owned by you and stored by Amazon, shipping, gift wrapping, or other actions by Amazon in relation to Your Products pursuant to the Fulfillment by Amazon Service Terms.

**"Your Trademarks"** means Trademarks of yours that you provide to us: (a) in non-text form for branding purposes; and (b) separate from (and not embedded or otherwise incorporated in) any product specific information or materials.

**"Your Transaction"** means any sale of Your Product(s) through an Amazon Site.

## Selling on Amazon Service Terms

The Selling on Amazon Service (**"Selling on Amazon"**) is a Service that allows you to offer certain products and services directly on the Amazon Sites.

These Selling on Amazon Service Terms are part of the Agreement, but, unless specifically provided otherwise, concern and apply only to your participation in Selling on Amazon. BY REGISTERING FOR OR USING THE SELLING ON AMAZON SERVICE, YOU (ON BEHALF OF YOURSELF OR THE

BUSINESS YOU REPRESENT) AGREE TO BE BOUND BY THE AGREEMENT, INCLUDING THESE SELLING ON AMAZON SERVICE TERMS. **NOTWITHSTANDING THE PREVIOUS SENTENCE, IF YOU HAVE ENTERED INTO A SEPARATE AGREEMENT THAT PERMITS YOU TO OFFER YOUR PRODUCTS THROUGH A PARTICULAR AMAZON SITE (E.G., A MERCHANTS@ AMAZON.COM PROGRAM AGREEMENT, MERCHANTS @AMAZON.CO.JP PROGRAM AGREEMENT OR ANY PREDECESSOR OF THOSE AGREEMENTS), THEN TO THE EXTENT THAT YOU CONTINUE TO LIST AND SELL YOUR PRODUCTS ON THAT AMAZON SITE PURSUANT TO SUCH SEPARATE AGREEMENT, TRANSACTIONS OF YOUR PRODUCTS ON THAT AMAZON SITE AND ANY TAX SERVICES WE MAKE AVAILABLE UNDER THAT AGREEMENT ARE GOVERNED BY THE TERMS OF THAT AGREEMENT AND NOT BY THESE SELLING ON AMAZON SERVICE TERMS.**

**S-1 Your Product Listings and Orders.**

**S-1.1 Products and Product Information.** You will provide accurate and complete Required Product Information for each product or service that you offer through any Amazon Site and promptly update that information as necessary to ensure it at all times remains accurate and complete. You will also ensure that Your Materials, Your Products (including packaging) and your offer and subsequent sale of any of the same on any Amazon Site comply with all applicable Laws (including all minimum age, marking and labeling requirements) and do not contain any sexually explicit (except to the extent expressly permitted under our applicable Program Policies), defamatory or obscene materials. You may not provide any information for, or otherwise seek to offer any Excluded Products on any Amazon Sites; or provide any URL Marks for use, or request that any URL Marks be used, on any Amazon Site. If you offer a product for sale on an Amazon Site that requires a warning under California Health & Safety Code Section 25249.6 (a “Proposition 65 Warning”) you (a) will provide us with such warning in the manner specified in our Program Policies, (b) agree that our display of a Proposition 65 Warning on a product detail page is confirmation of our receipt of that warning, and (c) will only revise or remove a Proposition 65 Warning for a product when the prior warning is no longer legally required.

**S-1.2 Product Listing; Merchandising; Order Processing.** We will enable you to list Your Products on a particular Amazon Site, and conduct merchandising and promote Your Products in accordance with the Agreement (including via the Amazon Associated Properties or any other functions, features, advertising, or programs on or in connection with the applicable Amazon Site). We may use mechanisms that rate, or allow shoppers to rate, Your Products and your performance as a seller and Amazon may make these ratings and feedback publicly available. We will

provide Order Information to you for each order of Your Products through the applicable Amazon Site. We will also receive all Sales Proceeds on your behalf for each of these transactions and will have exclusive rights to do so, and will remit them to you in accordance with these Selling on Amazon Service Terms. We may permit certain customers to place invoiced orders for Your Products, in which case remittance of Sales Proceeds may be delayed according to each customer's invoicing terms. You will accept and fulfill invoiced orders in the same manner as you accept and fulfill non-invoiced orders, except as otherwise provided in this Agreement.

**S-1.3 Shipping and Handling Charges.** For Your Products ordered by customers on or through an Amazon Site that are not fulfilled using Fulfillment by Amazon, you will determine the shipping and handling charges subject to our Program Policies and standard functionality (including any category-based shipping and handling charges we determine, such as for products offered by sellers on the Individual selling plan and BMVD Products generally). When we determine the shipping and handling charges, you will accept them as payment in full for your shipping and handling. Please refer to the Fulfillment by Amazon Service Terms for Your Products that are fulfilled using Fulfillment by Amazon.

**S-1.4 Credit Card Fraud and Unpaid Invoices.** We will bear the risk of (a) credit card fraud (i.e., a fraudulent purchase arising from the theft and unauthorized use of a third party's credit card information) occurring in connection with Your Transactions, and (b) late payments or defaults by customers in connection with invoiced orders for Your Products, except, in each case, in connection with Seller-Fulfilled Products that are not fulfilled strictly in accordance with the Order Information and Shipment Information. You will bear all other risk of fraud or loss.

**S-2 Sale and Fulfillment; Refunds and Returns.**

**S-2.1 Sale and Fulfillment.** Other than as described in the Fulfillment by Amazon Service Terms for each Amazon Site for which you decide to register or use the Selling on Amazon Service, you will: (a) source, offer, sell, and fulfill your Seller-Fulfilled Products, and source, offer, and sell your Amazon-Fulfilled Products, in each case in accordance with the terms of the applicable Order Information, this Agreement, and all terms provided by you or us and displayed on the applicable Amazon Site at the time of the order and be solely responsible for and bear all risk for those activities; (b) package each of Your Products in a commercially reasonable manner complying with all applicable packaging and labeling requirements, including any warnings or instructions necessary to safely use Your Products, and ship each of Your Products on or before its Expected Ship Date; (c) retrieve Order Information

at least once each business day; (d) only cancel Your Transactions as permitted pursuant to your terms and conditions appearing on the applicable Amazon Site at the time of the applicable order or as may be required under this Agreement; (e) fulfill Your Products throughout the Elected Country (except to the extent prohibited by Law or this Agreement); (f) provide to Amazon information regarding fulfillment and order status and tracking (to the extent available), in each case as requested by us using the processes designated by us, and we may make any of this information publicly available; (g) comply with all Street Date instructions; (h) ensure that you are the seller of each of Your Products; (i) include an order-specific packing slip, and, if applicable, any tax invoices, within each shipment of Your Products; (j) identify yourself as the seller of each of Your Products on all packing slips or other information included or provided in connection with Your Products and as the Person to which a customer may return the applicable product; and (k) not send customers emails confirming orders or fulfillment of Your Products. If any of Your Products are fulfilled using Fulfillment by Amazon, the Fulfillment by Amazon Service Terms for the applicable Amazon Site will apply to the storage, fulfillment, and delivery of such Amazon-Fulfilled Products.

**S-2.2 Cancellations, Returns, and Refunds.** The Amazon Refund Policies for the applicable Amazon Site will apply to Your Products. Subject to Section F-6, for any of Your Products fulfilled using Fulfillment by Amazon, you will promptly accept, calculate, and process cancellations, returns, refunds, and adjustments in accordance with this Agreement and the Amazon Refund Policies for the applicable Amazon Site, using functionality we enable for your account. Without limiting your obligations, we may in our sole discretion accept, calculate, and process cancellations, returns, refunds, and adjustments for the benefit of customers. You will route any payments to customers in connection with Your Transactions through Amazon. We will make any payments to customers in the manner we determine, and you will reimburse us for all amounts we pay.

**S-3 Problems with Your Products.**

**S-3.1 Delivery Errors and Nonconformities; Recalls.** You are responsible for any non-performance, non-delivery, misdelivery, theft, or other mistake or act in connection with the fulfillment of Your Products, except to the extent caused by: (a) credit card fraud for which we are responsible under Section S-1.4; or (b) our failure to make available to you Order Information as it was received by us or resulting from address verification. Notwithstanding the previous sentence, for those of Your Products that are fulfilled using Fulfillment by Amazon, if any, the Fulfillment by Amazon Service Terms for the applicable Amazon Site will apply to non-delivery, misdelivery, theft, or

other mistake or act in connection with the fulfillment of those of Your Products. You are also responsible for any non-conformity or defect in, any public or private recall of, or safety alert of any of Your Products or other products provided in connection with Your Products. You will notify us promptly as soon as you have knowledge of any public or private recalls, or safety alerts of Your Products or other products provided in connection with Your Products.

**S-3.2 A-to-z Guarantee and Chargebacks if the Elected Country is Canada or Mexico.** If we inform you that we have received or initiated a claim under the "A-to-z Guarantee" offered on a particular Amazon Site or other dispute relating to the offer, sale or fulfillment of Your Products (other than a chargeback), concerning one of Your Transactions, you will have 30 days to appeal our decision of the claim. If we find that a claim, chargeback, or dispute is your responsibility, you (a) will not take recourse against the customer, and (b) are responsible for reimbursing us in accordance with the Service Fee Payments section of this Agreement for the amount paid by the customer (including taxes and shipping and handling charges, but excluding any Referral Fees that we retained as defined in Section S-4), and all other fees and expenses associated with the original transaction (such as credit card, bank, payment processing, re-presentment, or penalty fees) and any related chargebacks or refunds, to the extent payable by us.

**S-3.3 A-to-z Guarantee, A-to-z Claims Process, and Chargebacks if the Elected Country is the United States.** Claims that we receive or initiate under the "A-to-z Guarantee" or the “A-to-z Claims Process for Property Damage and Personal Injury” will be governed by the Program Policy for such claims.

If we find that any claim, chargeback, or dispute is your responsibility, (i) you will not take recourse against the customer, and (ii) if Amazon resolves the claim directly with the customer and does not waive its right of indemnification, you will reimburse us in accordance with Section 2 of this Agreement to the extent of your responsibility (not to exceed the amount paid by Amazon to resolve the claim), including taxes and shipping and handling charges (but excluding any Referral Fees that we retained as defined in Section S-4), and all other fees and expenses associated with the original transaction (such as credit card, bank, payment processing, re-presentment, or penalty fees) and any related chargebacks or refunds.

**S-4 Compensation.**

You will pay us: (a) the applicable Referral Fees; (b) any applicable Variable Closing Fee; (c) the non-refundable Selling on Amazon Subscription Fee in

advance each month; and (d) any other applicable fees described in this Agreement (including any applicable Program Policies). **"Selling on Amazon Subscription Fee"** means the fee specified as such on the Selling on Amazon Fee Schedule for the applicable Amazon Site at the time such fee is payable. With respect to each of Your Transactions: (i) **"Sales Proceeds"** has the meaning set out in this Agreement; (ii) **"Variable Closing Fee"** means the applicable fee, if any, as specified on the Variable Closing Fee Schedule for the applicable Amazon Site; and (iii) **"Referral Fee"** means the applicable fee based on the Sales Proceeds from Your Transaction through the applicable Amazon Site specified on the Selling on Amazon Fee Schedule for that Amazon Site at the time of Your Transaction, based on the categorization by Amazon of the type of product that is the subject of Your Transaction; provided, however, that Sales Proceeds will not include any shipping charges set by us in the case of Your Transactions that consist solely of products fulfilled using Fulfillment by Amazon.

**S-5 Remittance of Sales Proceeds & Refunds.**

Except as otherwise stated in this Agreement, we will remit to you your available balance on a bi-weekly (14 day) (or at our option, more frequent) basis, which may vary for each Elected Country. For each remittance, your available balance is equal to any Sales Proceeds not previously remitted to you as of the applicable Remittance Calculation Date (which you will accept as payment in full for Your Transactions), less: (a) the Referral Fees; (b) the applicable Variable Closing Fee; (c) any Selling on Amazon Subscription Fees; (d) any other applicable fees described in this Agreement (including any applicable Program Policies); (e) any amounts we require you to maintain in your account balance pursuant to this Agreement (including payments withheld pursuant to Section 2 of the General Terms, Section S-1.4, Section S-3.2, Section S-3.3, and applicable Program Policies); and (f) any taxes that Amazon automatically calculates, collects and remits to a tax authority according to applicable law, as specified in the Tax Policies.

We may establish a reserve on your account based on our assessment of risks to Amazon or third parties posed by your actions or performance, and we may modify the amount of the reserve from time to time at our sole discretion.

When you either initially provide or later change Your Bank Account information, the Remittance Calculation Date may be deferred by up to 14 days. For sellers that registered after October 30, 2011 and are on the Individual selling plan, the remittance amount will not include Sales Proceeds from the 14-day period before the date of remittance. If you refund money to a customer in connection with one of Your Transactions,

and the refund is routed through us (or our Affiliate), on the next available Remittance Calculation Date we will refund to you the amount of the Referral Fee paid by you to us attributable to the amount of the customer refund (including refunded taxes and customs duties only to the extent specified in the applicable Tax Policies), less the Refund Administration Fee for each of Your Products refunded that is not a BMVD Product, which amount we may retain as an administrative fee; provided, however, that in the case of a complete refund of Sales Proceeds for a Media Product, we will refund to you the full amount of any Variable Closing Fee paid by you to us (and in the case of a partial refund of Sales Proceeds for a Media Product, we will not refund to you any portion of any Variable Closing Fee paid by you to us). We will remit any amounts to be refunded by us pursuant to this subsection from time to time together with the next remittance to be made by us to you. **"Refund Administration Fee"** means the applicable fee described on the Refund Administration Fee Schedule for the applicable Amazon Site.

Net Sales Proceeds from non-invoiced orders will be credited to your available balance when they are received by us or our Affiliates. Sales Proceeds from invoiced orders will be credited to your available balance: (a) if you have elected in advance to pay a fee to accelerate remittance of Sales Proceeds from invoiced orders, on the day all of Your Products included in an invoiced orders are shipped; or (b) otherwise, no later than the seventh day following the date that an invoiced order becomes due.

## S-6 Amazon's Websites and Services.

Amazon has the right to determine, the design, content, functionality, availability and appropriateness of its websites, selection, and any product or listing in the Amazon Stores, and all aspects of each Service, including your use of the same. Amazon may assign any of these rights or delegate any of its responsibilities.

## S-7 Continuing Guarantees

Guarantees. We require the following continuing guarantees from you.

S-7.1 Pesticides. If any of Your Products is a "pesticide" being offered or sold in the United States or other product regulated under the US Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA") or its implementing regulations, then you provide to us the following continuing guaranty that: (a) you are a resident of the United States; and (b) with respect to each such product, the pesticides and other FIFRA regulated products comprising each sale, shipment, or other delivery made previously or hereafter are: (i)

lawfully registered with the US Environmental Protection Agency at the time of sale, shipment, or delivery, or fully qualified for a specific exemption from the FIFRA registration requirements at the time of sale, shipment, or delivery, (ii) compliant with all requirements of FIFRA and its implementing regulations at the time of sale, shipment, or delivery, and (iii) provided by you in the original, unbroken packaging.

S-7.2 Foods, Drugs, Medical Devices, and Cosmetics. If any of Your Products is a “food”, “drug”, “medical device”, or “cosmetic” being offered or sold in the United States or other product regulated under the U.S. Federal Food, Drug, and Cosmetic Act (“FFDCA”) or its implementing regulations, then you provide us with the following continuing guaranty that with respect to all such products comprising each sale, shipment, or other delivery made previously or hereafter are: (i) not adulterated or misbranded within the meaning of the FFDCA, (ii) compliant with all requirements of FFDCA and its implementing regulations at the time of sale, shipment, or delivery, and (iii) provided by you in the original, unbroken packaging.

**Selling on Amazon Definitions**

**"Amazon-Fulfilled Products"** means any of Your Products that are fulfilled using the Fulfillment by Amazon Service.

**"Amazon Refund Policies"** means the return and refund policies published on the applicable Amazon Site and applicable to products and services offered via that Amazon Site.

**"BMVD Product"** means any book, magazine or other publication, sound recording, video recording, and/or other media product in any format, including any subscription, in each case excluding any software product, computer game, and/or video game.

**"Excluded Offer"** means any discount, rebate, promotional offer, or other term of offer and/or sale that you: (a) have attempted to make available through a particular Amazon Site but that we do not honor or support (but only until such time as we honor or support the same on such Amazon Site); or (b) make available solely to third parties that either (i) purchase products solely for resale and who are not end users of such products (i.e., wholesale purchasers), or (ii) if the Elected Country is Canada, Mexico, or the United States, have affirmatively elected and opted-in to participate in your or one of your Affiliates' membership-based customer loyalty or customer incentive programs.

**"Expected Ship Date"** means, with respect to any of Your Products, either: (a) the end of the shipping availability period (which begins as of the date on which the relevant order is placed by the customer), or the shipping availability date, as applicable, specified by you in the relevant inventory/product data feed for Your Product; or (b) if you do not specify shipping availability information in such inventory/product data feed or that Your Product is in a product category that Amazon designates as requiring shipment within two (2) business days, two (2) business days after the date on which the relevant order is placed by the customer.

**"Media Product"** means any book, magazine or other publication, sound recording, video recording, software product, computer game, videogame, or other media product in any format, including any related subscription, offered through an Amazon Site.

**"Purchase Price"** means the total amount payable or paid for Your Product (including taxes and shipping and handling charges only to the extent specified in the applicable Tax Policies).

**"Remittance Calculation Date"** is the date that is two (2) business days prior to the date of remittance (the **"Remittance Calculation Date"**).

**"Required Product Information"** means, with respect to each of Your Products in connection with a particular Amazon Site, the following (except to the extent expressly not required under the applicable Program Policies): (a) description, including as applicable, location-specific availability and options, scheduling guidelines and service cancellation policies; (b) SKU and UPC/EAN/JAN numbers, and other identifying information as Amazon may reasonably request; (c) information regarding in-stock status and availability, shipping limitations or requirements, and Shipment Information (in each case, in accordance with any categorizations prescribed by Amazon from time to time); (d) categorization within each Amazon product category and browse structure as prescribed by Amazon from time to time; (e) digitized image that accurately depicts only Your Product, complies with all Amazon image guidelines, and does not include any additional logos, text or other markings; (f) Purchase Price; (g) shipping and handling charge (in accordance with our standard functionality); (h) any text, disclaimers, warnings, notices, labels, warranties, or other content required by applicable Law to be displayed, or that are necessary for the safe use of Your Product, in connection with the offer, merchandising, advertising, or sale of Your Product; (i) any vendor requirements, restocking fees or other terms and conditions applicable to such product that a customer should be aware of prior to purchasing the product; (j) brand; (k) model; (l) product dimensions; (m) weight; (n) a delimited list of technical specifications; (o) SKU and

UPC/EAN/JAN numbers (and other identifying information as we may reasonably request) for accessories related to Your Product that is available in our catalog; (p) the state or country Your Product ships from; and (q) any other information reasonably requested by us (e.g., the condition of used or refurbished products; and invoices and other documentation demonstrating the safety and authenticity of Your Products).

**"Seller-Fulfilled Products"** means any of Your Products that are not fulfilled using the Fulfillment by Amazon Service.

**"Shipment Information"** means, with respect to any of Your Products, the estimated or promised shipment and delivery date.

**"Street Date"** means the date(s), if any, specified by the manufacturer, distributor, and/or licensor of a product as the date before which specified information regarding such product (e.g., title of a book) should not be disclosed publicly, or such product should not be delivered or otherwise made available to customers.

**"URL Marks"** means any Trademark, or any other logo, name, phrase, identifier, or character string, that contains or incorporates any top level domain (e.g., .com, .edu, .ca, .fr, .jp) or any variation of a top level domain (e.g., dot com, dotcom, net, or com).

**"Your Transaction"** is defined in the General Terms of this Agreement; however, as used in these Selling on Amazon Service Terms, it means any and all such transactions through Selling on Amazon only.

## Fulfillment by Amazon Service Terms

Fulfillment by Amazon (**"FBA"**) provides fulfillment and associated services for Your Products.

These FBA Service Terms are part of the Agreement, and, unless specifically provided otherwise, concern and apply only to your participation in FBA. BY REGISTERING FOR OR USING FBA, YOU (ON BEHALF OF YOURSELF OR THE BUSINESS YOU REPRESENT) AGREE TO BE BOUND BY THE AGREEMENT, INCLUDING THESE FBA SERVICE TERMS. You expressly agree that Amazon may engage its Affiliate(s) or a third party in order to complete one or more of the fulfillment and associated services outlined below.

### Fulfillment Services

**F-1 Your Products**

Once you are accepted into FBA, you must apply to register each product you offer that you wish to include in the FBA program. We may refuse registration in FBA of any product, including on the basis that it is an FBA Excluded Product or that it violates applicable Program Policies. You may at any time withdraw registration of any of Your Products from FBA.

**F-2 Product and Shipping Information**

You will, in accordance with applicable Program Policies, provide accurate and complete information about Your Products registered in FBA, and will provide Fulfillment Requests for any Units fulfilled using FBA that are not sold through an Amazon Site ("**Multi-Channel Fulfillment Units**"). You will promptly update any information about Your Products in accordance with our requirements and as necessary so that the information is at all times accurate and complete.

**F-3 Shipping to Amazon**

**F-3.1** Except as otherwise provided in Section F-3.4 and Section F-5, FBA is limited to Units that are shipped to and from fulfillment centers located within the applicable Elected Country, to be delivered to customers in the same Elected Country only. You will ship Units to us in accordance with applicable Program Policies. You will be responsible for all costs incurred to ship the Units to the shipping destination (including costs of freight and transit insurance) and Amazon will not pay any shipping costs. You are responsible for payment of all customs, duties, taxes, and other charges. In the case of any improperly packaged or labeled Unit, we may return the Unit to you at your expense (pursuant to Section F-7) or re-package or re-label the Unit and charge you an administrative fee.

**F-3.2** You will not deliver to us any Unsuitable Unit; we may reject any shipment of Your Products.

**F-3.3** We may, at our option, allow you to ship Units at your expense (as described in Section F-9.2) to fulfillment centers using discounted shipping rates that we may make available to you for certain carriers. In such event, you will use the processes and supply the information that we require for you to obtain such discounted rates. You also must comply with standard operating procedures, weight and size restrictions, and other shipping requirements of the applicable carriers. If we provide you with the estimated shipping costs prior to shipment, you acknowledge and agree that actual

shipping costs may vary from such estimates. In addition, if the weight of the Unit, as determined by the applicable carrier, differs from that submitted by you to us for purposes of determining the estimated shipping costs, then: (a) you may be charged more than the estimated shipping costs if the carrier determines that such Unit weighs more than as submitted by you; or (b) you may be charged the full amount of the estimated shipping costs even if the carrier determines the weight to be less than that submitted by you. You will not use carrier account information (e.g., carrier account number, amount of shipping rates, etc.) for any purpose, nor disclose such information to any third party, and you will protect such information as Amazon's confidential information in accordance with Section 11 of the General Terms of this Agreement. As between you, us, and the applicable carrier, you will be the shipper of record, and we will make payment to the carrier with respect to the shipment of all Units using such discounted rates. Title and risk of loss for any Unit shipped using discounted rates provided by us under this Section will remain with you, and our provision of such shipping rates will not create any liability or responsibility for us with respect to any delay, damage, or loss incurred during shipment. You authorize the applicable carrier to provide us with all shipment tracking information.

**F-3.4** If you ship Units from outside the applicable Elected Country to fulfillment centers, you will list yourself as the importer/consignee and nominate a customs broker. If Amazon is listed on any import documentation, Amazon reserves the right to refuse to accept the Units covered by the import documents and any costs assessed against or incurred by Amazon will be collected from Your Bank Account, deducted from amounts payable to you, or by other method at our election.

**F-4 Storage**

We will provide storage services as described in these FBA Service Terms once we confirm receipt of delivery. We will keep electronic records that track inventory of Units by identifying the number of Units stored in any fulfillment center. We will not be required to physically mark or segregate Units from other inventory units (e.g., products with the same Amazon standard identification number) owned by us, our Affiliates or third parties in the applicable fulfillment center(s). If we elect to commingle Units with such other inventory units, both parties agree that our records will be sufficient to identify which products are Units. We may move Units among facilities. If there is a loss of or damage to any Units while they are being stored, we will, compensate you in accordance with the FBA Guidelines, and you will, at our request, provide us a valid tax invoice for the compensation paid to you. If we compensate you for a Unit, we will be entitled to dispose of the Unit pursuant to Section F-7. At all other times, you will be solely responsible for

any loss of, or damage to, any Units. Our confirmed receipt of delivery does not: (a) indicate or imply that any Unit has been delivered free of loss or damage, or that any loss or damage to any Unit later discovered occurred after confirmed receipt of delivery; (b) indicate or imply that we actually received the number of Units of Your Product(s) specified by you for such shipment; or (c) waive, limit, or reduce any of our rights under this Agreement. We reserve the right to change scheduling restrictions and volume limitations on the delivery and storage of your inventory in fulfillment centers in accordance with Section 15 of the General Terms, and you will comply with any of these restrictions or limitations.

### F-5 Fulfillment

As part of our fulfillment services, we will ship Units from our inventory of Your Products to the shipping addresses in the Elected Country included in valid customer orders, or submitted by you as part of a Fulfillment Request. We may ship Units together with products purchased from other merchants, including any of our Affiliates. We also may ship Units separately that are included in a single Fulfillment Request. If you participate in our export fulfillment services, we will also ship Your Products that we determine to be eligible (each, a **"Foreign-Eligible Product"**) to Foreign Addresses within countries we determine to be eligible for foreign shipments, subject to the additional terms on foreign shipments in the applicable FBA Guidelines.

### F-6 Customer Returns

**F-6.1** You will be responsible for and will accept and process returns of, and provide refunds and adjustments for, any Multi-Channel Fulfillment Units in accordance with the Agreement (including the applicable Program Policies).

**F-6.2** We will receive and process returns of any Amazon Fulfillment Units that were shipped to addresses within the Elected Country in accordance with the terms of your Seller Agreement, these FBA Service Terms, and the Program Policies. Any Sellable Units that are also Amazon Fulfillment Units and that are properly returned will be placed back into the inventory of Your Products in the FBA Program. We may fulfill customer orders for Your Products with any returned Amazon Fulfillment Units. Except as provided in Section F-7, you will retake title of all Units that are returned by customers.

**F-6.3** Subject to Section F-7, we will, at your direction, either return or dispose of any Unit that is returned to us by a customer and that we determine is an Unsuitable Unit.

**F-6.4** If Amazon receives a customer return of a Multi-Channel Fulfillment Unit, you will direct us to return or dispose of the Unit at your own cost failing which we may dispose of the Unit as provided in Section F-7.

**F-7 Returns to You and Disposal**

**F-7.1** You may, at any time, request that Units be returned to you or that we dispose of Units.

**F-7.2** We may with notice return Units to you, including upon termination of these FBA Service Terms. Returned Units will be sent to your designated shipping address. However, if (a) the designated shipping address we have for you is outdated or incorrect, (b) you have not provided or, upon our request, confirmed a designated shipping address in the Elected Country, or (c) we cannot make arrangements for you to pay for the return shipment, then the Unit(s) will be deemed abandoned and we may elect to dispose of them as appropriate based on the inventory (e.g., by selling, recycling, donating, or destroying it) and retain any proceeds we may receive from the disposal.

We may dispose of any Unsuitable Unit (and you will be deemed to have consented to our action): (d) immediately if we determine that (i) the Unit creates a safety, health, or liability risk to Amazon, our personnel, or any third party; (ii) you have engaged in fraudulent or illegal activity; or (iii) we have cause to terminate your use of Services with immediate effect pursuant to Section 3 and are exposed to liability towards a third party; (e) if you fail to direct us to return or dispose of any Unsuitable Unit within thirty (30) days after we notify you that the Unit has been recalled; or (f) if you fail to direct us to return or dispose of any Unsuitable Unit within thirty (30) days (or as otherwise specified in the applicable Program Policies) after we notify you that its removal is required, for instance because your use of FBA is suspended or terminated or your seller account is suspended, terminated or closed. In addition, you will reimburse us for expenses we incur in connection with any Unsuitable Units.

We may dispose of any Unit we are entitled to dispose of (including any Unsuitable Units) in the manner we deem appropriate (e.g., by selling, recycling, donating, or destroying it) and retain any proceeds we may receive from the disposal.

**F-7.3** You may, at any time, request that we dispose of Units. In this case, we may dispose of these Units as appropriate based on the inventory (e.g., by selling, recycling, donating, or destroying it) and retain any proceeds we may receive from the disposal. Title to each disposed Unit will transfer to us (or a

third party we select such as a charity) at no cost, free and clear of any liens, claims, security interests or other encumbrances to the extent required to dispose of the Unit, and we may retain any proceeds, we may receive from the disposal.

**F-7.4** You will promptly notify us of any recalls or potential recalls, or safety alerts of any of Your Products and cooperate and assist us in connection with any recalls or safety alerts, including by initiating the procedures for returning items to you under our standard processes. You will be responsible for all costs and expenses you, we or any of our or your Affiliates incur in connection with any recall or potential recall or safety alerts of any of Your Products (including the costs to return, store, repair, liquidate, or deliver to you or any vendor any of these products).

### F-8 Customer Service

**F-8.1** For Multi-Channel Fulfillment Units we will have no customer service obligations other than to pass any inquiries to your attention at the contact you provide, and to make available a reasonable amount of information regarding the status of the fulfillment of Your Products if you request it and if and to the extent we possess the requested information. You will ensure that all of your policies and messaging to your customers regarding shipping of Your Products and other fulfillment-related matters, reflect our policies and requirements, including with regard to shipping methods, returns, and customer service; and, you will conspicuously display on your website(s), in emails or in other media or communications any specific disclosures, messaging, notices, and policies we require.

**F-8.2** We will be responsible for all customer service issues relating to packaging, handling and shipment, and customer returns, refunds, and adjustments related to Amazon Fulfillment Units. We will determine whether a customer will receive a refund, adjustment or replacement for any Amazon Fulfillment Unit and we will require you to reimburse us where we determine you have responsibility in accordance with the Agreement (including these FBA Service Terms and the Program Policies). We will promptly notify you when you are responsible for a customer refund. You may appeal if you disagree with our finding within thirty (30) days after our notification, in addition to your right to request that Units be returned to you under Section F-7.1. Except as provided in this Section F-8 regarding any Amazon Fulfillment Units, customer service will be handled in accordance with your Seller Agreement.

**F-8.3** In situations relating to Amazon Fulfillment Units where the wrong item was delivered or the item was damaged or lost or is missing, unless we

determine that the basis for such request is caused by you or any of your employees, agents, or contractors, we will, at our option: (a) for any Amazon Fulfillment Unit, (i) ship a replacement Unit to the customer and reimburse you in accordance with the FBA Guidelines for the replacement Unit, or (ii) process a refund to the customer and reimburse you in accordance with the FBA Guidelines for the Unit; or (b) for any Multi-Channel Fulfillment Unit, reimburse you in accordance with the FBA Guidelines for the Unit (and you will, at our request, provide us a valid tax invoice for the compensation paid to you). Any customer refund will be processed in accordance with the Selling on Amazon and the Transaction Processing Service Terms (if the Elected Country for a Service is the United States). Notwithstanding the Selling on Amazon Service Terms, we will be entitled to retain the applicable fees payable to us under the Selling on Amazon Service Terms and these FBA Service Terms, respectively. Except as expressly provided in this Section F-8.3, you will be responsible for all costs associated with any replacement or return.

**F-8.4** If we provide a replacement Unit or refund as described in Section F-8.3 to a customer and that customer returns the original Unit to us, we will be entitled to dispose of the Unit pursuant to Section F-7, or, if it is a Sellable Unit, we may, at our option, place such Unit back into your inventory in accordance with Section F-6. If we do put a Unit back into your inventory, you will reimburse us for the applicable Replacement Value (as described in the FBA Guidelines) of the returned Unit. Any replacement Unit shipped by us under these FBA Service Terms will be deemed to be, and will be treated in the same manner as, an order and sale of such Unit from you to the customer via the applicable Amazon Site or Service in accordance with, and subject to, the terms and conditions of this Agreement and your Seller Agreement.

### F-9 Compensation for Fulfillment Services

**F-9.1 Handling and Storage Fees.** You will pay us the applicable fees described in the applicable Fulfillment by Amazon Fee Schedule. You will be charged the Storage Fees beginning on the day (up to midnight) that the Unit arrives at a fulfillment center and is available for fulfillment by Amazon (or in the case of any Unsuitable Unit, the arrival day (up to midnight)), until the earlier of: (a) the day (up to midnight) we receive a valid customer order for such product or a request from you to return or dispose of the Unit; or (b) the day (up to midnight) we actually ship the Unit to your designated return location or dispose of the Unit.

**F-9.2 Shipping and Gift Wrap.** For any Amazon Fulfillment Units we will determine the amounts charged to the customer for shipping and gift wrap

services for the Units that we fulfill through the FBA Program. As between you and us, these charges will be your charges to the customer, and we will report them to you. We will charge you (and you will pay us) a fee equal to the amount of such charges to the customer. In the case of shipments of Units sold through the Amazon Site that qualify for the "Free Shipping" promotion, the amounts charged to the customer for shipping the Selling on Amazon Units that Amazon fulfills will first be charged to the customer and will next be deducted from the total charges to the customer as your promotion and Amazon will not charge you the fee described above. If you ship Units to us using the shipping rates that we may make available pursuant to Section F-3.3, you will reimburse us for the actual amounts charged to us by the applicable carrier for such shipments.

**F-9.3 Proceeds.** We may as appropriate keep part of or all proceeds of any Units that we are entitled to dispose of pursuant to F-7 above, or to which title transfers, including returned, damaged, or abandoned Units. You will have no security interest, lien, or other claim to the proceeds that we receive in connection with the sale, fulfillment, and/or shipment of these Units.

### F-10 Indemnity

In addition to your obligations under Section 6 of the General Terms of this Agreement, you also agree to indemnify, defend, and hold harmless us, our Affiliates, and our and their respective officers, directors, employees, representatives, and agents against any Claim that arises from or relates to: (a) the Units (whether or not title has transferred to us, and including any Unit that we identify as yours pursuant to Section F-4), including any personal injury, death, or property damage; (b) any of Your Taxes or the collection, payment, or failure to collect or pay Your Taxes; and, if applicable (c) any sales, use, value added, personal property, gross receipts, excise, franchise, business, or other taxes or fees, or any customs, duties, or similar assessments (including penalties, fines, or interest on any of the foregoing) imposed by any government or other taxing authority in connection with the shipment of Foreign-Eligible Products to Foreign Addresses (collectively, **"Foreign Shipment Taxes"**).

### F-11 Release

You, on behalf of yourself and any successors, subsidiaries, Affiliates, officers, directors, shareholders, employees, assigns, and any other person or entity claiming by, through, under, or in concert with them (collectively, the **"Releasing Parties"**), irrevocably acknowledge full and complete satisfaction of and unconditionally and irrevocably release and forever fully discharge Amazon and each of our Affiliates, and any and all of our and their

predecessors, successors, and Affiliates, past and present, as well as each of our and their partners, officers, directors, shareholders, agents, employees, representatives, attorneys, and assigns, past and present, and each of them and all Persons acting by, through, under, or in concert with any of them (collectively, the **"Released Parties"**), from any and all claims, obligations, demands, causes of action, suits, damages, losses, debts, or rights of any kind or nature, whether known or unknown, suspected or unsuspected, absolute or contingent, accrued or unaccrued, determined or speculative (collectively, **"Losses"**) which the Releasing Parties now own or hold or at any time have owned or held or in the future may hold or own against the Released Parties, or any of them, arising out of, resulting from, or in any way related to the shipment, export, or delivery of Your Products to Foreign Addresses, including any tax registration or collection obligations. You, on behalf of yourself and all other Releasing Parties, recognize that you, and each of them, may have some Losses, whether in tort, product liability, contract, warranty, or otherwise, against the Released Parties of which you, or any of them, are totally unaware and unsuspecting, or which may arise or accrue after the date you register for or use FBA, which the Releasing Parties are giving up by agreeing to these FBA Service Terms. It is your intention in agreeing to these FBA Service Terms that these FBA Service Terms will deprive the Releasing Parties of each and all such Losses and prevent the Releasing Party from asserting any such Losses against the Released Parties, or any of them. In addition to the foregoing, you acknowledge, on behalf of yourself and all other Releasing Parties that you are familiar with Section 1542 of the Civil Code of the State of California, as follows:

**"A general release does not extend to claims that the creditor or releasing party does not know or suspect to exist in his or her favor at the time of executing the release and that, if known by him or her, would have materially affected his or her settlement with the debtor or released party."**

You, on behalf of yourself and all other Releasing Parties, expressly waive and relinquish any rights that you had or may have under Section 1542 of the Civil Code of the State of California or any similar provision of the law of any other jurisdiction, to the full extent that you may lawfully waive all such rights pertaining to the subject matter of these FBA Service Terms.

**F-12 Disclaimer**

IN ADDITION TO THE DISCLAIMER IN SECTION 7 OF THE GENERAL TERMS OF THIS AGREEMENT, WE DISCLAIM ANY DUTIES OF A BAILEE OR WAREHOUSEMAN, AND YOU WAIVE ALL RIGHTS AND REMEDIES OF A BAILOR (WHETHER ARISING UNDER COMMON LAW OR STATUTE OR

OTHERWISE), RELATED TO OR ARISING OUT OF ANY POSSESSION, STORAGE, OR SHIPMENT OF YOUR PRODUCTS BY US OR OUR AFFILIATES OR ANY OF OUR OR THEIR CONTRACTORS OR AGENTS.

### F-13 Effect of Termination

Your termination rights are set forth in Section 3 of this Agreement. Following any termination of the Agreement or these FBA Service Terms in connection with a particular Elected Country, we will, as directed by you, return to you or dispose of the Units held in that Elected Country as provided in Section F-7. If you fail to direct us to return or dispose of the Units within thirty (30) days (or as otherwise specified in the applicable Program Policies) after termination, then we may elect to return and/or dispose of the Units in whole or in part, as provided in Section F-7, and you agree to such actions. Upon any termination of these FBA Service Terms in connection with a particular Elected Country, all rights and obligations of the parties under these FBA Service Terms in connection with such Elected Country will be extinguished, except that the rights and obligations of the parties under Sections F-1, F-2, F-3, F-4, F-5, F-6, F-7, F-8, F-9, F-11, F-12, and F-13 with respect to Units received or stored by Amazon as of the date of termination will survive the termination.

### F-14 Tax Matters

You understand and acknowledge that storing Units at fulfillment centers may create tax nexus for you in any country, state, province, or other localities in which your Units are stored, and you will be solely responsible for any taxes owed as a result of such storage. If any Foreign Shipment Taxes or Your Taxes are assessed against us as a result of performing services for you in connection with the FBA Program or otherwise pursuant to these FBA Service Terms, you will be responsible for such Foreign Shipment Taxes and Your Taxes and you will indemnify and hold Amazon harmless from such Foreign Shipment Taxes and Your Taxes as provided in Section F-10 of these FBA Service Terms.

### F-15 Additional Representation

In addition to your representations and warranties in Section 5 of the General Terms of this Agreement, you represent and warrant to us that: (a) you have valid legal title to all Units and all necessary rights to distribute the Units and to perform under these FBA Service Terms; (b) you will deliver all Units to us in new condition (or in such condition otherwise described by you in the applicable Your Product listing) and in a merchantable condition; (c) all Units and their packaging will comply with all applicable marking,

labeling, and other requirements required by Law; (d) no Unit is or will be produced or manufactured, in whole or in part, by child labor or by convict or forced labor; (e) you and all of your subcontractors, agents, and suppliers involved in producing or delivering Units will strictly adhere to all applicable Laws of the Elected Country, its territories, and all other countries where Units are produced or delivered, regarding the operation of their facilities and their business and labor practices, including working conditions, wages, hours, and minimum ages of workers; and (f) that all Foreign-Eligible Products (i) can be lawfully exported from Canada, Mexico, or the United States, as applicable, without any license or other authorization; and (ii) can be lawfully imported into, and comply with all applicable Laws of, any eligible country.

**FBA Definitions**

**"Amazon Fulfillment Units"** means Units fulfilled using FBA that are sold through an Amazon Site. For avoidance of doubt, if you have successfully registered for or used both the FBA and Selling on Amazon Services, then the term "Amazon Fulfillment Units" and the defined term "Amazon Fulfilled Products" in the Selling on Amazon Service Terms both refer to the same items.

**"FBA Excluded Product"** means any Unit that is an Excluded Product or is otherwise prohibited by the applicable Program Policies.

**"Foreign Address"** means (a) if the Elected Country is the United States, any mailing address that is not (i) within the fifty states of the United States or Puerto Rico, or (ii) an APO/FPO address; and (b) if the Elected Country is not the United States, any mailing address that is not within the Elected Country.

**"Fulfillment Request"** means a request that you submit to us (in accordance with the standard methods for submission prescribed by us) to fulfill one or more Multi-Channel Fulfillment Units.

**"Multi-Channel Fulfillment Units"** has the meaning in Section F-2.

**"Sellable Unit"** means a Unit that is not an Unsuitable Unit.

**"Seller Agreement"** means the Selling on Amazon Service Terms, the Merchants@ Program Agreement, the Marketplace Participation Agreement, any successor to any of these agreements, or any other similar agreement (as determined by Amazon) between you and us that permits you to offer products and services via a particular Amazon Site.

**"Shipping Information"** means with respect to any purchased Unit(s), the following information: the name of the recipient, the shipping address, the quantity of Units to be shipped, and any other shipping-related information we may reasonably request.

**"Unit"** means a unit of Your Product that you deliver to Amazon in connection with the FBA Program.

**"Unsuitable Unit"** means a Unit: (a) that is defective, damaged, unfit for a particular purpose, or lacking required label(s); (b) the labels for which were not properly registered with Amazon before shipment or do not match the product that was registered; (c) that is an FBA Excluded Product or does not comply with the Agreement (including applicable Service Terms and Program Policies); (d) that Amazon determines is unsellable or unfulfillable; or (e) that Amazon determines is otherwise unsuitable.

## Amazon Advertising Service Terms

The Amazon Advertising Service Terms govern your use of Amazon Advertising, a Service that allows you to advertise your products. The Amazon Advertising Service Terms apply to your use of the Ad Services.

Your use of the Ad Services (as defined in the Amazon Advertising Agreement) is governed by the Amazon Advertising Agreement. You accept the Amazon Advertising Agreement, which may be updated from time to time by Amazon in accordance with its terms. The Amazon Advertising Agreement is available at https://advertising.amazon.com/terms. In the event of any conflict between the General Terms or Program Policies and the Amazon Advertising Agreement with respect to the Ad Services, the Amazon Advertising Agreement will prevail to the extent of the conflict. If the Amazon Advertising Agreement is deemed unlawful, void, or for any reason unenforceable, then the General Terms will govern your access to and use of the Ad Services.

## Transaction Processing Service Terms

BY REGISTERING FOR OR USING ANY SERVICE OTHER THAN AMAZON ADVERTISING FOR WHICH THE ELECTED COUNTRY IS THE UNITED STATES, YOU (ON BEHALF OF YOURSELF OR THE BUSINESS YOU REPRESENT) AGREE TO BE BOUND BY THESE TRANSACTION PROCESSING SERVICE TERMS FOR THAT SERVICE. **NOTWITHSTANDING THE FOREGOING, IF A SEPARATE AGREEMENT GOVERNS THE OFFER, SALE OR FULFILLMENT OF YOUR PRODUCTS ON THE US AMAZON SITE, THE TERMS OF THAT AGREEMENT**

**WILL CONTINUE TO GOVERN THE PROCESSING OF YOUR TRANSACTIONS TO THE EXTENT DESCRIBED IN THAT AGREEMENT.**

**P-1 Payments Processing Agency Appointment**

For non-invoiced orders, you authorize Amazon Payments, Inc. to act as your agent for purposes of processing payments, refunds and adjustments for Your Transactions, receiving and holding Sales Proceeds on your behalf, remitting Sales Proceeds to Your Bank Account, charging your Credit Card, and paying Amazon and its Affiliates amounts you owe in accordance with this Agreement or other agreements you may have with Amazon Affiliates. For invoiced orders, you authorize: (a) Amazon Capital Services, Inc. to act as your agent for purposes of processing payments, refunds and adjustments for Your Transactions, and receiving and holding Sales Proceeds on your behalf; and (b) Amazon.com Services LLC to act as your agent for purposes of remitting Sales Proceeds to Your Bank Account, charging your Credit Card, and paying Amazon and its Affiliates amounts you owe in accordance with this Agreement or other agreements you may have with Amazon Affiliates. Amazon Payments, Inc., Amazon Capital Services, Inc., and Amazon.com Services LLC are each an **"Amazon Payments Agent"**. The applicable Amazon Payments Agents provide the services described in these Transaction Processing Service Terms and the related services described in Sections S-1.4, S-2.2, S-5, and F-8.3 of the Agreement (collectively, the **"Transaction Processing Services"**).

When a buyer instructs us to pay you, you agree that the buyer authorizes and orders us to commit the buyer's payment (less any applicable fees or other amounts we may collect under this Agreement) to you. You agree that buyers satisfy their obligations to you for Your Transactions when we receive the Sales Proceeds. We will remit funds to you in accordance with this Agreement.

**P-2 Remittance**

Subject to Section 2 of the General Terms of this Agreement, the applicable Amazon Payments Agents will remit funds to you in accordance with Section S-5 of the Agreement and these Transaction Processing Service Terms. Each applicable Amazon Payments Agent's obligation to remit funds collected or received by it or otherwise credited to your available balance in connection with Your Transactions is limited to funds in your available balance that have become available in accordance with this Agreement less amounts owed to Amazon and any taxes that Amazon automatically calculates, collects and remits to a tax authority according to applicable law, as specified in the Tax Policies, subject to chargeback or reversal or withheld for anticipated claims

in accordance with this Agreement. Without limiting Amazon's rights to collect any amounts you owe, the applicable Amazon Payments Agent's receipt of Sales Proceeds or crediting of Sales Proceeds to your available balance discharges your obligation to pay applicable fees and other amounts under this Agreement to the extent the Sales Proceeds received or credited equal or exceed the fees and other amounts you owe and the Sales Proceeds are applied to the payment of those fees and amounts.

### P-3 Your Funds

Your Sales Proceeds will be held in an account with the applicable Amazon Payments Agent (a **"Seller Account"**) and will represent an unsecured claim against that Amazon Payments Agent. Your Sales Proceeds are not insured by the Federal Deposit Insurance Corporation, nor do you have any right or entitlement to collect Sales Proceeds directly from any customer. Prior to disbursing funds to you, an Amazon Payments Agent may combine Sales Proceeds held with the funds of other users of the Services, invest them, or use them for other purposes permitted by applicable Laws. You will not receive interest or any other earnings on any Sale Proceeds. To the extent required by applicable Laws, an Amazon Payments Agent will not use any funds held on your behalf for its corporate purposes, will not voluntarily make such funds available to its creditors in the event of bankruptcy or for any other purpose, and will not knowingly permit its creditors to attach such funds.

### P-4 Verification

We may at any time require you to provide any financial, business or personal information we request to verify your identity. You authorize us to obtain from time to time consumer credit reports to establish or update your Seller Account or in the event of a dispute relating to this Agreement or the activity under your Seller Account. You agree to update all Seller Account information promptly upon any change. The Amazon Payments Privacy Notice applies to transactions processed by Amazon Payments, Inc.

### P-5 Dormant Accounts

If there is no activity (as determined by us) in connection with your Seller Account for the period of time set forth in applicable unclaimed property laws and we hold Sales Proceeds on your behalf, we will notify you by means designated by us and provide you the option of keeping your Seller Account open and maintaining the Sales Proceeds in your Seller Account. If you do not respond to our notice(s) within the time period we specify, we will send the Sales Proceeds in your Seller Account to your state of residency, as

determined by us based on the information in your Seller Account. If we are unable to determine your state of residency or your Seller Account is associated with a foreign country, your funds may be sent to the State of Delaware.

## Selling Partner API Terms

### API-1 Description of the Selling Partner APIs

The "Selling Partner APIs" enable your systems to interface with certain features or functionality we make available to you. These Selling Partner API Terms concern and apply only to your use of the Selling Partner APIs unless specifically provided otherwise. Under the Selling Partner API Terms, you may authorize parties who (a) develop Applications to support you using the Selling Partner APIs or the API Materials, (b) have registered with us as Developers, and (c) who have agreed to the Marketplace Developer Agreement ("Developers") to access Confidential Information and Your Materials via the Selling Partner APIs provided, in each case, that where Confidential Information is disclosed to Developers, you shall remain liable for the acts or omissions of such Developers as if such acts or omissions were your own. If you wish to use the Selling Partner APIs directly or develop software or a website that interfaces with the Selling Partner APIs or the API Materials (an "Application"), you must register as a Developer.

We may make available Selling Partner APIs (including the Marketplace Web Services APIs) and software, data, text, audio, video, images, or other content we make available in connection with the Selling Partner APIs, including related documentation, software libraries, and other supporting materials, regardless of format (collectively the "API Materials") that permit your systems to interface with certain features or functionality available to you. You may authorize Developers to access Confidential Information and Your Materials via the Selling Partner APIs solely for the purpose of supporting your business on Amazon and provided, in each case, that where Confidential Information is disclosed to Developers, you shall remain liable for the acts or omissions of such Developers as if such act or omissions were your own. All terms and conditions applicable to the Selling Partner APIs and the API Materials in this Agreement are solely between you and us. API Materials that are public or open source software ("Public Software") may be provided to you under a separate license, in which case, notwithstanding any other provision of this Agreement, that license will govern your use of those API Materials. For the avoidance of doubt, except to the extent expressly prohibited by the license governing any API Materials that are Public Software, all of the non-license provisions of this Agreement will apply.

## API-2 License and Related Requirements

### API-2.1 Generally.

We grant you a limited, revocable, non-exclusive, non-sublicenseable, nontransferable license during the term of the Agreement to allow Developers to access and use Confidential Information and Your Materials through the Selling Partner APIs and the API Materials solely in support of your use of the Services covered by this Agreement. As between you and us, we or our licensors own all right, title, and interest in and to the Confidential Information, the Selling Partner APIs, the API Materials, any technical and operational specifications, security protocols and other documentation or policies provided or made available by us with respect to the Selling Partner APIs or the API Materials (the "Selling Partner API Specifications"), and our internal data center facilities, servers, networking equipment, and host software systems that are within our or their reasonable control and are used to provide the Selling Partner APIs or the API Materials (the "Amazon Network").

### API-2.2 License Restrictions.

You may authorize Developers to access Confidential Information and Your Materials through the Selling Partner APIs and the API Materials only through APIs documented and communicated by us in accordance with any applicable Selling Partner API Specifications. You may not authorize any other party to do any of the following with the Confidential Information, the Selling Partner APIs and the API Materials: (a) reverse engineer, decompile, or disassemble them; (b) modify or create derivative works based upon them in whole or in part; (c) distribute copies of them; (d) remove any proprietary notices or labels on them; (e) use any Public Software in any manner that requires, pursuant to the license applicable to such Public Software, that the Confidential Information, the Selling Partner APIs and the API Materials be disclosed, licensed, distributed, or otherwise made available to anyone; (f) resell, lease, rent, transfer, sublicense, or otherwise transfer rights to them; (g) access or use them in a way intended to avoid incurring any applicable fees or exceeding usage limits or quotas; (h) access or use them for any purpose unrelated to your use of Services; or (i) access or use them for fraudulent or illegal activities or activities that violate our policies or are otherwise harmful to us or any third parties. The limitations regarding Data Use in Section 11 above apply to any information you disclose or receive by the direct or indirect use of the Selling Partner APIs.

### API-2.3 No License for Direct Access.

For the avoidance of doubt, these Selling Partner API Terms do not provide you a license to directly access or use the Selling Partner APIs, or install, copy, use, or distribute API Materials. Direct use of the Selling Partner APIs may only be licensed to Developers.

**API-2.4 Account Identifiers and Credentials.**

You must use the account IDs and any unique public key/private key pair issued by us to provide access to your data via the Selling Partner APIs ("Account Identifiers and Credentials") in accordance with these Selling Partner API Terms to authorize Developers to access the Selling Partner APIs on your behalf. You may only authorize access to Confidential Information and Your Materials via the Selling Partner APIs in the way that we prescribe. Your Account Identifiers and Credentials are for your personal use only and you must maintain their secrecy and security. You are solely responsible for all activities that occur using your Account Identifiers and Credentials, regardless of whether the activities are undertaken by you or a third party (including your employees, contractors, or agents). You will provide us with notice immediately if you believe an unauthorized third party may be using your Account Identifiers and Credentials or if your Account Identifiers and Credentials are lost or stolen. We are not responsible for unauthorized use of your Account Identifiers and Credentials.

**API-2.5 Security of Your Materials and Confidential Information.**

You are solely responsible for authorizing others to access the Selling Partner APIs on your behalf and taking your own steps to maintain appropriate security, protection, and backup of the Confidential Information and Your Materials processed pursuant to your access to the Selling Partner APIs and the API Materials, including any Confidential Information you have disclosed to Developers in accordance with this Agreement. We are not responsible for any unauthorized access to, alteration of, or deletion, destruction, damage, loss, or failure to store any of the Confidential Information or Your Materials in connection with the Selling Partner APIs (including as a result of your or any third party's errors, acts, or omissions). If you believe (acting reasonably) that a personal data breach has occurred in relation to any customer personal data in your possession or otherwise under your control (including in the possession of a Developer), you shall immediately notify Amazon of such personal data breach (in sufficient detail) for information purposes, and promptly take any actions (or require a Developer take such actions, if relevant) as applicable to you under data privacy Laws.

**API-3 Termination**

### API-3.1 Termination of Your Access to the Selling Partner APIs and the API Materials.

Without limiting the parties' rights and obligations under this Agreement, the Amazon Marketplace Developer Agreement, or the Amazon Marketplace API License Agreement, we may limit, suspend, or terminate your access to the Selling Partner APIs and the API Materials for convenience with 30 days' notice. We may terminate immediately if (a) we determine that you have materially breached this Agreement and failed to cure within 7 days of a cure notice; (b) you or your account have been engaged in deceptive, fraudulent, or illegal activity; or (c) your use of the Selling Partner APIs and the API Materials may harm our customers.

Upon any suspension or termination of your access to the Selling Partner APIs and the API Materials, you will immediately cease authorizing others to use the Selling Partner APIs and the API Materials. Upon any termination of your access to the Selling Partner APIs and the API Materials, you will also immediately destroy all API Materials. Upon any suspension or termination of your access to the Selling Partner APIs and the API Materials, we may cause your Account Identifiers and Credentials to cease to be recognized by the Amazon Network for the purposes of the Selling Partner APIs and the API Materials.

### API-4 Modifications to the Selling Partner APIs and the API Materials

We may change or discontinue the Selling Partner APIs or the API Materials (including by changing or removing features or functionality of the Selling Partner APIs or the API Materials) from time to time. For any material changes that will negatively affect your business, we will provide notice under Section 18.

### API-5 Disclaimers

THE SELLING PARTNER APIS AND THE API MATERIALS ARE PROVIDED "AS IS". WE AND OUR AFFILIATE COMPANIES AND LICENSORS MAKE NO REPRESENTATIONS OR WARRANTIES OF ANY KIND, WHETHER EXPRESS, IMPLIED, STATUTORY OR OTHERWISE REGARDING THE SELLING PARTNER APIS OR THE API MATERIALS, INCLUDING ANY WARRANTY THAT THE SELLING PARTNER APIS OR THE API MATERIALS WILL BE UNINTERRUPTED, ERROR FREE, OR FREE OF HARMFUL COMPONENTS, OR THAT ANY MATERIALS OR DATA YOU ACCESS, USE, STORE, RETRIEVE, OR TRANSMIT IN CONNECTION WITH THE SELLING PARTNER APIS, INCLUDING YOUR MATERIALS, WILL BE SECURE OR NOT OTHERWISE LOST OR DAMAGED. EXCEPT TO THE EXTENT PROHIBITED BY LAW, WE AND OUR AFFILIATE

COMPANIES AND LICENSORS DISCLAIM ALL WARRANTIES, INCLUDING ANY IMPLIED WARRANTIES OF MERCHANTABILITY, SATISFACTORY QUALITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT, OR QUIET ENJOYMENT, AND ANY WARRANTIES ARISING OUT OF ANY COURSE OF DEALING OR USAGE OF TRADE. FURTHER, NEITHER WE NOR ANY OF OUR AFFILIATE COMPANIES OR LICENSORS WILL BE RESPONSIBLE FOR ANY COMPENSATION, REIMBURSEMENT, OR DAMAGES ARISING IN CONNECTION WITH: (A) THE INABILITY TO USE THE SELLING PARTNER APIS OR THE API MATERIALS FOR ANY REASON; (B) THE COST OF PROCUREMENT OF SUBSTITUTE GOODS OR SERVICES; OR (C) ANY INVESTMENTS, EXPENDITURES, OR COMMITMENTS BY YOU IN CONNECTION WITH THIS AGREEMENT OR YOUR USE OF OR ACCESS TO THE SELLING PARTNER APIS OR THE API MATERIALS.

**Related articles**

- Amazon Services Business Solutions Agreement
- Changes to the Amazon Services Business Solutions Agreement
- Program Policies
- Changes to program policies
- Intellectual Property for Rights Owners
- International selling agreements
- Additional Guidelines
- About the 2019 Novel Coronavirus (COVID-19)

Case 2:25-cv-00943-RSM Document 1 Filed 05/19/25 Page 175 of 182

**Need more help?**

See more on Seller Central

Visit Seller Forums

**Reach Hundreds of Millions of Customers**

Start Selling On Amazon

© 1999-2021, Amazon.com, Inc. or its affiliates

# EXHIBIT 4

AMERICAN ARBITRATION ASSOCIATION® | INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION®

**American Arbitration Association**

**Preliminary Hearing and Scheduling Order#1**

Case Number: 01-24-0003-2039

DotCom LLC,

Claimant,

-vs-

Amazon.com Services, LLC and Amazon.com, Inc.

Respondents.

Pursuant to the Commercial Arbitration Rules (the "Rules") of the American Arbitration Association (the "AAA") effective September 1, 2022, a preliminary hearing (R. 22) was held on June 17, 2024, before Arbitrator Jennifer Lupo via the Zoom videoconferencing platform. There is no recorded transcript of the videoconference.

**Preliminary Hearing Attendees**:

For Claimant: Mr. Kenneth Eade, Esq. and Mr. Michael Brandt, Esq.

For Respondents: Mr. Ian Harris, Esq.

For the AAA: Ms. Eve Turner

**By agreement of the Parties and Order of the Arbitrator, the following is now in effect**:

1. **Arbitrability and Applicable Law**: By agreement of the Parties, such agreement found in the *Amazon Services Business Solutions Agreement for the United States* (the "Agreement"), The Parties have elected AAA to administer all disputes between them. The Agreement sets the law of Washington State as the applicable substantive law as well as the Federal Arbitration Act as the Parties performance effects interstate commerce. See generally R-1.
2. **Amendments to Statement of Claim:** Pursuant to R-6, Claimant shall file any amendment(s) to their Claim(s) within seven (7) calendar days following service of the Order. Response(s), if any, are due seven (7) calendar days thereafter. An amended answer, if any,
3. **Counterclaims:** Within seven (7) calendar days following service of this Scheduling Order No. 1 (the

"Order"), Respondents shall file and serve any counterclaim(s). Response(s), if any, are due seven (7) calendar days thereafter. See generally R-6(b).

**4. Motions:**

a. **Non-Dispositive:** If a Party seeks to file a motion, for example, a motion to compel or a motion for the issuance of a third-party subpoena, such party, copying the opposing Party and the AAA case manager, is to notify the arbitrator by email to schedule a pre-motion conference to seek leave to file a such motion. In no event should a Party move without seeking prior leave.

b. **Dispositive:** Neither Party has indicated that dispositive motion practice is warranted. Without limiting the foregoing, should it become apparent to one or more Party(ies) that a dispositive motion would resolve all claim(s) presented, such party, copying opposing party and the AAA case manager, is to notify the arbitrator by email to schedule a pre-motion conference to seek leave to file a such motion. In no event should a Party move without seeking prior leave.

c. **Conclusion of Motion Practice**: All motion practice, whether dispositive or otherwise, is to be concluded on or before the close of business in Washington State on August 22, 2024. Any response or opposition to a motion shall be due four (4) calendar days after service and filing or August 26, 2024, in the case of a discovery motion, and Seven (7) calendar days following service and filing of a dispositive motion or September 3, 2024. All responses are to be served and filed by close of business in Washington State on the date set out in the preceding sentence.

**5.** **Hearing:** This Arbitration will be determined via the submission of documents. The Arbitrator reserves the right to order live testimony if she determines that it would be beneficial to make a fair and equitable determination of the claim(s) and/or defense(s) before her.

a. **Simultaneous Merits Submissions; Moving**: The Parties shall serve and file their written submissions, which should include position statement(s) (the "Moving Brief"), affidavit testimony and exhibits, by close of business in Washington State on October 15, 2024. Neither Moving Brief is to exceed thirty (30) pages, excluding exhibits, per Party. Each Party is to submit with its Moving Brief a Table of Cases, each case sited in their Moving Brief (including proof the case remains good law), and an Exhibit List. The Parties are to make every effort to refrain from the submission of

information (documents) which are not cited within your Brief or referenced in affidavit testimony.

b. **Simultaneous Submissions; Opposition**. The Parties may serve and file responsive written submissions ("Opposition Brief"), by close of business in Washington State on October 29, 2024 (together with the Moving Brief, the "Merits Submissions"). Neither Opposition Brief is to exceed twenty (20) pages, excluding exhibits, per Party. Each Party is to submit with its Opposition Brief, a Table of Cases, each case sited in their Opposition Brief (including proof the case remains good law), and an Exhibit List. The Parties are to make every effort to refrain from the submission of information (documents) which are not cited within your Opposition Brief or referenced in rebuttal testimony made by affidavit.

c. **These are firm settings and will not be changed or continued absent exceptional circumstances, upon a showing of good cause.**

**6.** **Exhibits:** The parties shall submit all exhibits to be offered and all schedules, summaries, diagrams, and charts to be used in their final merit's submissions no later than October 15, 2024.

a. The AAA does not require a copy of the exhibits for its file.

b. Each proposed exhibit shall be pre-marked for identification using the following designations:

| **Party** | **Exhibit #** | **To Exhibit #** |
|---|---|---|
| Claimant | C-1 | C___ |
| Respondent | R-1 | R___ |

c. The Parties shall attempt to agree upon and submit a jointly prepared consolidated and comprehensive set of joint exhibits. Joint Exhibits shall be numbered sequentially with the prefix J (J-1, J-2, J-3, etc.).

**7.** **Pre-Hearing Exchange of Information (R-23)**:

a. Each Party may propound no more than ten (10) requests for production of documents or other information on or before July 22, 2024 (the "Information Request").

c. The Party receiving an Information Request, requests shall respond with the delivery of such information as requested within the Party's possession within thirty (30) days following delivery of the Information

Request and in no event later than August 22, 2024.

d. Any Party wishing to propound additional Information Requests shall request leave from the Arbitrator in a writing not to exceed two (2) pages in which said Party shall outline why such additional information is necessary to its claim or defense.

e. **Depositions:** By Agreement of the Parties, each side may take one (1) remote deposition of the other Party's designated representative on or before September 25, 2024. Said depositions will be comparable to a Federal Rule 30(b)6 deposition, with the requesting party designating a desired topic for testimony and the producing party designating a representative with the requisite knowledge on the topic requested. Each deposition shall be limited to three (3) hours and shall take place by Zoom unless the parties agree otherwise. The party requesting a deposition shall bear the costs of a stenographer and transcription and provide a transcript to the other party and arbitrator, if such testimony is relied upon in a Moving Brief, affidavit, or Opposition Brief.

f. The Parties shall make their respective representative(s) available for deposition on or before September 18, 2024.

g. The Information Exchange and discovery cutoff, including the completion of all depositions shall be no later than September 30, 2024.

h. **These are firm settings and will not be changed or continued absent exceptional circumstances, upon a showing of good cause.**

8. **Witness Disclosures**: The parties' disclosure of witnesses shall be made on or before September 28, 2024. The Parties did not indicate the need to submit expert reports or testimony by affidavit.

9. **Arbitration Hold:** The Arbitrator hereby orders each party to institute an arbitration hold akin to a litigation hold which shall apply to all information, documents, and records pertaining to, relating to, or mentioning the Parties' Agreement in any mode or medium including but not limited to, paper and electronic. If any party has an automatic document deletion/destruction program in place that system shall be overridden until such time as (i) the final award has been confirmed by a court of competent jurisdiction and no further proceedings are required to fulfill the directives of the award and/or the court order, or (2) the final award is fully complied with.

10. **Award :** the Arbitrator will issue an reasoned final (R-48) award within thirty (30) calendar days following the closing of the hearing. If the Arbitrator seeks to award attorney's fees, costs and disbursements to one or more Party(ies) (the "Fee Application") she will issue an interim award (R-49(b)) requesting that the Party(ies) make a Fee Application to the Arbitrator (the "Interim Award"). Thereafter, she will render a final award in accordance with the in accordance with the Arbitrator's interim award.

11. **Confidentiality (R-45(a)):** The Arbitrator deems this arbitration to be confidential. Without limiting the foregoing, should during Information Exchange or any time prior to the issuance of the final award, a Party find the need for confidentiality, said Party shall make an application to the Arbitrator pursuant to R-45 (b).

12. **Cybersecurity/Privacy:** Having reviewed the AAA-ICDR Best Practices Guide for Maintaining Cybersecurity and Privacy and in order to ensure that sufficient precautions with regard to cybersecurity, privacy, and data protection are in place, the following measures shall be implemented: To protect the personal privacy and other legitimate interests, the Parties and their counsel must not include, or must redact where inclusion is necessary from all pleadings, personal identifiable information such as social security numbers and financial account numbers. If account numbers are required, only the last four digits of a number may be used.

13. **Communication**: All submissions shall be made via to the AAA WebFile® with an email copy to the opposing Party, the arbitrator (jlupo@lupolaw.com) and the AAA Administrator. The Arbitrator does not accept hard copies of documents absent prior application to her and good cause shown. There shall be no *ex parte* communications with the Arbitrator in any form or format. Without limiting the foregoing, the Parties may communicate with the Arbitrator by direct email communication, copying the opposing Party and the AAA case manager.

14. **Disclosures of the Arbitrator:** Each counsel and Party has a continuing obligation to protect the integrity of the arbitration proceeding by promptly providing the Arbitrator the information necessary to allow her to comply with his ongoing duties of disclosure pursuant to the Code of Ethics for Arbitrators in Commercial Disputes and the American Arbitration Association. Counsel, for themselves and for each of their clients, acknowledge the continuing obligation to supplement the identification of potential fact and expert witnesses, consulting experts, counsel participation and representation in any capacity, and any other individual or entity

interested in the outcome of the arbitration. Any issues concerning disqualification of the Arbitrator shall be raised promptly with the AAA.

**15. File Destruction:** The Arbitrator will destroy her file related to this matter six (6) months following the issuance of the final Award, unless otherwise notified not to do so by a Party(ies).

**16. Deadline Enforcement:** All deadlines stated herein will be strictly enforced and adhered to to avoid unnecessary delays and to ensure an expedient and fair resolution of this matter. This order shall continue in effect unless and until amended by subsequent order of the Arbitrator.

**Dated:** June 20, 2024

Jennifer Lupo

Jennifer Lupo, Arbitrator